IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LEI KE, | |
| Plaintiff, | |
| v. | CIVIL ACTION |
| | NO. 11-6708 |
| DREXEL UNIVERSITY, et al., | |
| Defendants. | |

## OPINION

**Slomsky, J.**                                                                 **March 14, 2013**

## I.    INTRODUCTION

Plaintiff Lei Ke ("Plaintiff" or "Ke"), proceeding pro se, filed this lawsuit against Drexel

University ("Drexel") and the individual defendants[1] (collectively "Individual Defendants")

seeking reinstatement as a medical student at Drexel University College of Medicine ("DCM").

Individual Defendants include the President of Drexel University and doctors at DCM who hold

different positions at the medical school.  Ke claims that he was discriminated against based on

his race and national origin and that discrimination led to his dismissal from DCM.

On June 12, 2012, Defendants filed a Motion to Partially Dismiss Plaintiff's Second

Amended Complaint.  (Doc. No. 31.)  They seek a dismissal of the following counts:  Count VI,

which charges a violation of the Family Educational Rights and Privacy Act (20 U.S.C.

§ 1232g); Count VII, which charges a violation of the Pennsylvania Fair Educational

Opportunity Act (24 Pa. Cons. Stat. § 5004(a)); and Count IX, which charges intentional

---

[1] The Individual Defendants are:  John Fry ("Fry"), President of Drexel; Richard Homan
("Homan"), Dean of DCM; Dr. Samuel Parrish ("Parrish"), Dean of Student Affairs at DCM; Dr.
Amy Fuchs ("Fuchs"), Associate Dean of Student Affairs at DCM; Dr. Jennifer Hamilton
("Hamilton"), Director of Family Medicine Clerkship at DCM; Dr. Anthony Sahar ("Sahar"), a
third-party contractor affiliated with Monmouth Medical Center, where DCM had placed Ke for
his Family Medicine rotation.  (Doc. No. 29 at 2-3.)

infliction of emotional distress.  In addition, the President of Drexel University, John Fry, is named as a Defendant in four counts of the Second Amended Complaint (Counts I, II, VI, VII, and IX).  (Doc. No. 29.)  Defendant Fry has moved to be dismissed from this case.  He contends that the evidence is insufficient to establish his involvement in any violation.  Plaintiff filed a Memorandum in Opposition to the Motion to Dismiss (Doc. No. 33).  Plaintiff concedes, however, that Count VI should be dismissed.  The Motion to Dismiss is now ripe for disposition and will be granted as to Counts VI, VII, and IX.  In addition, Defendant Fry will be dismissed as a Defendant in this case.[2]

## II.    FACTUAL BACKGROUND

The following facts are set forth in the Second Amended Complaint and are being viewed in the light most favorable to Plaintiff.[3]  The facts he alleges are quite extensive, and therefore the Court will review them at length.[4]

In the fall of 2008, Ke started medical school at DCM.  Sometime after his second year it seems that he was dismissed from the school and then readmitted on a conditional status to

---

[2] Plaintiff has filed a Motion for a Preliminary Injunction.  On September 24, 2012, the Court held a hearing on the Motion for a Preliminary Injunction and, during the hearing, also heard argument from the parties on the Motion to Dismiss.

[3] However diligent Plaintiff Ke was in his studies and however sincere he is in his attempt to become a doctor is within the decision-making authority of the officials at DCM.  It is not this Court's prerogative to judge his qualifications to become a doctor, but only to ensure that his legal rights are not being violated.  "Courts are particularly ill-equipped to evaluate academic performance" and should avoid "any such judicial intrusion into academic decisionmaking."  Bd. of Curators of Univ. of Mo. v. Horowitz, 435 U.S. 78, 92 (1978).

[4] Simultaneous with the issuance of this Opinion, the Court is issuing an Opinion on Plaintiff's Second Motion for a Preliminary Injunction (Doc. No. 34) and denying the Motion.  Because the standard for evaluating the merits of a motion to dismiss are different from the standard for evaluating whether a preliminary injunction should be issued, the factual statements in the Court's Opinions differ slightly, although they essentially cover the same subject matter.

retake his second year. (Doc. No. 29-4 at 45.) When Ke was readmitted to DCM in July of 2009, one of the conditions stipulated to by Dean Homan was the following:

> The receipt of any grade lower than Satisfactory during your clinical training will be considered as grounds for dismissal from the College of Medicine.

(Doc. No. 29-4 at 45.)

Apparently, Plaintiff successfully completed his second year. The problems that led to the filing of this lawsuit by Ke occurred during his third year.

As part of Ke's third year in medical school, he was required to complete a Family Medicine rotation. A medical school rotation is an internship in which the student "obtains hands-on experience in a hospital environment while self-studying for an NBME (National Board of Medical Examiners) exam[5] that covers the content of the internship." (Doc. No. 29 at n.1.) From September 28, 2010, to November 3, 2010, Ke attempted to fulfill his required Family Medicine rotation (also known as a "clerkship") at AM Sahar, a private family medical practice owned by Defendant Dr. Anthony Sahar. (Id. ¶¶ 13, 14.) AM Sahar was affiliated with Monmouth Medical Center and also served as a learning center for DCM students. (Id. ¶ 14, n.3.) In his office, Sahar posted a notice explaining his hospital affiliation and teaching position. (Id. at n.3.)

When Ke and Dr. Sahar first met, Sahar asked where Ke came from. (Doc. No. 29 ¶ 15.) Plaintiff responded that he was from Canada. (Id.) Sahar "said that [response] was not good enough because [Plaintiff] was not a white Canadian and kept asking exactly where [Plaintiff] came from." (Id.) Plaintiff explained that he was born in China and immigrated to Canada as a child. (Id.) According to Ke, after he explained where he was born, Sahar "started to talk to Lei

---

[5] The NBME exam is also known as a "shelf exam." This exam tests a student's knowledge of the area of medicine studied during the rotation.

[Ke] with an arrogant, condescending demeanor. . . ." (Id.) A week later, Sahar left for a four week trip to Portugal. (Id. ¶ 16.) From October 6, 2010, to October 28, 2010, during Plaintiff's rotation, Sahar was not in the office. (Id. ¶ 16, 17.) During this interim period, Dr. John Dalton, another AM Sahar employee, supervised Plaintiff and his classmate, Jacqueline Calvo. (Id. at ¶ 17.)

On October 25, 2010, at the end of the fifth week of the rotation, Dr. Dalton wrote Ke's "mid-block evaluation." (Doc. No. 29-4 at 2-3.) In relevant part, Dalton evaluated Ke as a four out of five points on "Medical Knowledge," four out of five points on "Interpersonal/ Communication Skills," and five out of five points on "Professionalism." (Id.) Plaintiff claims that he got along well with the AM Sahar staff and treated patients with courtesy and professionalism. (Doc. No. 29 ¶¶ 34, 35.)

On November 2, 2010, Plaintiff again worked with Dr. Sahar. (Id. ¶¶ 20, 21.) Typically, Plaintiff would see a patient first without the doctor. (Id. ¶ 20.) During one of these sessions, a patient complained to Plaintiff about the frequency and expense of injections he was receiving. (Id. ¶ 19.) Ke asked if the patient understood how the medications worked. (Id.) When the patient responded that he did not, Ke volunteered to ask Sahar this question when Sahar came into the room. (Id.) Ke formulated the question as "he had been taught at the orientation, which was not just to ask the question but to include a pertinent fact to demonstrate knowledge in the area[.]" (Id.) He asked: "'I remember that [the medication] increases GnRH and enhances testosterone secretion. Why would a prostate cancer survivor need it? Shouldn't he be on something that suppresses testosterone?'" (Id.) Sahar loudly responded: "'What? *You* asked me this question!'" (Id. ¶ 21) (emphasis original). After administering the patient's shot, Sahar "stormed out." (Id.)

4

Plaintiff realized that he had offended Sahar by asking the question in the presence of the patient, but he believed his question was consistent with the Drexel University Code of Conduct, which covers how to ask a professor a question.  (Id. ¶ 22, n.2.)  In the presence of the next patient, Sahar asked Ke what test would be used to test for renal insufficiency.  (Id. ¶ 23.)  Still "traumatized" and "panicky" from the prior encounter, Plaintiff responded incorrectly.  (Id.)

Later that day, Plaintiff approached Sahar and apologized for unintentionally offending him and incorrectly answering his question.  (Id. ¶ 24.)  Sahar responded, "'Okay, okay okay.  I give you the benefit of the doubt.  Today is your off-day!  It's a bad day for you!'"  (Id.)

The next day was the last day of the rotation.  (Id. ¶ 25.)  Sahar was not in the office that day.  (Id.)  Dalton covered for him and gave Ke and Ms. Calvo their oral evaluations.  (Id.)  Dalton told Ke that he had "improved during the rotation and had done a good job."  (Id. ¶ 26.)  He advised Plaintiff, however, that he should "not ask many questions in the presence of a patient."  (Id.)  Finally, Dalton informed Plaintiff that Sahar would write the final evaluation. (Id.)

Sometime later, Plaintiff discussed his clerkship with classmate Cyrus Hadadi ("Hadadi").  (Id. ¶ 27.)  Hadidi told Plaintiff that Sahar usually wrote the final evaluation and showed it to the student before submitting it.  (Id.)  He told Plaintiff that it was odd that Sahar had not shown Plaintiff his final evaluation.  (Id. ¶ 28.)  Hadidi also claimed that Dalton gave him a positive final evaluation but, after "chumm[ing] up" to Sahar, Sahar "further embellished the evaluation to make it look shinier."  (Id. ¶ 27.)  Finally, Hadadi told Plaintiff that the final evaluations were typically better than the mid-block evaluations.  (Id.)  In contrast, Plaintiff alleges that Sahar maliciously provided negative feedback regarding his clinical performance.

(Id. ¶¶ 31-39.)  Plaintiff suggests that Sahar showed preferential treatment to Hadadi who, like

Sahar, is of Middle Eastern descent.  (Id. ¶ 27.)  Plaintiff did not receive a positive report.

On January 3, 2011, Dr. Jennifer Hamilton, the director of the Family Medicine clerkship

at DCM, informed Plaintiff that he had failed both the Family Medicine rotation and the Family

Medicine shelf exam.  (Id. ¶ 29.)  At that time, "Lei [Ke] was resigned to failure in the shelf

exam because he had not been able to spend enough time on the preparation" for his upcoming

Step 1 exam that he planned to take in addition to the shelf exam.[6]  (Id. ¶ 30.)  Plaintiff failed the

Step 1 exam.  Dr. Amy Fuchs, Associate Dean of Student Affairs, told Plaintiff that he had to

retake the Step 1 exam in six weeks.  (Id.)  In contrast, Plaintiff alleges that "other similarly

situated students were given five or six months to prepare for Step 1 full-time."  (Id.)

Plaintiff disputes that he had failed his Family Medicine rotation, citing Dalton's positive

mid-block evaluation and final oral evaluation.  (Id. ¶ 31.)  Plaintiff alleges that Sahar failed Ke

because Ke "had asked him a question in front of a patient."  (Id. ¶ 39.)  Additionally, Plaintiff

believed that this question was "protected under 42 U.S.C. § 1981."  (Id.)

The next day, January 4, 2011, Hamilton emailed Plaintiff that he should repeat the

Family Medicine rotation in accordance with the student manual.  (Id. ¶ 40.)  Plaintiff objected to

this solution, again criticizing Sahar's behavior and evaluation.  (Id.)  Two days later, on January

6, 2011, Hamilton responded that if Plaintiff was concerned about his grade he should appeal the

grade with her.  (Id.)  Plaintiff did so.  (Id. ¶ 41.)

Thereafter, Hamilton called Sahar and reported back to Plaintiff that Sahar found Plaintiff

did not perform well throughout the clerkship.  (Id.)  Accordingly, Sahar rated Plaintiff's work as

---

[6] The Step 1 exam is the first of the three-part United States Medical Licensing Examination.
This three-part exam is required for initial medical licensure.

less than satisfactory in "Medical Knowledge," "Professionalism," and "Interpersonal/ Communication Skills." (Id. ¶ 41.) Sahar rated Plaintiff in the final a two out of five points for both "Medical Knowledge" and "Interpersonal/Communication Skills" and a one out of five points for "Professionalism." Additionally, Sahar noted in his feedback that:

> [Ke] had issues with professionalism and interpersonal skills. In one patient encounter, he took exception to a treatment strategy in front of a patient, rather than discussing his concerns outside of the patient room. This incident of questioning treatment in the presence of patient was unacceptable. He also had poor interactions with office staff, often aloof and non-interactive.

(Doc. No. 29-4 at 14.)

According to Plaintiff, he "argued" to Hamilton that Dalton's mid-block and oral evaluation at the end of the clerkship contradicted Sahar's evaluation. (Id. ¶ 42.) Hamilton again called Sahar and reported the content of the call to Plaintiff. (Id.) Sahar told Hamilton that Ke "was good at the beginning" and therefore received a positive mid-block evaluation. (Id.) Plaintiff notes in his Second Amended Complaint that Dalton completed the mid-block evaluation later than it was supposed to be done. (Id.) By the time Dalton completed the mid-block evaluation, Ke only had a few days left in the clerkship. (Id.)

Hamilton told Ke that she would raise his clinical grades where he received below three out of five points. (Id. ¶ 43.) Despite this promise, Hamilton only amended the "Professionalism" score, raising it from one to two points out of five. (Id.) She advised Plaintiff that he could appeal her finding to Dr. Eugene Hong, Chairman of the Family Medicine Department. (Id.)

On January 22, 2011, Plaintiff appealed his grade to Hong. (Id. ¶ 44.) In the appeal, Plaintiff requested that Hong review the two written evaluations from AM Sahar, the final oral

evaluation by Dalton, and the grade for a bio-psychosocial report.[7] (Id. ¶ 44.)  On February 2,

2011, Hong upheld Ke's overall grade of "Unsatisfactory" for the Family Medicine clerkship.

(Id.)  Hong advised that if Ke wanted to appeal his decision, Ke could appeal to Dr. Barbara

Schindler, Vice Dean for Academic Affairs.  (Id.)

On February 8, 2011, Plaintiff emailed his appeal to Schindler.  (Id. ¶ 45.)  In the appeal,

Plaintiff stated his opinion that Sahar negatively reviewed him because of the question he asked

in front of the patient.  (Doc. No. 29-4 at 41.)  Plaintiff again criticized what he considered the

"two harshest comments"[8] on Sahar's final evaluation as being "related to that incident."  (Id. ¶

40.)  Furthermore, Plaintiff related that he "performed poorly on the last day he was with [Sahar]

before the end of the rotation[,] leaving [Sahar] with a bad impression."  (Id. ¶ 41.)  Ke did not

seek a "Satisfactory" grade in his appeal; rather, he sought a "Marginal Unsatisfactory"[9] grade so

that he could retake the shelf exam in Family Medicine.  (Id.)

Plaintiff acknowledges that writing the appeal to Schindler "tapped his energy and time

although he ought to have devoted them to preparing for the second attempt at Step 1. . .".  (Doc.

No. 29 ¶ 45.)  On February 10, 2011, he took the Step 1 exam for a second time.  (Id.)  On

February 11, 2011, Ke met with Schindler for a half hour.  (Id. ¶ 46.)  Because Schindler could

not find the email Plaintiff sent to her in preparation for the meeting, Ke explained orally why he

---

[7] The bio-psychosocial report was part of the Family Medicine grade.  He claims he received an "excellent" grade on the report, but does not further elaborate.  (Doc. No. 29 ¶¶ 44, 83, 115, 159.)

[8] In the letter, Plaintiff does not specifically state which of Sahar's comments were the two harshest.  (Doc. No. 29-4 at 40.)

[9] At DCM, a "Marginal Unsatisfactory" is a temporary grade.  It falls between "Satisfactory" and "Unsatisfactory."  Generally at DCM, a student who receives a grade of "Marginal Unsatisfactory" in a course may retake the rotation or related shelf exam.

did poorly.  (Id.)  Schindler, however, agreed with Hamilton's recommendation that Ke repeat the Family Medicine clerkship.  (Id.)  Although Hamilton allowed Plaintiff to repeat the Family Medicine clerkship, Ke contends that she treated him differently from other students who had failing grades.  (Id. ¶ 47.)  In his Second Amended Complaint, Plaintiff notes that one student, Shannon Toccio, and other unnamed students also failed the clinical portion of their clerkships. (Id.)  Plaintiff alleges that DCM remedied their situation by increasing their grades to passing. (Id.)

Later on the same day, Dr. Fuchs informed Plaintiff that he would no longer do his scheduled year-long rotation courses at Monmouth Medical Center or an affiliated site.  (Id. ¶ 57.)  Instead, he would do his second required rotation at Hahnemann Hospital in Philadelphia. (Id.)  This rotation was in Obstetrics and Gynecology ("OB/GYN").  (Id.)

Plaintiff alleges that his reassignment to Hahnemann Hospital was part of a plan by administrators of Defendant DCM to ensure his failure.  (See generally Doc. No. 29.)  The location of Hahnemann Hospital in Philadelphia required Plaintiff to commute a total of two hours daily.  (Id. ¶ 59, 60.)  The commute reduced his study time.  (Id. ¶ 60.)  As acknowledged in the Second Amended Complaint, students deemed by DCM to need more supervision in their clerkships are assigned to rotations in Philadelphia.  (Id. ¶ 53.)

On February 14, 2011, Plaintiff received a letter signed by Fuchs.  (Doc. No. 29-4 at 45.) The letter acknowledges that Plaintiff was previously readmitted to DCM in July 2009 so he could repeat his second year.  (Id.)  DCM conditioned Ke's prior readmission on receiving grades rated at least a "Satisfactory;" grades lower than "Satisfactory" would be "grounds for dismissal" from DCM.  (Id.)  Despite the "Unsatisfactory" grade Ke received in his Family Medicine rotation, the Clinical Promotions Committee determined that Ke's situation "warranted

9

leniency." (Id.) As such, the Committee permitted Plaintiff to remain enrolled at DCM after receiving an "Unsatisfactory" grade in the Family Medicine clerkship. (Id.) However, the Committee placed conditions on his continued enrollment:

1.  You are allowed to remain enrolled in the College of Medicine.
2.  You will do the remainder of your Clerkships in the Philadelphia area.
3.  You are required to repeat the 6-week Family Medicine Clerkship.
4.  The receipt of any additional grade of less than Satisfactory (including Unsatisfactory or Marginal Unsatisfactory) will be considered grounds for dismissal from the College of Medicine.

(Id.)

Despite being advised by Drs. Fuchs and Samuel Parrish, the Dean of Student Affairs at DCM, not to take the shelf exam in OB/GYN at the same time he was retaking the Step 1 exam and completing a rotation, Ke took both exams and failed them. (Doc. No. 29 ¶ 58-61; Doc. No. 29-4 at 77.)

Plaintiff received a rating of "Marginal Unsatisfactory" on his OB/GYN shelf exam. He was then dismissed from DCM in accordance with the warning in the February 14th letter. (Doc. No. 29 ¶ 61.) Fuchs informed Ke that he could appeal the decision, which he did. (Id.) Both Fuchs and Parrish assisted Plaintiff with the appeals process and his presentation. (Id. ¶ 62-66.) Plaintiff alleges this assistance constituted a conflict of interest, since Fuchs had been part of the committee that dismissed him from the medical school. (Id. ¶ 66.)

Plaintiff alleges that DCM showed preferential treatment to similarly situated white students. (Doc. No. 29 ¶ 86.) He claims that unnamed white students failed the Family Medicine clerkship, but DCM did not require them to repeat the rotation. (Id.) Furthermore, Ke alleges disparate treatment based on the fact that "many Caucasian students received multiple ["Marginal Unsatisfactory" grades] and were still allowed to do remediation work without being

10

dismissed." (Id. ¶ 119(A)(11).)  In contrast, when Ke received a grade of "Marginal Unsatisfactory" in OB/GYN, he was dismissed from DCM.  (Id. ¶ 54.)

At an April 26, 2011, meeting with Parrish and Fuchs, Plaintiff took notes.  (Doc. No. 29-4 at 77.)  Before Fuchs arrived, Ke and Parrish discussed why Ke believed he should be readmitted.  (Id.)  Plaintiff explained that his third-year rotations were supposed to take place at Monmouth Medical Center in New Jersey and that he preferred that location because Monmouth Medical Center offered room and board near the hospital.  (Id.)  This placement would shorten his commute and give him time to devote to his studies.  (Id.)

Parrish told Plaintiff that Dr. Sahar had called Parrish before the Clinical Promotions Committee meeting.  (Doc. No. 29 ¶ 49.)  Dr. Sahar stated that he was upset with Ke, that he should not be a doctor, does not belong in medicine, was inappropriate with patients, and inappropriate in his presence.  (Id.)  Parrish agreed with Sahar and related a story to Plaintiff in which Parrish believed Ke had asked him an inappropriate question at a meeting he had with students.  (Id. ¶ 50.)  Ke asked Parrish about the size of DCM's endowment in front of a group of students, upsetting Parrish.  (Id. ¶ 51.)

During the meeting, both Fuchs and Parrish noted that Plaintiff's appeal letter blamed them for his failures.  (Id. ¶ 68.)  Parrish submitted a performance evaluation of Ke to Dr. Richard Homan, Dean of DCM, but did not share it with Plaintiff.  (Id. ¶ 69.)  Homan denied Plaintiff's appeal for reinstatement, citing his grades of "Unsatisfactory" in Family Medicine and "Marginal Unsatisfactory" in OB/GYN as the reason for dismissing Ke.  (Id.)  Ke still planned to take the Step 1 exam in July, regardless of his student status.  (Id. ¶ 70.)  However, the National Board of Medical Examiners ("NBME") requires student status in order to take the Step 1 exam.

(Doc. No. 29-5 at 23.)  After DCM notified the NBME that Plaintiff was no longer a medical

student, the NMBE cancelled his test.  (Doc. No. 29 ¶ 70; Doc. No. 29-5 at 23.)

On May 9, 2011, Ke appealed to the DCM Promotions Committee and wrote the

following:

> This committee is made of successful professionals who are extremely smart and
> knowledgeable.  You probably wonder why I keep failing. The truth is that I have
> worked very hard from the day I entered this medical college four years ago, but
> obviously I am not as smart as many other students. When I repeated my second
> year, I lost confidence in my abilities and felt isolated and separated from my
> original class that continued to move forward. I was devastated and humiliated
> and became an outcast. I had never felt so bad in all my life.

(Doc. No. 29, Ex. 15.)

On May 12, 2011, Ke and Parrish had another meeting, and Parrish again brought up the

time Ke asked him about DCM's endowment in front of a group of students.  (Doc. No. 29 ¶ 52.)

At a subsequent meeting on May 26, 2011, Parrish stated, "I go back to your first year of medical

school when you were the weirdest guy I've ever met.  You were weird, strange, truly odd, you

scared people.  The only thing that's changed is that you have gotten quieter."  (Doc. No. 29-2 at

43.)  Parrish also told Ke that "the fact of the matter is you have a persistent pattern of academic

failure."  (Id. at 44.)

On June 22 and June 30, 2011, Plaintiff's parents petitioned Defendant John Fry,

president of Drexel, for his assistance in having their son readmitted to DCM.  (Doc. No. 29 ¶

73.)  Fry did not respond.  (Id.)  On July 4, 2011, Plaintiff requested a formal hearing with Fry

and Homan.  (Id.)  Because Fry was abroad, the Vice President of Drexel, Dr. David Ruth,

responded to Plaintiff's request.  (Id. ¶ 73-74.)  Dr. Ruth explained that Homan would consult

with the Registrar to determine whether to grant Plaintiff's request to have his "Marginal

Unsatisfactory" grade amended under Drexel's Family Educational Rights Privacy Act

("FERPA") Policy.  (Id. ¶ 74.)  On July 19, 2011, Homan emailed Plaintiff informing him that

the grade would not be amended and that Ke had a right to a formal hearing.  (Id. ¶ 75.)  The

Registrar arranged for and then cancelled the meeting, because challenging a grade and clinical

evaluation was not within the purview of the Drexel FERPA Policy:

> I have considered all of the information you have provided to me and have
> determined that this is not a matter for which a hearing is available under the
> Drexel University FERPA Policy. This is because you are attempting to use the
> FERPA amendment process to challenge a grade and a clinical evaluation.

(Doc. No. 29-3 at 31.)

On August 25, 2011, Plaintiff filed a complaint with the Pennsylvania Human Relations

Commission to be reinstated at DCM.  (Doc. No. 29 ¶ 76.)  On September 19, 2011, Plaintiff

filed another complaint, this time with the Department of Education, Office of Civil Rights,

again seeking reinstatement at DCM.  (Id.)  On November 18, 2011, Plaintiff filed his original

Complaint in this Court, because, according to Plaintiff, he "realized that the agencies could not

timely help him or could never help him."  (Id.)

## III.    STANDARD OF REVIEW

To survive a motion to dismiss, a plaintiff's complaint must state a plausible claim.

Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544,

556 (2007)).  Ashcroft v. Iqbal, the leading case on the matter, explained that this plausibility

standard requires "more than a sheer possibility that a defendant has acted unlawfully."  Id. at

678.  This means that a simple recitation of the elements of a claim, accompanied by conclusory

statements of law, will not suffice.  Id. (citing Twombly, 550 U.S. at 555.)

Applying this principle, in Malleus v. George, the Third Circuit explained that the inquiry

requires that a district court:  "(1) identify[] the elements of the claim, (2) review[] the complaint

to strike conclusory allegations, and then (3) look[] at the well-pleaded components of the complaint and evaluat[e] whether all of the elements identified in part one of the inquiry are sufficiently alleged." 641 F.3d 560, 563 (3d Cir. 2011). Elements are sufficiently alleged when the facts in the complaint "show" that the plaintiff is entitled to relief. Iqbal, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). Deciding whether a claim is plausible will be a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.

## IV.    ANALYSIS

### A.  Count VI Will be Dismissed By Agreement of the Parties

Plaintiff concedes that Count VI, in which he alleges a violation of FERPA, is not a cause of action he may pursue. (Doc. No. 33 at 19.) The Third Circuit has held that FERPA does not create a private cause of action and that 42 U.S.C. § 1983 does not provide a conduit for the filing of a private FERPA claim. Woodruff v. Hamilton Twp. Pub. Sch., 305 F. App'x. 833, 837 (3d Cir. 2009). Because both Defendants and Plaintiff agree that Count VI should be dismissed, the Court will dismiss Count VI.

### B.  Count VII: The Pennsylvania Fair Educational Opportunities Act ("PFEOA")

This Court will dismiss the PFEOA claim against Defendant Drexel and Individual Defendants for two reasons. First, viewing the factual allegations in the Second Amended Complaint in the light most favorable to Plaintiff, he fails to plausibly demonstrate that unlawful discriminatory action took place. Second, he failed to comply with the one year time period in which the Pennsylvania Human Relations Commission ("PHRC") has exclusive jurisdiction over this matter before filing suit in this Court, and therefore failed to exhaust his administrative remedies.

**1. Plaintiff's allegations do not plausibly demonstrate racial or national origin discrimination[10]**

In Count VII, Plaintiff alleges a violation of the PFEOA. Section 5004(a) of the PFEOA provides that ". . . it shall be an unfair educational practice for an educational institution . . . [t]o expel, suspend, punish, deny facilities or otherwise discriminate against any student because of race. . . [or] national origin . . . ." 24 Pa. Cons. Stat. § 5004(a)(3). When a plaintiff alleges a discrimination-based claim under the PFEOA, he must first establish a prima facie case of discrimination in regard to the adverse action he experienced. Manning v. Temple Univ., 157 F. App'x 509, 513 (3d Cir. 2005) (requiring inference of discrimination as to plaintiff's dismissal from Temple University School of Medicine before reaching specific elements of education discrimination claim under PFEOA). Facts raising an inference of discrimination must be alleged. Manning, 157 F. App'x at 513; see Storey v. Burns Int'l Sec. Servs., 390 F.3d 760, 764 (3d Cir. 2004) (requiring plaintiffs to first produce evidence that raises inference of discrimination). Here, Ke must establish, when viewing the allegations in his Second Amended Complaint in the light most favorable to him, a prima facie case that raises a plausible inference of discrimination. Manning, 157 F. App'x. at 513. To raise the required inference of discrimination, he must provide a link between his race or national origin and his dismissal from DCM. Id.

A plaintiff's minority status and adverse action do not alone raise the required inference of discrimination. In Manning, a case similar to this one, a female African-American medical student was dismissed from medical school because of her poor grades and sought reinstatement.

---

[10] In Defendants' Response to the Motion for a Preliminary Injunction, they argue that he is unlikely to succeed on the merits of the discrimination claims in the Second Amended Complaint. The arguments are relevant in part to the PFEOA claim and, therefore, are being given consideration here.

157 F. App'x at 510. Manning presented evidence that a professor had advised her to study from her old notes and to participate in a Temple University School of Medicine academic assistance program targeted to minority and underprivileged students. Id. at 511. Manning did not participate in the program, but did study from her notes. Id. As a result of studying from her notes, Manning improved her performance in that professor's course. Id. The same professor, however, gave a white female student different advice, but not enough to avoid dismissal from the medical school. Id. Nonetheless, when weighing the legal merits of the claim, the Third Circuit concluded that:

> Manning has failed to present evidence that her dismissal was due to race or that the RAR program [a study and support program targeted to — but not exclusively for — minority students and underprivileged students to which Manning was directed] was related her to dismissal in any way. The only evidence of differential treatment Manning offers is her testimony that a Caucasian student known only as "Tracy" told her that she was advised by Dr. Pearson to study from old exams, while Dr. Pearson did not give Manning the same advice. . . . Even if the testimony could be considered, Dr. Pearson's dispensation of different studying advice to two different students is not sufficient to raise an inference of discrimination.

Id. at 514. To demonstrate the link, however, a plaintiff may show that a similarly-situated individual of a different race was treated more favorably than the plaintiff. Ade v. KidsPeace Corp., 398 F. Supp. 2d. 501, 515 (E.D. Pa. 2010), aff'd, 401 F. App'x 697 (3d Cir. 2010).

In this case, Plaintiff Ke fails to provide a plausible link between his race and the adverse actions taken against him. He does not plausibly allege that his dismissal from DCM was based on discriminatory animus. At the September 24, 2012 hearing before this Court, Ke listed three allegedly discriminatory acts that form the basis of his Complaint: (1) Sahar asked where Plaintiff is from, (2) Parrish made disparaging comments about Ke, and (3) the disparate treatment he faced in comparison to other DCM students. These allegations are either directly

set forth in the Second Amended Complaint or can be inferred from the facts alleged. The Court will address each alleged act of discrimination in turn.

First, Ke alleges that Dr. Sahar engaged in discrimination when he asked Ke where he came from. It is not unlawful to ask someone where he came from, even if the initial response appears to be inadequate. Questions or comments about race or national origin unconnected to an adverse action are not evidence of racial or ethnic discrimination when the comments "do not tend to show a discriminatory reason was more likely than not a motivating cause of his discharge." <u>Ade</u>, 401 F. App'x at 704. This principle is especially true when the questions are not asked at or near the time of the adverse action. <u>Id.</u>; <u>Kim-Foraker v. Allstate Ins. Co.</u>, 834 F. Supp. 2d 267, 274 (E.D. Pa. 2011); <u>Toth v. Cal. Univ. of Pa.</u>, 844 F. Supp. 2d 611 (W.D. Pa. 2012).

A case involving far ruder comments than Dr. Sahar's questions illustrates this principle. In <u>Kim-Foraker v. Allstate Insurance Co.</u>, an Asian woman claimed that three remarks made by her supervisor centered on her Korean heritage and led to the adverse action taken against her. <u>Kim-Foraker</u>, 834 F. Supp. 2d at 274. The plaintiff described these alleged remarks in a deposition:

- After the February 15, 2006 CPU meeting: "[W]e had a meeting, this was in front of everybody, all the lawyers as well as the staff, where [the supervisor] looked at me straight in the face and said that she was taking kung fu, and that was very derogatory, sir."

- At some date between February 15 and March 1, 2006: "[The supervisor] told Mr. Steiger that I was on the take, that I dress too well and that Koreans always use cash and for the place I'm working for I was just looking too good."

- At some date between February 15 and March 1, 2006: "[S]he basically told me that you Koreans, you work hard, you're a model minority, so therefore I expect you to produce more than the other

> lawyers in this office, but if you rat on the white guys and also the old dudes, she didn't say dudes, the old lawyers, you know who I am talking about, she said . . . then I'll help you out and you won't get as much."

Id. at 274 (internal citations omitted).

The supervisor did not make any of these comments near the time when that plaintiff was terminated. Id. Instead, human resources records of the employer proved that the plaintiff had been warned several times that her behavior was unprofessional and "continued unprofessional behavior would lead to her termination." Id. at 273. The court held in Kim-Foraker that the alleged remarks by the supervisor did not demonstrate that the plaintiff's race or national origin was a motivating factor in the plaintiff's termination, because none of the remarks were made when the plaintiff was fired. Id. at 276.

Here, Dr. Sahar asked Plaintiff where he was from the first time they met. This meeting occurred in or about September 2010. Asking someone where he is from, standing alone, is not rude or improper comment. The way Plaintiff describes Sahar's questions does not raise an inference that Sahar was being rude or projecting any stereotype onto Plaintiff. Moreover, Plaintiff has not plausibly shown that questions about where he is from was a factor in his termination from medical school in or about April 2011, which was seven months after the question was asked by Sahar. The intervening events between September 2010 and April 2011, when Ke failed the required shelf exam and Step 1 test and received a grade of "Marginal Unsatisfactory" in the OB/GYN clerkship, removed any connection between the allegedly racial questions and his dismissal from the medical school. In addition, similar to Kim-Foraker, Sahar made no comments about Ke's race or national origin at the time he gave him a poor rating for "Medical Knowledge," "Professionalism," and "Interpersonal/Communication Skills." (Doc.

18

No. 29-4 at 13-14.)  Consequently, Sahar's remarks do not demonstrate that discrimination was more likely than not the motivating factor for Ke's dismissal from medical school.

Plaintiff attempts to contrast his failing grade with the alleged passing grade of Middle Eastern classmate Cyrus Hadadi and alludes to the fact that both Hadadi and Sahar are Middle Eastern.  (Doc. No. 29 ¶ 27.)  In his Second Amended Complaint, however, Ke fails to describe how he and Cyrus Hadadi were similarly situated other than having been assigned to the same Family Medicine practice, albeit during different semesters.  (See Doc. No. 29 ¶ 27.)  This fact alone is insufficient to demonstrate a similar situation.  The law requires that a comparator's acts be of "the same level of seriousness" as the plaintiff's own infraction.  Ade, 401 F. App'x at 705.  Thus, Hadadi and his alleged experience with Sahar is not a valid comparison for evaluating Ke's claims.  Accordingly, Ke fails to establish a prima facie case that he was treated less favorably than another student in Sahar's office.

Ke also fails to demonstrate that he received different treatment from other students based on his race or national origin when he alleges that DCM administrators did not inflate his Family Medicine grade to a passing grade.  He alleges that one student, Shannon Toccio, whose race was not disclosed,[11] and other students failed a General Surgery clerkship and DCM inflated their grades to pass those students.  (Doc. No. 29 ¶ 47.)  As was the case with Hadadi, Plaintiff fails to demonstrate that Toccio and the other students were similarly situated.  Ke does not allege that these students failed their second-year courses and repeated them while conditionally

---

[11] The Court has examined each allegation in the Second Amended Complaint about the treatment of Ke in comparison to the treatment of other students.  The facts alleged do not show that these students were similarly situated to Ke, who was conditionally readmitted after his second year and then failed courses and a rotation during his third year.  No plausible inference is raised that Ke was treated different from other students because of race or national origin.

19

readmitted to DCM and then failed third-year tests and received a "Marginal Unsatisfactory" in an OB/GYN rotation. The students were not similarly situated for purposes of comparison.

Ke also alleges that Parrish's comments that Ke is "weird, strange, and odd" were discriminatory because they were racially based or based on his place of origin. These comments do not mention Plaintiff's race or national origin. They do not raise an inference that Parrish was motivated by Plaintiff's race or national origin when he uttered them. Moreover, these comments were not made at the time Ke was dismissed from DCM for violating the conditions of his probationary status set forth in the February 14th letter from Fuchs. In fact, these comments were made on May 12, 2011, after Plaintiff had been dismissed from DCM in April 2011.

Third, DCM's decision to re-assign Ke to Hahnemann Hospital had nothing to do with Ke's race or national origin. At the time that Ke was reassigned to Hahnemann Hospital, no one made any mention of his race or national origin. In the February 14th letter that required Plaintiff do his OB/GYN rotation in Philadelphia, the letter did not mention his race or national origin. (Doc. No 29-4 at 45.) Rather, Plaintiff notes that it is DCM's policy that students who perform poorly do a rotation in the Philadelphia area so that they can be better supervised. (Doc. No. 29 ¶ 53.) Despite admitting that this policy is in place, Ke still claims he received disparate treatment as to his rotation due to his race or national origin. (Doc. No. 29 ¶ 85.) Plaintiff's academic record, however, shows that he would have benefitted from rotating at Philadelphia's Hahnemann Hospital. (Doc. No. 29-4 at 83-85.) It was his failing grades that caused DCM to assign him to a hospital where they could better supervise him, not his race or national origin.

The DCM Clinical Promotions Committee did not dismiss Ke because of his race or place of origin. Instead, the clear inference from the Second Amended Complaint is that the

DCM Clinical Promotions Committee dismissed him because he violated the conditions of his readmission to DCM. (Doc. No. 29-4 at 45.) In the February 14, 2011 letter, Fuchs, on behalf of the Clinical Promotions Committee, reminded Plaintiff of these conditions after they opted not to immediately dismiss Plaintiff for failing the Family Medicine Clerkship. (Doc. No. 29-4 at 45.) His "Marginal Unsatisfactory" grade in the OB/GYN course was the final straw in the school's attempt to work with Plaintiff in his pursuit of a medical degree.

Because Plaintiff has failed to allege a plausible discrimination claim against all Defendants in Count VII, this Count will be dismissed for this reason and the one that follows.

### 2. Plaintiff failed to exhaust administrative remedies before filing the instant action

The Pennsylvania Fair Educational Opportunities Act ("PFOEA") follows the procedure outlined in the Pennsylvania Human Relations Act ("PHRA"): "The procedure for processing any complaint and the remedies available shall be in accordance with sections 9, 9.2 and 11 of the act of October 27, 1955 (P.L. 744, No. 222), known as the 'Pennsylvania Human Relations Act.'" 24 Pa. Cons. Stat. § 5007. In relevant part, the PHRA requires complainants to:

> make, sign and file with the Commission a verified complaint, in writing, which shall state the name and address of the person, employer, labor organization or employment agency alleged to have committed the unlawful discriminatory practice complained of, and which shall set forth the particulars thereof and contain such other information as may be required by the Commission.

43 Pa. Cons. Stat. § 959.

When filing a discrimination claim with the Pennsylvania Human Relations Commission ("PHRC") alleging a violation of the PFEOA, the PHRC has exclusive jurisdiction over that claim for one year. 24 P.S. 5007.1(a); Burgh v. Borough of Montrose, 251 F.3d 465, 471 (3d Cir. 2001) (citations omitted). If the PHRC does not take action within one year after a

complainant files a claim, then the complainant may pursue his claim in court.  Burgh, 251 F.3d at 471.  The one year time period "allows the PHRC to use its specialized expertise to attempt to resolve discrimination claims without the parties resorting to court."  Mikulski v. Bucks Cnty. Comm. Coll., No. 11-557, 2011 WL 1584081, at *6 (E.D. Pa. April 27, 2011).  If a plaintiff files a court case within that one year period before the PHRC takes action, he has not exhausted his administrative remedies.  If a plaintiff fails to first exhaust his administrative PFEOA remedies, his court case is premature and subject to dismissal.  See First Jersey Secs., Inc. v. Bergen, 605 F.2d 690, 700 (3d Cir. 1979) (applying exhaustion doctrine to bias claim and holding failure to exhaust administrative remedies rendered district court without jurisdiction to hear case).

Ke filed a complaint with the PHRC on August 25, 2011.  (Doc. No. 29 ¶ 76.)  It was served on September 13, 2011.  Unhappy with the pace of the PHRC review of his complaint, he filed his first Complaint in this Court on November 18, 2011.  (Doc. No. 1.)  Because he filed a court case, the PHRC dismissed his complaint without making a decision.  (Doc. No. 29 at n.10)  Since Plaintiff filed his initial Complaint in federal court within the one-year period of exclusive jurisdiction of the PHRC, the Commission was not afforded the opportunity to fully "use its specialized expertise" during the one-year statutory period when it had exclusive jurisdiction.  Mikulski, 2011 WL 1584081, at *6.  Thus, Plaintiff failed to exhaust the administrative remedies offered by the PHRC.  Accordingly, Plaintiff is barred from bringing the claim he pursues in Count VII.  For this additional reason, Count VII will be dismissed.[12]

---

[12] Defendants also seek dismissal of Count VII because they allege that Ke did not name all Defendants in the complaint filed with the PHRA.  "If a party is not a named respondent in the charge, the plaintiff is prevented from later filing a lawsuit against that party alleging violations of the PHRA."  Ilori v. Carnegie Mellon Univ., 742 F. Supp. 2d 734, 748 (W.D. Pa. 2010); Urey v. E. Hempfield Twp., No. 08-5346, 2009 WL 561664, at *3 (E.D. Pa. Mar. 4, 2009).  This "named respondent rule" is meant to notify the accused parties and facilitate resolution instead of

## C. Count IX: "Intentional Infliction of Pain and Suffering"

Plaintiff fails to plead a plausible claim of infliction of emotional distress in Count IX. "The elements of an intentional infliction of emotional distress claim are (1) extreme and outrageous conduct (2) that intentionally or recklessly (3) causes emotional distress (4) which must be severe." White v. Ottinger, 442 F. Supp. 2d 236, 251 (E.D. Pa. 2006). Here, Ke fails to establish the first and fourth elements.

The first element is satisfied if a plaintiff is able to allege conduct by the defendant that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." Lane v. Cole, 88 F. Supp. 2d 402, 406 (E.D. Pa. 2000) (citing Hoy v. Angelone, 720 A.2d 745, 754 (Pa. 1998)). Everyday annoyances, insults, and indignities do not rise to the requisite outrageousness. Chuy v. Phila. Eagles Football Club, 595 F.2d 1265, 1274-75 (3d Cir. 1979). Alleged racial discrimination alone does not demonstrate the requisite outrageous and extreme conduct necessary to prove intentional infliction of emotional pain and suffering. Nichols v. Acme Markets, 712 F. Supp. 488, 495 (E.D. Pa. 1988), aff'd, 902 F.2d 1561 (3d Cir. 1990); E.E.O.C. v. Chestnut Hill Hosp., 874 F. Supp. 92, 96 (E.D. Pa. 1995). For example, to allege plausible conduct that is sufficiently outrageous and extreme, a plaintiff would have to demonstrate discrimination plus extreme additional behavior. Bowersox v. P. H. Glatfelter Co., 677 F. Supp. 306 (M.D. Pa. 1988) (holding conduct was sufficiently extreme when defendant sexually

---

a trial. Urey, 2009 WL 561664, at *3. Defendants allege that the caption of the case in the PHRC is "Lei Ke v. Drexel University" and attach a Notice of Investigation from the PHRC which shows the caption. The actual complaint filed by Ke is not part of the record. For this reason, the Court is unable to determine if all Defendants in the instant case were placed on notice of Ke's allegations and request for relief. Since the Court is dismissing Count VII for other reasons, there is no need to address further the argument of Defendants' about a deficiency in naming parties in the PHRC proceeding.

harassed plaintiff, withheld important job-related information from plaintiff, forbade plaintiff from speaking to other employees and answering the telephone, and followed plaintiff around factory).

Plaintiff alleges that the process he went through to appeal his failing Family Medicine grade, the "Marginal Unsatisfactory" grade in his OB/GYN rotation, and the resulting violation of the conditions set by the Clinical Promotions Committee caused his emotional distress. (Doc. No. 29 ¶ 167.) Plaintiff describes the appeals process as draining. (Doc. No. 29-5 at 8.) The process that Ke was afforded by DCM throughout his tenure as a student was not extreme, atrocious, outrageous, or intolerable. He does not cite any court decision that, on facts comparable to his case, show that a claim of intentional infliction of emotional distress was plausibly alleged. For this reason, Count IX will be dismissed.

### D. President Fry Will Be Dismissed As A Defendant

Drexel University President John Fry will be dismissed as a Defendant in the Second Amended Complaint. The claims, not previously discussed, that remain against Fry are as follows: Intentional Discrimination in Violation of 42 U.S.C. § 1981 (Count I) and Willful Retaliation in Violation of 42 U.S.C. § 1981 (Count II). (Doc. No. 29 at ¶¶ 77, 99.) In order to state a viable claim against Fry on these counts, at the Motion to Dismiss stage, Plaintiff is required to demonstrate that Fry personally engaged in the offending conduct.

As noted, Counts I and II of the Second Amended Complaint assert discrimination and retaliation claims under 42 U.S.C. § 1981 against Fry. Section 1981 provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be

subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a). The statute defines "make and enforce contracts" to "include[e] the making, performance, modification, and termination of contracts, and the enjoyment of all the benefits, privileges, terms and conditions of the contractual relationship." Id. § 1981(b). To establish a basis for relief under § 1981, a plaintiff must show: (1) that he belongs to a racial minority; (2) an intent to discriminate on the basis of race on the part of the defendant; (3) discrimination concerning one or more of the activities enumerated in § 1981. See e.g., Estate of Oliva v. New Jersey, 604 F.3d 788, 797 (3d Cir. 2010). To establish a prima facie retaliation claim under § 1981, a plaintiff must show that: (1) he engaged in protected activity; (2) the defendant took an adverse action; and (3) there was a causal connection between his participation in the protected activity and the adverse action. Johnson v. Labor Force, Inc., No. 10-199, 2011 WL 6303192, *2 (E.D. Pa. Dec. 15, 2011).

Liability under § 1981 "is premised on intentional discrimination." Boykin v. Bloomsburg Univ., 893 F. Supp. 400, 405 (M.D. Pa. 1995). Accordingly, liability under § 1981 cannot be imposed vicariously, because liability under § 1981 is personal in nature. Id. To establish a case against an individual under § 1981, evidence of "personal involvement is essential." Id. A plaintiff must demonstrate that an individual defendant played a part in the adverse action against the plaintiff. Elmore v. Clarion Univ., 933 F. Supp. 1237, 1245 (M.D. Pa. 1996).

In his Second Amended Complaint, Plaintiff avers only the following facts with regard to Defendant Fry:

> After his gruesome appeal process inside DCM in July 2011, [Ke] still tried to resolve the matter peacefully. For that matter, his parent sent President Fry a

petition for his intervention on June 30, 2011 but received no reply. . . . On July 4, 2011, [Ke] emailed President Fry and Homan to request a formal hearing under the FERPA law.  President Fry promised to "review" the matter when he returned from travelling abroad and tasked Dr. David Ruth, a Vice President, to respond.  (Doc. No. 29 ¶ 73.)  Petitioner further alleges that Fry never looked into the matter as promised (Id. ¶ 144) and contends that Fry's "deliberate indifference aided and abetted" other administrators in their retaliation against Petitioner.  (Id. at  ¶¶ 115(3), 119(A)(10).)

Nowhere in these factual averments does Plaintiff Ke allege that Fry personally intended to discriminate against Ke on the basis of his race or national origin.  Nor does Ke put forth any facts alleging that Fry played a role in dismissing him from DCM.  Plaintiff did not contact Fry until after the Clinical Promotions Committee dismissed him from DCM.  (Id. ¶ 73.)  Since personal involvement of a defendant in the acts of discrimination is required to establish a violation of § 1981, and no such involvement has been alleged as to Fry, Count I against Fry must be dismissed.  To the extent Plaintiff asserted retaliation claims against Fry under this same section, Count II also fails for the same reason.

## V.    CONCLUSION

For the above stated reasons, Defendants' Motion to Partially Dismiss Plaintiff's Second Amended Complaint will be granted.  An appropriate Order follows.