IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LEI KE,<br><br>　　　　　　Plaintiff,<br><br>　v.<br><br>DREXEL UNIVERSITY, et al.,<br><br>　　　　　　Defendant. | CIVIL ACTION<br>NO. 11-6708 |

**OPINION**

**Slomsky, J.**　　　　　　　　　　　　　　　　　　　　　　　　　　　　**March 14, 2013**

## I.　INTRODUCTION

Before the Court is the Second Motion of Plaintiff Lei Ke ("Plaintiff" or "Ke"), who is proceeding pro se, for a Preliminary Injunction pursuant to Federal Rule of Civil Procedure 65(a). (Doc. No. 34.) On September 24, 2012, a hearing was held on all outstanding motions in this case, including the one for the preliminary injunction. At that hearing, Plaintiff was afforded the opportunity to present evidence and arguments in support of his Second Motion for a Preliminary Injunction. All briefing on this Motion has been concluded, and it is now ripe for a decision by this Court. In rendering this Opinion, the Court has considered the arguments made at the motions hearing, the Second Motion for a Preliminary Injunction (Doc. No. 34), the Second Amended Complaint (Doc. No. 29), including all attached exhibits, and the response filed by Defendants (Doc. No. 35).

On November 18, 2011, Plaintiff filed his original Complaint (Doc. No. 4) against Drexel University and other individual Defendants (hereafter "Individual Defendants"),[1] alleging

---

[1] The individual Defendants are: John Fry ("Fry"), President of Drexel University; Richard Homan ("Homan"), Dean of DCM; Samuel Parrish ("Parrish"), Dean for Student Affairs at

1

discrimination and retaliation based on race and national origin, after he was dismissed as a medical student from the Drexel University College of Medicine ("DCM"). In a Second Amended Complaint (Doc. No. 29), which is the last one filed of record, Plaintiff alleges the following nine counts against Defendants: (1) Intentional Discrimination in violation of 42 U.S.C. § 1981 against all Defendants (Count I); (2) Willful Retaliation in violation of 42 U.S.C. § 1981 against all Defendants (Count II); (3) Hostile Educational Environment in violation of 42 U.S.C. § 1981 against Defendants Sahar, Parrish, and Drexel University (Count III); (4) Intentional Discrimination in violation of Title VI of the 1964 Civil Rights Act, 42 U.S.C. §§ 2000d-2000d-7, against Defendant Drexel University (Count IV); (5) Willful Retaliation in violation of Title VI of the 1964 Civil Rights Act, 42 U.S.C. §§ 2000d-2000d-7, against Defendant Drexel University (Count V); (6) Violation of the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g and 34 C.F.R. § 99.21, against Defendant Drexel University (Count VI); (7) Discrimination and Retaliation in violation of the Pennsylvania Fair Educational Opportunities Act ("PFEOA"), 24 P.S. § 5004, against all Defendants (Count VII); (8) Conspiracy in violation of 42 U.S.C. § 1985 against Defendants Sahar, Parrish, and Hamilton (Count VIII); and (9) Intentional Infliction of Pain and Suffering against all Defendants (Count IX). (Doc. No. 29.)

---

DCM; Amy Fuchs ("Fuchs"), Associate Dean for Student Affairs at DCM; Jennifer Hamilton ("Hamilton"), Director of Family Medicine Clerkship at DCM; and Anthony Sahar ("Sahar"), a third-party contractor affiliated with Monmouth Medical Center, where DCM had placed Ke for his family medicine rotation. (Doc. No. 29 ¶ 12.)

2

In the Second Motion for a Preliminary Injunction, Plaintiff asks this Court to order Drexel University to reinstate him as a third-year medical student. (Doc. No. 34.) For reasons that follow, the Court will deny Plaintiff's Motion for a Preliminary Injunction.[2]

## II. FACTUAL BACKGROUND

Prior to the instant litigation, Plaintiff was enrolled as a medical student at DCM. (Doc. No. 29 ¶ 4.) In 2009, during his second year, Plaintiff failed courses and was dismissed from DCM. (See Doc. No. 34 at 1; Doc. No. 29, Ex. 10.) He was readmitted in July 2009 and required to repeat his second year, subject to the following condition: "The receipt of any grade lower than Satisfactory during your clinical training will be considered as grounds for dismissal from the College of Medicine." (Doc. No. 29, Ex. 10.) He apparently repeated the second year in compliance with this condition.

As part of Plaintiff's third year in medical school, he was required to complete a family medicine clinical rotation, or clerkship. (Doc. No. 29 ¶ 13.) A medical school clinical rotation is an internship in which the student "obtains hands-on experience in a hospital environment while self-studying for an NBME (National Board of Medical Examiners) exam[.]" (Id. n.1.) After completing the clinical program, Plaintiff would be graded on his clerkship performance and

---

[2] Simultaneous with the issuance of this Opinion, the Court is issuing an Opinion on Defendants' Motion to Dismiss (Doc. No. 31) and dismissing Counts VI, VII, and IX of the Second Amended Complaint. Therefore, the Court is only concerned here with Counts I-V and VIII in determining whether a preliminary injunction should be issued. In addition, Defendant Fry, President of Drexel University, is being dismissed from the case.

As noted in the Opinion on the Motion to Dismiss, because the standard for evaluating the merits of a motion to dismiss is different from the standard for evaluating whether a preliminary injunction should be issued, the factual statements in the Court's Opinions differ slightly, although they essentially cover the same subject matter.

3

would also be required to take a family medicine shelf exam.[3] Both the clerkship performance and shelf exam grade would count towards his overall grade in the Family Medicine course.

In September 2010, Plaintiff began his third-year clinical rotation at the Monmouth Medical Center in Long Branch, New Jersey. (Id. ¶ 13.) Affiliated with Monmouth was a family medical practice known as AM Sahar, a private practice owned by Anthony Sahar, M.D. ("Sahar"). (Id. ¶ 14.) In his office, Sahar posted a notice explaining his hospital affiliation and teaching position. (Id. ¶ 22 n.3; Doc. No. 29 at 6 n.3.) From September 28, 2010 through November 3, 2010, Plaintiff participated in a Family Medicine clerkship at AM Sahar. (Id. ¶ 14.)

When Ke and Dr. Sahar first met, Sahar asked where Plaintiff came from. (Id. ¶ 15.) After Plaintiff responded that he was from Canada, Sahar said that "was not good enough because he was not a white Canadian" and continued to ask "exactly where" Plaintiff was from. (Id.) Plaintiff eventually explained that he had been born in China and immigrated to Canada as a child. (Id.) According to Ke, after he explained where he was born, Sahar "started to talk to [Plaintiff] with an arrogant, condescending demeanor, setting up the tone for a master-and-slave relationship." (Id.)

One week later, Sahar left for a four week trip to Portugal. (Id. ¶ 16.) From October 6, 2010 to October 28, 2010, during Plaintiff's rotation, Sahar was not in the office. (Id.) In this interim period, Dr. John Dalton ("Dalton"), another physician at AM Sahar, supervised Plaintiff and his classmate, Jacqueline Calvo. (Id. ¶ 17.) On October 25, 2010, at the end of the fifth

---

[3] The "[National Board of Medical Examiners shelf exams] are achievement tests in a broad sense, requiring medical students to solve scientific and clinical problems. Although students' performance on the exams will reflect the learning specific to their course and clerkship experiences, their test scores will also reflect educational development resulting from their overall medical school experiences." National Board of Medical Examiners, Subject Examination Program Information Guide 2 (March 2012), available at http://www.nbme.org/pdf/SubjectExams/SubExamInfoGuide.pdf.

4

week of the rotation, Dalton wrote Plaintiff's "mid-block evaluation." (Id. ¶ 18.) In relevant part, Dalton evaluated Plaintiff as a four out of five points on "Medical Knowledge," four out of five points on "Interpersonal/Communication Skills," and five out of five points on "Professionalism." (Doc. No. 29-4 at 2.) Plaintiff claims that he got along well with the AM Sahar staff and treated patients with courtesy and professionalism. (Doc. No. 29 ¶¶ 33-34.)

On November 2, 2010, Plaintiff again worked with Dr. Sahar. (Id. ¶¶ 19-20.) Typically, Plaintiff would see a patient first without the doctor present. (Id. ¶ 19.) During one of the sessions, a patient had complained to him about the frequency and expense of injections. (Id.) Plaintiff asked if the patient understood how the medications worked. (Id.) When the patient responded that he did not, Plaintiff volunteered to ask Sahar this question when Sahar came into the room. (Id. ¶ 20.) Plaintiff formulated the question as "he had been taught at the orientation, which was not just to ask the question but to include a pertinent fact to demonstrate knowledge in the area[.]" (Id.) He then asked: "I remember that Leuprolide increases GnRH and enhances testosterone secretion. Why would a prostate cancer survivor need it? Shouldn't he be on something that suppresses testosterone?" (Id.) In response, Sahar loudly asked: "What? *You* asked me this question!" (Id. ¶ 21.) (emphasis original). After administering the patient's shot, Sahar "stormed out." (Id.)

Plaintiff realized that he had offended Dr. Sahar by asking him the question in the presence of the patient, but he believed that his question was consistent with the Drexel University Code of Conduct, which details how to ask a professor a question. (Id. ¶ 22.) In the presence of the next patient, Dr. Sahar asked him what test would be used to test for renal insufficiency. (Id. ¶ 23.) Still "traumatized" and "panicky" from the prior encounter, Plaintiff responded incorrectly. (Id.)

5

Later that day, Plaintiff approached Sahar and apologized for unintentionally offending him and incorrectly answering his question. (Id. ¶ 24.) Sahar responded: "Okay, okay okay. I give you the benefit of the doubt. Today is your off-day! It's a bad day for you!" (Id.)

The next day was the last day of the rotation, and Dr. Sahar was not in the office that day. (Id. ¶ 25.) In Sahar's absence, Dr. Dalton covered for him and gave Plaintiff his oral evaluation. (Id.) Dalton told Plaintiff that he had "improved during the rotation and had done a good job." (Id. ¶ 26.) He advised Plaintiff, however, that he should "not ask many questions in the presence of a patient." (Id.) Finally, Dalton informed Plaintiff that Sahar would write the final evaluation. (Id.)

Sometime later, Plaintiff discussed his clerkship with classmate, Cyrus Hadadi ("Hadadi"). (Id. ¶ 27.) Hadadi told Plaintiff that Sahar usually wrote the final evaluation and showed it to the student before submitting it. (Id.) He told Plaintiff that it was odd that Sahar had not shown Plaintiff his final evaluation. (Id. ¶ 28.) Hadidi also claimed that Dr. Dalton gave him a positive final evaluation but, after "chumm[ing] up" to Sahar, Sahar "further embellished the evaluation to make it look shinier." (Id. ¶ 27.) Finally, Hadadi told Plaintiff that the final evaluations were typically better than the mid-block evaluations. (Id.) On the contrary, Plaintiff did not receive a positive report. (Id. ¶ 29).

After completing his family medicine clerkship, Plaintiff took the accompanying shelf exam. On January 3, 2011, Dr. Jennifer Hamilton ("Hamilton"), Director of the Family Medicine Clerkship at DCM, informed Plaintiff that he had failed both the Family Medicine clerkship and the Family Medicine shelf exam. (Id. ¶ 29.) Based on these events, Plaintiff's

final Family Medicine grade was an "Unsatisfactory."[4] (Id., Ex. 4). Plaintiff appealed the "Unsatisfactory" grade multiple times, and on each occasion, the grade was upheld. (Doc. No. 29 ¶¶ 40-46.)

After receiving an "Unsatisfactory" grade in Family Medicine, Plaintiff was not dismissed, although the conditions of his re-admission to DCM permitted such dismissal. (See id., Ex. 10.) Instead, the DCM Clinical Promotions Committee required Plaintiff to repeat the Family Medicine clerkship and advised him that "[t]he receipt of any additional grade of less than Satisfactory (including Unsatisfactory or Marginal Unsatisfactory) will be considered grounds for dismissal from the College of Medicine." (Id.)

In February 2011, Plaintiff began an Obstetrics and Gynecology ("OB/GYN") clerkship at Hahnemann University Hospital in Philadelphia, Pennsylvania. (Doc. No. 29 ¶ 54.) While Plaintiff passed the clinical portion of his OB/GYN course, he failed the accompanying shelf exam. (Id. ¶ 61.) As a result, Plaintiff received a grade of "Marginal Unsatisfactory" for the OB/GYN course and in April 2011 was dismissed from DCM as a result. (Id.) On May 9, 2011, Plaintiff appealed to the DCM Promotions Committee and wrote the following:

> This committee is made of successful professionals who are extremely smart and knowledgeable. You probably wonder why I keep failing. The truth is that I have worked very hard from the day I entered this medical college four years ago, but obviously I am not as smart as many other students. When I repeated my second year, I lost confidence in my abilities and felt isolated and separated from my original class that continued to move forward. I was devastated and humiliated and became an outcast. I had never felt so bad in all my life.

---

[4] According to the DCM handbook: "Transcript grades are restricted to Honors (H), Highly Satisfactory (HS), Satisfactory (S) and Unsatisfactory (U). An interim, unofficial grade of Marginal Unsatisfactory (MU) indicates a course in which remedial work (repeat examination, other supplemental laboratory or clinical work) is required. If remedial work is successful, the grade is recorded as Satisfactory and may be no higher than Satisfactory. If remedial work is not successful, the transcript grade is recorded as Unsatisfactory, and the course (or a course equivalent determined by the department with the approval of the year-appropriate Student Promotions Committee) must be repeated." (Doc. No. 29, Ex. 11.)

7

(Doc. No. 29, Ex. 15.) After many unsuccessful attempts to appeal DCM's decision (Doc. No. 29 ¶¶ 62-76), Plaintiff filed the present action, largely alleging discrimination and retaliation based on race or national origin. Three claims are made by Ke in support of his allegation that his dismissal from DCM was a result of discrimination based on his race or national origin.

First, Plaintiff alleges that upon meeting Sahar at his family medicine clerkship, Sahar asked Plaintiff where he was from. (Id. ¶ 15.) After Plaintiff told Sahar that he was from Canada, Plaintiff alleges that Sahar said this answer was not good enough because Plaintiff was not a white Canadian. (Id.) Plaintiff eventually explained that he immigrated to Canada from China when he was a child. (Id.) After that, Plaintiff alleges that Sahar established a "master-and-slave relationship" and proceeded to talk to Plaintiff in an arrogant and condescending manner. (Id.) Plaintiff suggests that Sahar showed preferential treatment to at least one clinical student of Middle Eastern descent, rather than to Plaintiff. (See id. ¶ 27.)[5]

Second, Plaintiff also alleges that Samuel Parrish, M.D. ("Parrish"), the Dean for Student Affairs at DCM, discriminated against Plaintiff based on race or national origin by calling him names. Specifically, Plaintiff alleges that at a meeting with Parrish on May 12, 2011, Parrish stated:

> I go back to your first year of medical school when you were the weirdest guy I've ever met. You were weird, strange, truly odd, you scared people. The only thing that's changed is you have gotten quieter.

(Doc. No. 29, Ex. 14A.) Then, at a subsequent meeting on May 26, 2011, Plaintiff alleges that

---

[5] As noted above, Plaintiff alleges that when one of his classmates, Cyrus Hadadi, "chummed up to Dr. Sahar (both of them are of Middle Eastern descent), Doctor Sahar further embellished the evaluation to make it look shinier." (Doc. No. 29 ¶ 27.) In contrast, Plaintiff alleges that Sahar maliciously provided negative feedback regarding Plaintiff's clinical performance. (Id. ¶¶ 31-39.)

8

Parrish told Plaintiff: "the fact of the matter is you have a persistent pattern of academic failure." (Id.)

Third, Plaintiff asserts that he received disparate treatment in clerkship assignments and that in so doing, DCM used anti-student-handbook/manuals, discriminatory, and retaliatory rules and regulations against him. (Id. ¶ 71.) Aside from implying that Sahar treated at least one student of Middle Eastern descent more favorably than Plaintiff (Doc. No. 29 ¶ 27), Plaintiff also alleges that white students had never been required to repeat the family medicine clerkship after failing it, whereas he was required to do so. (Id. ¶ 86.) Additionally, Plaintiff alleges disparate treatment based on the fact that "many Caucasian students received multiple ["Marginal Unsatisfactory" grades] and were still allowed to do remediation work without being dismissed." (Id. ¶ 119(A)(11).) In contrast, after Plaintiff received a "Marginal Unsatisfactory" grade in his third-year OB/GYN course, he was dismissed. (Id. ¶ 54.)

### III. STANDARD OF REVIEW

The Second Motion for a Preliminary Injunction requests that the Court order Defendant DCM to reinstate Plaintiff as a student. (Doc. No. 34.) Plaintiff is proceeding pro se, and federal courts "tend to be flexible when applying procedural rules to pro se litigants[.]" Mala v. Crown Bay Marina, Inc., No. 10–4710, 2013 WL 57895, at *3 (3d Cir. Jan. 7, 2013). Despite this "tradition of leniency[,]" "there are limits to our procedural flexibility." Id. at *3-4.

Notwithstanding Plaintiff's pro se status, the fact remains that "injunctive relief [is] an extraordinary remedy that may only be awarded upon a clear showing that [Plaintiff] is entitled to such relief." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008). In order for this Court to grant injunctive relief, Plaintiff must establish that: 1) he is likely to succeed on the merits; 2) he is likely to suffer irreparable harm in the absence of this relief; 3) the balance of

9

equities tips in his favor; and 4) an injunction is in the public interest. Id. at 20. When exercising its discretion, the Court must consider the effect of the proposed relief on both Plaintiff and Drexel University and the Individual Defendants. See Amoco Prod. Co. v. Gambell, 480 U.S. 531, 542 (1987) ("In each case, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.").

## IV.     ANALYSIS

### A.     Plaintiff Has Not Shown That He Is Likely to Succeed on the Merits of Counts I-V and VIII

Plaintiff has failed to demonstrate that on Counts I-V and VIII, he is likely to prevail on the merits. Discrimination based on Plaintiff's race or national origin lies at the heart of each of these claims. For example, to establish a basis for relief under 42 U.S.C. § 1981, Plaintiff must show that: "(1) [he] belongs to a racial minority; (2) [D]efendants intended to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute." Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 569 (3d Cir. 2002). Likewise, Title VI of the Civil Rights Act of 1964 prohibits federally assisted programs from discriminating based on race, color, or national origin. 42 U.S.C. § 2000d. Clarifying its earlier decision in Guardians Ass'n. v. Civil Serv. Comm'n of New York City, the Supreme Court explained that "[f]irst, Title VI itself directly reached only instances of intentional discrimination. Second, . . . actions having an unjustifiable disparate impact on minorities could be redressed through agency regulations designed to implement the purposes of Title VI." Alexander v. Choate, 469 U.S. 287, 293 (1985). Disparate impact claims, therefore, may also be asserted under Title VI.

Lastly, 42 U.S.C. § 1985(3) prohibits conspiracies designed to deprive a person of equal protection of law. To successfully make out a violation of § 1985(3), Plaintiff must show: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is injured in his person or property or deprived of any right or privilege of a citizen of the United States." Farber v. City of Paterson, 440 F.3d 131, 134 (3d Cir. 2006) (quoting United Bhd. of Carpenters & Joiners v. Scott, 463 U.S. 825, 828-29 (1983)). Additionally, under § 1985(3) Plaintiff must demonstrate "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the [Defendants'] action." Griffin v. Breckenridge, 403 U.S. 88, 102 (1971). Therefore, in order to prevail on the merits of each of these claims, Plaintiff will be required to demonstrate that Defendants treated Plaintiff differently, based on his race or national origin.

As explained previously, Plaintiff points to three examples in support of the allegation of discrimination: 1) Sahar asked Plaintiff where he was from; 2) Parrish made disparaging and humiliating comments about Plaintiff; and 3) the disparate treatment he faced in comparison to other DCM students. (Hr'g Tr. 18:18-21:14, Sept. 24, 2012.)

First, with respect to Dr. Sahar, race-based questions or comments alone are not evidence of discrimination leading to an adverse action when the comments "do not tend to show a discriminatory reason was more likely than not a motivating cause of [Plaintiff's] discharge." Ade v. KidsPeace Corp., 401 F. App'x. 697, 704 (3d Cir. 2010). This principle is especially true when the comments are not stated at the time of the adverse action. See id. (supervisor's allegedly discriminatory questions and comments made six months before employee's termination not sufficient to demonstrate discriminatory animus behind adverse employment

11

action); Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1112 (3d Cir. 1997) (decision maker's alleged discriminatory comment made approximately four to five months prior to termination was insufficient to prove that adverse action resulted from discriminatory animus); Kim-Foraker v. Allstate Ins. Co., 834 F. Supp. 2d 267, 276 (E.D. Pa. 2011) (supervisor's alleged discriminatory remarks did not demonstrate that employee's race or national origin was motivating factor in adverse employment action because none of the remarks were made when employee was fired).

In this case, Sahar asked Plaintiff where he was from on the first day they met, in September 2010. Then, months later, Sahar gave Plaintiff a poor evaluation at the end of his clerkship. He was eventually dismissed by DCM in April 2011 after failing required tests and receiving the "Marginal Unsatisfactory" grade in the OB/GYN course. Thus, the alleged discriminatory questions and comments are too attenuated from the adverse action to sufficiently establish discriminatory animus.

In support of his second alleged instance of discrimination, Plaintiff argues that Parrish made disparaging and humiliating comments against him based on his race or national origin. Specifically, he points to Parrish's characterization of him as "weird, strange, truly odd" as evidence of discrimination. Plaintiff fails to connect these terms to his race or national origin. Furthermore, like the Sahar questions, Parrish's alleged comments were not made at the time of the adverse action. In fact, these comments were made on May 12, 2011, after Plaintiff had been dismissed from DCM in April 2011. (See Doc. No. 29, Ex. 14A.) Thus, Plaintiff is unlikely to demonstrate that discriminatory animus by Dr. Parrish motivated his dismissal from DCM.

Lastly, Plaintiff alleges that he was treated different from white medical school students when he was required to repeat his family medicine clerkship after failing it (Doc. No. 29 ¶ 86),

and when he was dismissed from DCM after receiving a "Marginal Unsatisfactory" grade in his OB/GYN course. (Id. ¶ 54.)[6] Given the fact that Plaintiff had previously failed his second year of medical school, was readmitted on the condition that he not recieve any grade lower than satisfactory during his clinical training, and continued to fail courses in his third year,[7] it appears unlikely that Plaintiff could prove that Defendants' actions in their treatment of him versus their treatment of other students were the result of race-based discrimination rather than his own poor academic performance. In fact, Plaintiff told the DCM Promotions Committee:

> You probably wonder why I keep failing. The truth is that I have worked very hard from the day I entered this medical college four years ago, but obviously I am not as smart as many other students. When I repeated my second year, I lost confidence in my abilities and felt isolated and separated from my original class that continued to move forward.

(Doc. No. 29, Ex. 15.)

After considering these three instances of alleged discrimination, the Court cannot conclude that Plaintiff has shown that he is likely to succeed on the merits on Counts I-V and VIII. These claims will require Plaintiff to put forth evidence that race or national origin was behind the Defendants' actions and decisions. Plaintiff may not succeed based on the three scenarios he alleges, and to the extent Plaintiff asserts retaliation claims under the same statutes, those claims are questionable on the merits too.

---

[6] As noted in the Opinion on Defendant's Motion to Dismiss, the Court has examined each allegation in the Second Amended Complaint about the treatment of Ke in comparison to the treatment of other students. The facts alleged do not show that these students were similarly situated to Ke, who was conditionally readmitted after his second year and then failed courses and a rotation during his third year. No plausible inference is raised that Ke was treated different from other students because of race or national origin.

[7] Plaintiff alleges that the first instance of discrimination occurred when he met Sahar during his family medicine clerkship and that his subsequent troubles all stemmed from this encounter. The facts show, however, that Plaintiff had failing grades during his second year of medical school, before meeting Sahar in his third year at DCM. (See Doc. No. 29, Ex. 15).

13

### B.     Denying Plaintiff's Requested Relief is Unlikely to Cause Irreparable Harm

Plaintiff is unlikely to suffer irreparable harm in the absence of his requested relief. In his Second Motion for a Preliminary Injunction, Plaintiff requests the Court to order DCM to reinstate him to his third year of medical school. (Doc. No. 34 at 22.) In the Third Circuit, "[t]he relevant inquiry is whether [Plaintiff] is in danger of suffering irreparable harm at the time the preliminary injunction is to be issued." SI Handling Sys., Inc. v. Heisley, 753 F.2d 1244, 1264 (3d Cir. 1985). Here, Plaintiff contends that if he is not reinstated, he will suffer irreparable harm because he will not be able to continue his medical education and will default on his student loans. Plaintiff has been out of medical school for two years, since his dismissal in April 2011. (Doc. No. 34 at 20.) Since then, Plaintiff "has been staying at home" and has not put forth any evidence that he has tried to find employment or apply to another medical school. (Id. at 22.)

Additionally, because he is no longer a full-time student, Plaintiff is responsible to begin paying back his various student loans. (Id. at 21.) Plaintiff argues that if he is not reinstated as a full time medical student, he is likely to default on these loans and "get into more serious financial trouble." (Id.) Regardless of whether Plaintiff is reinstated at DCM, he still will be required to pay back his student loans, and the fact that he is not a medical student at DCM is not preventing him from doing so. More importantly, Plaintiff has been out of medical school for two years, admittedly has begun to forget what he learned at DCM, and has seemingly made no attempts to find alternative employment or to apply to a different medical school. (Id. at 20.) For these reasons, denying Plaintiff's requested relief is unlikely to cause him to suffer irreparable harm beyond the harm which he alleges he already suffers.

### C. Plaintiff Fails to Establish that the Balance of Equities Tips in his Favor

In this request for injunctive relief, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Winter, 555 U.S. at 24 (quoting Amoco, 480 U.S. at 542). In support of his Second Motion for a Preliminary Injunction, Plaintiff alleges that DCM will not be harmed by reinstating Plaintiff as a third-year medical student. (Doc. No. 34 at 21.) Defendants, on the other hand, argue that awarding Plaintiff his requested relief would force them:

> [T]o reinstate a student with repeated instances of poor academic performance in the context of patient clinicals, . . . who has not received any medical training for well over a year or had any patient interaction since he was dismissed; who admits to "forgetting" the information he learned at DCM prior to his dismissal; and, who the Promotions Committee decided did not meet the qualifications to continue in DCM's M.D. program, or, ultimately, to become a practicing physician.

(Doc. No. 35 at 19.) At this stage, this Court is not called on to decide whether DCM's Promotions Committee was justified in dismissing Plaintiff from medical school. Furthermore, "[c]ourts are particularly ill-equipped to evaluate academic performance" and should generally avoid "any such judicial intrusion into academic decisionmaking." Bd. of Curators of Univ. of Mo. v. Horowitz, 435 U.S. 78, 92 (1978). This Court must consider whether the balance of equities tips in favor of granting or denying the requested relief. Here, if Plaintiff was reinstated, his participation in clerkship programs would require him to help "care for patients in a hospital setting[.]" (Doc. No. 35 at 19.) Based on the fact that Plaintiff has not been a medical student for almost two years and admits to forgetting some of what he had previously learned (Doc. No. 34 at 20), DCM is likely to suffer greater harm if ordered to reinstate Plaintiff as a third year medical student. Thus, Plaintiff fails to establish that the balance of equities tip in his favor.

### D. Plaintiff's Requested Relief is Not in the Public Interest

Granting Plaintiff's requested relief, reinstatement to DCM, does not appear to serve the public interest. Plaintiff alleges that ordering DCM to reinstate him is in the public interest because: "(1) America needs more doctors than it has; (2) the public has an interest in defending 'equal rights under the law' and opposing race discrimination and retaliation under Title VI and 42 U.S.C. §1981 that serve to lubricate the gears of democracy; and (3) the public has an interest in protecting civil rights under PFEOA in Pennsylvania." (Doc. No. 34 at 22.)

Plaintiff's first argument is unconvincing. While it may be true that the United States needs more doctors, it is more likely that this country needs doctors who pass their medical school courses. By Plaintiff's own admission, he failed courses in his second year, requiring him to repeat that year of medical school, and he also failed courses and a clinical in his third year at DCM. (See Doc. No. 34 at 1; Doc. No. 29 at ¶¶ 29, 61.) Given Plaintiff's academic history at DCM, it is unlikely that he would succeed if reinstated as a medical student there. Thus, the public's interest in having more doctors may not be served by Plaintiff's reinstatement.

Plaintiff's remaining arguments are equally unavailing. Plaintiff is correct that Title VI and 42 U.S.C. § 1981 are meant to prohibit race discrimination and retaliation. However, he does not sufficiently explain how his reinstatement as a medical student will help defend equal rights under the law or prevent impermissible discrimination and retaliation. Thus, this argument is not persuasive. Lastly, Plaintiff's final argument about the public interest stems from Count VII, alleging a violation of Pennsylvania Fair Education Opportunities Act ("PFEOA"), which this Court is dismissing in a contemporaneously issued Opinion on Defendants' Motion to Dismiss (Doc. No. 31). Therefore, Plaintiff's final argument need not be addressed here.

## V. CONCLUSION

Injunctive relief is "an extraordinary remedy[,]" and Plaintiff has failed to satisfy any of the required elements to warrant relief. <u>Winter</u>, 555 U.S. at 22. Thus, the Court will deny Plaintiff's Second Motion for a Preliminary Injunction.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LEI KE,

        Plaintiff,

v.

DREXEL UNIVERSITY, et al.,

        Defendant.

CIVIL ACTION
NO. 11-6708

# ORDER

**AND NOW**, this 14th day of March 2013, upon consideration of Plaintiff's Second Motion for a Preliminary Injunction (Doc. No. 34), the response of Defendants (Doc. No. 35), the arguments made at the September 24, 2012 hearing, and in accordance with the accompanying Opinion of the Court on Plaintiff's Motion for a Preliminary Injunction issued this day, it is **ORDERED** that Plaintiff's Second Motion for a Preliminary Injunction (Doc. No. 34) is **DENIED**.

BY THE COURT:

/s/ Joel H. Slomsky
JOEL H. SLOMSKY, J.