IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LEI KE,

                    Plaintiff,

          v.

DREXEL UNIVERSITY, et al.,

                    Defendant.

CIVIL ACTION
NO. 11-6708

## OPINION

Slomsky, J.                                          September 4, 2015

### TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................................1

II.     FACTUAL BACKGROUND ................................................................................2

        A.      Plaintiff is Dismissed from DUCOM and then Conditionally Readmitted .............2

        B.      Plaintiff Takes the Step 1 Exam and Begins his Third Year Clerkship
                Requirements ...................................................................................................4

        C.      Plaintiff Prepares to Retake the Step 1 Exam and to Take the Family Medicine
                Shelf Exam........................................................................................................7

        D.      Plaintiff Fails the Family Medicine Clerkship and Retakes the Step 1 Exam.........8

        E.      Plaintiff Fails again the Step 1 Exam, Fails the OB/GYN Shelf Exam, and is
                Dismissed from DUCOM ..................................................................................12

        F.      Plaintiff Unsuccessfully Appeals his Dismissal ..................................................12

III.    PROCEDURAL HISTORY..................................................................................16

IV.     STANDARD OF REVIEW ..................................................................................17

V.      ANALYSIS ..........................................................................................................18

A.      Plaintiff Has Failed to Raise a Genuine Issue of Material Fact with Respect
        to His Claims of Intentional Discrimination under 42 U.S.C. § 1981 and
        Title VI of the Civil Rights Act, 42 U.S.C. § 2000d.............................................19

        1.      Plaintiff has not presented direct evidence of discrimination...................21

                a.      Comments contained in Plaintiff's student records ......................21

                b.      Comments made by Dr. Sahar ......................................................27

        2.      Plaintiff has not presented circumstantial evidence of discrimination ......30

                a.      Plaintiff has failed to establish that he was qualified to
                        continue in his pursuit of education ................................................31

                b.      Plaintiff has failed to establish that he was treated
                        differently from similarly situated students ...................................33

                        i.      Spreadsheets with Third Year Caucasian and
                                African-American students who failed clerkships and
                                were not dismissed ..............................................................39

                        ii.     Spreadsheets with Caucasian and African-American
                                students who violated conditional letters and were not
                                dismissed...............................................................................41

                        iii.    Spreadsheets with Caucasian and African-American
                                students who failed courses in the first and second
                                year and who did not receive conditional letters ..............42

                        iv.     Spreadsheets with students who were given more than
                                18 months or more than three attempts to take the
                                Step 1 exam.........................................................................45

                        v.      Spreadsheets with African-American students who
                                failed multiple courses in the first or second year
                                and were not dismissed .......................................................47

                        vi.     Spreadsheets with Caucasian students who failed
                                multiple courses in the first or second year and
                                were not dismissed...............................................................50

                        vii.    Statistical evidence with respect to students dismissed
                                from DUCOM from 2007-2011 ..........................................52

        c.      Plaintiff has not shown that Defendants' legitimate non-discriminatory reason for his dismissal was pretextual ................54

B.      Plaintiff Has Failed to Establish a Claim for Racially Motivated Breach of Contract Under 42 U.S.C. § 1981 .........................................................................58

C.      Plaintiff Has Failed to Raise a Genuine Issue of Material Fact Regarding His Claim of a Hostile Educational Environment....................................................60

      1.      Comments made by Dr. Sahar ...................................................61

      2.      Comments made by Dr. Parrish .................................................63

      3.      Other comments ........................................................................67

D.      Plaintiff Has Failed to Raise a Genuine Issue of Material Fact that He Engaged in Protected Activity in Order to Sustain a Claim of Retaliation Under 42 U.S.C. § 1981 and Title VI, 42 U.S.C. § 2000d .................................................71

E.      Plaintiff Has Failed to Raise a Genuine Issue of Material Fact that Defendants Conspired Against Him in Violation of 42 U.S.C. § 1985(3) ...........77

VI.      CONCLUSION....................................................................................................79

## I.      INTRODUCTION

Before the Court is pro se Plaintiff Lei Ke's Motion for Summary Judgment (Doc. No. 632), and the Cross-Motion for Summary Judgment of Defendants Drexel University, Dr. Anthony Sahar, Dr. Samuel Parrish, Dr. Amy Fuchs, Dr. Jennifer Hamilton, and Dr. Richard Homan (Doc. No. 634).   Plaintiff was a student at Drexel University College of Medicine ("DUCOM") from the fall of 2007 to the spring of 2011 when he was dismissed because of his poor academic performance.   Plaintiff disputes this reason for dismissal.   He contends that it was due to discrimination on the basis of his Chinese race and national origin and in retaliation for an incident that occurred during his third year Family Medicine clerkship.[1]   He therefore filed the instant lawsuit.

Plaintiff initiated this action on October 26, 2011, when he filed an application to proceed in forma pauperis.   (Doc. No. 1.)   The application was granted (Doc. No. 3) and after a period of motion practice, on May 22, 2012, the Second Amended Complaint ("SAC"), in which Plaintiff's claims are asserted, was filed (Doc. No. 29).   The allegations in the SAC (Doc. No. 29) that remain are as follows: (1) Count I—Intentional Discrimination in violation of 42 U.S.C. § 1981 against all Defendants; (2) Count II—Willful Retaliation in violation of 42 U.S.C. § 1981 against all Defendants; (3) Count III—Hostile Educational Environment in violation of 42 U.S.C. § 1981 against Dr. Sahar, Dr. Parrish, and Drexel University; (4) Count IV—Intentional Discrimination in violation of Title VI of the Civil Rights Act, 42 U.S.C. § 2000d, against Drexel University; (5) Count V—Willful Retaliation in violation of Title VI of the Civil Rights Act, 42

---

[1]   A medical school clerkship is an internship in which the student obtains hands-on experience in a clinical environment.   At the end of the clinical rotation, the student takes the National Board of Medical Examiners ("NBME") examination, also known as a "shelf exam," that covers the subject matter of the clerkship.   (Doc. No. 29 at n.1.)

U.S.C.      § 2000d against Drexel University; (6) Count VI—Conspiracy in violation of 42

U.S.C.  § 1985 against Sahar, Parrish, and Hamilton; and (7) Count VII—Racially Motivated

Breach of Contract in violation of 42 U.S.C. § 1981(b) against all Defendants.[2]

On February 16, 2015, Plaintiff filed a Motion for Summary Judgment.[3]  (Doc No. 632.)

On February 17, 2015, Defendants filed a Cross-Motion for Summary Judgment.  (Doc. No.

632.)  Responses and Replies thereafter were filed by the parties.  (Doc. Nos. 640, 647, 652,

653.)  After considering the Motions for Summary Judgment and for reasons that follow, the

Court will grant Defendants' Cross-Motion for Summary Judgment and deny Plaintiff's Motion.

## II.      FACTUAL BACKGROUND

### A.      Plaintiff is Dismissed from DUCOM and then Conditionally Readmitted

In the fall of 2007, Plaintiff began medical school at Drexel University College of

Medicine ("DUCOM").  Plaintiff initially had difficulty with his studies, receiving a grade of

Marginal Unsatisfactory in Behavioral Science and a grade of Unsatisfactory[4] in Immunology.

---

[2]  This cause of action was added after the Court granted Plaintiff's Third Motion to Amend the Complaint in part.  (Doc. No. 127.)

[3]  The docket in this case contains 682 entries.  They were entered during the three years and ten months that the case was open.  During this period, a considerable amount of case management was required as a result of the numerous filings.

[4]  At DUCOM, transcript grades are listed as follows:

> Honors (H), Highly Satisfactory (HS), Satisfactory (S), and Unsatisfactory (U).
> An interim, unofficial grade of Marginal Unsatisfactory (MU) indicates a
> course in which remedial work (repeat examination, other supplemental
> laboratory or clinical work) is required.  If remedial work is successful, the
> grade is recorded as Satisfactory and may be no higher than Satisfactory.  If
> remedial work is not successful, the transcript grade is recorded as
> Unsatisfactory, and the course . . . must be repeated.

(Doc. No. 633, Ex. 7.)

(Doc. No. 634-1 at 3.)  During his second academic year in 2008 and 2009, Plaintiff received a grade of Unsatisfactory in four courses, including: Introduction to Clinical Medicine, Medical Microbiology, Pathology and Laboratory Medicine, and Medical Pharmacology.  (Id.)  As a result, the Student Promotions Committee[5] voted to dismiss Plaintiff from DUCOM on May 11, 2009.[6]  (Doc. No. 29-4 at 45.)

Plaintiff appealed the decision of the Promotions Committee to Dr. Richard Homan, the Dean of DUCOM.  On July 21, 2009, Dean Homan reversed the decision of the Promotions Committee and readmitted Plaintiff to DUCOM on the following conditions:

1.  You will retake all courses in which your grade was Unsatisfactory and Marginal Unsatisfactory.
2.  Any grade below Satisfactory will be considered grounds for dismissal from the College of Medicine.

---

[5]  Student Promotions Committees at DUCOM are separated into the Preclinical Student Promotions Committee for students in the first two years of the curriculum, and the Clinical Student Promotions Committee for students in the final two years of the curriculum.  "The Student Promotions Committees are standing committees of the Faculty.  They make decisions about student progress and advise the Dean on matters related to student academic and professional progress."  In addition to commenting on a student's academic deficiencies, the Committee also addresses "breaches of professional and ethical behavior."  (Doc. No. 633, Ex. 16-17.)

[6]  The DUCOM student handbook states that:

The year-appropriate Student Promotions Committee reviews the entire record of a student with one or more grades of Marginal Unsatisfactory or Unsatisfactory in order to determine if that student is demonstrating a level of academic performance sufficient to remain in medical school; and if so, to review individual departmental recommendations, especially when a student needs remediation in multiple courses.

(Doc. No. 633, Ex. 18.)  Here, because Plaintiff had received a grade of Marginal Unsatisfactory and Unsatisfactory in his first year, and then four grades of Unsatisfactory in his second year, the Promotions Committee was bound to "review[] the entire record of [Plaintiff] . . . in order to determine if [Plaintiff] [was] demonstrating a level of academic performance sufficient to remain in medical school."  (Id.)

3.      You must meet with Dr. Janet Moore prior to the beginning of classes, August 11, 2009.  You will work with Dr. Moore and focus on test taking skills, time management, and study skills.

4.      You will meet with a designated faculty advisor at least monthly throughout the remainder of time in medical school.

5.      The receipt of any grade lower than Satisfactory during your clinical training will be considered as grounds for dismissal from the College of Medicine.

. . . .  I strongly encourage you to utilize all personal and academic support services in the College of Medicine.

(Doc. No. 634, Ex. F.)

Upon Plaintiff's return to DUCOM during the academic years 2009 and 2010, he was required to retake the four second-year courses he had failed.  Plaintiff, in violation of the terms of his re-enrollment, received a grade of Marginal Unsatisfactory in Medical Microbiology.  (Doc. No. 634, Ex. B.)  Nevertheless, he was not dismissed from DUCOM but permitted to remediate his grade by sitting for the National Board of Medical Examiners ("NBME") Microbiology Subject Exam.  (Id.)  After passing the exam, his grade in Microbiology was changed to Satisfactory.  (Id.)

**B.      Plaintiff Takes the Step 1 Exam and Begins his Third Year Clerkship Requirements**

After completing his second year in May 2010,[7]  Plaintiff deferred taking the required Step 1 United States Medical Licensing Examination ("USMLE") until September 27, 2010.

---

[7]   DUCOM's medical school curriculum is designed as a four-year program.  The first two years of school focus on medical education including basic science and clinical medicine.  After completing coursework in the second year, students must successfully pass a "Step 1" exam administered by the United States Medical Licensure Examination ("USMLE").  Students cannot progress to the third year curriculum until they have passed Step 1, except when they are awaiting results when their clerkships begin.  Students must pass Step 1 within 18 months after successfully completing their second year curriculum, or they may be dismissed from DUCOM.  (Doc. No. 633, Ex. 20.)

In the third year, DUCOM students take required clinical clerkship rotations in Medicine,

(Doc. No. 29 ¶ 13; Doc. No. 634, Ex. I.)  The next day, September 28, 2010, before he received the results of the Step 1 exam, Plaintiff began a required Family Medicine rotation at AM Sahar—a private family medical practice owned by Defendant Dr. Anthony Sahar.  (Doc. No. 29 ¶¶ 13, 14.)  AM Sahar was affiliated with the Monmouth Medical Center in Long Branch, New Jersey, which is a regional medical campus of DUCOM.  (Id. ¶ 14.)

Plaintiff's internship at AM Sahar lasted six weeks.  (Doc. No. 29 ¶ 25.)  During Dr. Sahar's first interaction with Plaintiff, Dr. Sahar asked Plaintiff "where [he] came from."  When Plaintiff responded that he was from Canada, Dr. Sahar said "that [response] was not good enough because [Plaintiff] was not a white Canadian and kept asking where [Plaintiff] came from."  (Id. ¶ 15.)  Plaintiff informed Dr. Sahar that he was born in China and immigrated to Canada when he was a child.  (Id.)  According to Plaintiff, Dr. Sahar thereafter became arrogant and condescending with Plaintiff.  (Id.)

Because Dr. Sahar's brother had died, he left the United States after the first week of Plaintiff's clerkship.  Dr. Sahar was not present at AM Sahar for the next four weeks of Plaintiff's internship, from October 6, 2010 to October 28, 2010.  (Id. ¶ 16; Doc. No. 29 at Ex. 6.)  During this hiatus, Plaintiff and another student were supervised by Dr. John Dalton.  (Id. ¶ 17.)  On October 25, 2010, Dr. Dalton completed a mid-internship evaluation of Plaintiff.  In relevant part, Dr. Dalton gave Ke four out of five points on "Medical Knowledge," four out of five points on "Interpersonal/ Communication Skills," and five out of five points on "Professionalism."  (Id.)

_____

Surgery, Pediatrics, Family Medicine, Psychiatry, and Obstetrics and Gynecology.  By October 31 of their fourth year, DUCOM students must successfully pass the USMLE "Step 2" exam in clinical skills ("CS"), and clinical knowledge ("CK").  In the fourth year, students take both required courses and electives.  (Doc. No. 633, Exs. 7-22.)

During Plaintiff's final week of the internship, Dr. Sahar had returned.  Plaintiff attended to a prostate cancer survivor.  Initially, he was alone with the patient.  (Doc. No. 29 ¶ 19.)  The patient spoke to Plaintiff about the expense and frequency of injections he was receiving.  (Id.)  Plaintiff asked the patient if he understood how his medications worked, and the patient responded that he did not.  (Id.)  Soon thereafter, Dr. Sahar came into the room.  (Id. ¶ 20.)  Plaintiff, who had "been taught . . . not just to ask the question but to include a pertinent fact to demonstrate knowledge," asked Dr. Sahar the following in front of the patient:

> I remember that Leuprolide increases GnRH and enhances testosterone secretion.  Why would a prostate cancer survivor need it?  Shouldn't he be on something that suppresses testosterone?

(Doc. No. 29-4 at 41.)  According to Plaintiff, Dr. Sahar appeared "shocked" that Plaintiff had forgotten that the drug decreased GnRH levels if taken continuously, and that Plaintiff had asked the question in front of a patient.  (Id. ¶ 21; Doc. No. 29, Ex. 9.)  Plaintiff was under the impression that it was appropriate to ask Dr. Sahar this question in the presence of the patient pursuant to the Drexel University Code of Conduct.  (Doc. No. 29 ¶ 22 n.2.)

Later, when Plaintiff and Dr. Sahar were attending to a different patient, Dr. Sahar asked Plaintiff what test Plaintiff should use to test for renal insufficiency.  Plaintiff answered the question incorrectly.  (Doc. No. 29 ¶ 23.)  At the end of the day, Plaintiff apologized to Dr. Sahar for what had occurred in front of the patient as well as for incorrectly answering his question later in the day, explaining that he was having an "off-day."  (Id. ¶ 24.)  Dr. Sahar said he would give Plaintiff the benefit of the doubt, and acknowledged it had been an "off-day" for Plaintiff.

On Plaintiff's last day, Dr. Sahar was out of the office.  Dr. Dalton gave Plaintiff an oral evaluation.  (Doc. No. 29 at ¶ 25.)  He told Plaintiff that he had improved during the internship and "had done a good job."  (Id. ¶ 26.)  However, Dr. Dalton emphasized that Plaintiff should

not "ask many questions in the presence of a patient." (Id.)  Dr. Dalton informed Plaintiff that

Dr. Sahar would complete Plaintiff's final written evaluation.  (Id.)

> **C.      Plaintiff Prepares to Retake the Step 1 Exam and to Take the Family Medicine Shelf Exam**

Meanwhile, four weeks into his Family Medicine internship, Plaintiff learned that he had

failed the Step 1 exam.  (Doc. No. 29, Ex. 14a at 1.)  Dr. Amy Fuchs, Associate Dean of Student

Affairs, sent Plaintiff an email on October 20, 2010 noting:

> As you probably know, you did not pass the USMLE Step 1 Exam.  As per school policy, you will be allowed to complete your current 6-week Family Medicine Clerkship.  However, after that you will be pulled from clinical rotations to study for and retake Step 1.  You cannot resume clinical rotations until you have taken the exam again.  While we spoke last week about various possibilities, now that we have your score, I would like to talk with [you] in more detail about your schedule and a plan for study.

(Doc. No. 634, Ex. K.)  When Plaintiff and Dr. Fuchs did speak, she advised Plaintiff to retake

the Step 1 exam within six weeks.  Plaintiff had only failed the Step 1 exam by two points.

While Plaintiff could have taken more time to take the Step 1 exam since the student, not

DUCOM, schedules the examination, Dr. Fuchs believed that he would need only six weeks to

improve his score in order to pass.  (Doc. No. 29, Ex. 14a at 7; Doc. No. 29, Ex. 15 at 2.)

Plaintiff ultimately scheduled to retake the Step 1 exam on December 27, 2010, which would

afford him over two months to study.  Ultimately, Plaintiff was unable to take the exam on

December 27, 2010 because of a snowstorm.  (Doc. No. 29, Ex. 14a at 2; Doc No. 29, Ex. 15 at

1.)

While studying to retake the Step 1 exam, Plaintiff was also preparing for the NBME

shelf exam in Family Medicine.[8]  In an email to Dr. Fuchs on November 1, 2010, Plaintiff wrote

---

[8]  The NBME shelf examination covers a specific subject matter and is the final examination in a clinical rotation.  If a student does not take the shelf exam during the final exam period, the

the following:

> After substantial thought, I am seriously considering not taking the Family Medicine shelf exam this Friday to focus more on Step 1.  If I do this, will this missed exam be considered a failed shelf?  I understand that students cannot fail a shelf exam twice and that after failing a shelf, they can only receive a satisfactory grade.  Can you elaborate on the details?  My letter from Dean Homan stated that I cannot fail a course so that does concern me.

(Doc. No. 634, Ex. K.)  In light of Plaintiff's concerns about Step 1, Dr. Fuchs permitted Plaintiff to delay taking the Family Medicine shelf exam until the make-up period over winter break. (Id.)  Plaintiff took the Family Medicine shelf exam on December 29, 2010.  (Id., Ex. L.)

### D.  Plaintiff Fails the Family Medicine Clerkship and Retakes the Step 1 Exam

On January 3, 2011, Dr. Jennifer Hamilton, the director of the Family Medicine clerkship at DUCOM, informed Plaintiff that he had failed both the clinical rotation at AM Sahar and the Family Medicine shelf exam.  (Doc. No. 29 ¶ 29.)  Dr. Sahar had written the final evaluation in which he graded Plaintiff as "Unsatisfactory" in Family Medicine.  The failures were particularly troubling to Plaintiff because of the terms of his readmission after he had failed courses during his second year.  Plaintiff believed that Dr. Sahar had failed him "just because he had asked him a question in front of a patient."  (Id. ¶ 39.)  Dr. Hamilton advised Plaintiff on January 4, 2011 that he would have to retake the Family Medicine clerkship pursuant to the DUCOM student manual.  (Id.)  Plaintiff disputed the failure, citing his positive mid-block oral evaluations made by Dr. Dalton.  (Id. ¶ 31.)  On January 6, 2011, Hamilton advised Plaintiff that he could appeal the grade.  (Id. ¶ 40; Doc. 29-4, Ex. 6.)

While in the process of reviewing Plaintiff's appeal, Dr. Hamilton spoke with Dr. Sahar and Dr. Dalton.  Dr. Sahar explained to Dr. Hamilton that Plaintiff had performed well during the

---

student may take the shelf exam during the make-up period over winter break or immediately before beginning the fourth school year.  (Doc. No. 634, Ex. D at 6.)

beginning of his internship, which is why he had received a positive mid-block evaluation. (Id. at ¶ 42.) By the end of the clerkship, however, Dr. Sahar rated Plaintiff's work as less than satisfactory in "Medical Knowledge," "Professionalism," and "Interpersonal/ Communication Skills." (Id. ¶ 41.) Additionally, Dr. Sahar noted in his feedback that:

> [Ke] had issues with professionalism and interpersonal skills. In one patient encounter, he took exception to a treatment strategy in front of a patient, rather than discussing his concerns outside of the patient room. This incident of questioning treatment in the presence of patient was unacceptable. He also had poor interactions with office staff, often aloof and non-interactive.

(Doc. No. 29-4 at 14.)[9]

Plaintiff appealed the Unsatisfactory grade to Hamilton. With respect to Dr. Sahar's evaluation, Hamilton agreed to modify the Professionalism score from a 1 out of 5, to a 2 out of 5. (Doc. No. 29-4, Ex. 6.) Hamilton was unwilling, however, to modify the interpersonal and communication skills and medical knowledge scores, noting, "[a]side from concerns of any challenge to the instructor, what would the patient think of the suggestion that the treatment he was receiving would actually worsen his disease." (Id.) Moreover, Hamilton stressed that had Plaintiff passed the shelf exam for Family Medicine, she would consider modifying his grade from Unsatisfactory to Marginal Unsatisfactory, but his failure on the shelf exam, coupled with the "less-than-satisfactory" clinical skills, resulted in an overall grade of Unsatisfactory. (Id.) Hamilton informed Plaintiff that if he wished to appeal her findings, he would have to contact Dr. Eugene Hong, Chairman of the Family Medicine Department of DUCOM. (Id.)

---

[9] Dr. Sahar was apparently so distressed by Plaintiff's performance that he called Dr. Parrish, the Dean of Student Affairs at DUCOM, to speak about Plaintiff's future as a doctor. Dr. Parrish later told Plaintiff that Dr. Sahar spoke with him for nearly two hours, saying, "this student should not be a doctor. He does not belong in medicine. He was inappropriate to patients. He was inappropriate in my presence, and he upset people." (Doc. No. 29, Ex. 14a at 1.)

On February 2, 2011, Dr. Hong declined to amend Plaintiff's grade, and advised Plaintiff that if he wished to appeal his decision, Plaintiff could appeal to Dr. Barbara Schindler, the Vice Dean for Academic Affairs at DUCOM.  (Id. ¶ 45.)  On February 8, 2011, Plaintiff emailed an appeal to Schindler.  Plaintiff again criticized what he considered the "two harshest comments"[10] on Dr. Sahar's final evaluation as being "related to that incident."  (Id. ¶ 40.)  Furthermore, Plaintiff related that he "performed poorly on the last day he was with [Sahar] before the end of the rotation[,] leaving [Sahar] with a bad impression."  (Id. ¶ 41.)  Plaintiff did not seek a Satisfactory grade in the appeal; rather, he sought a Marginal Unsatisfactory grade so that he could retake the shelf exam in Family Medicine.  (Id.)

While the above described events were occurring, Plaintiff was also studying to retake the Step 1 exam that he had failed that fall and was unable to retake in December 2011.  Plaintiff admits that appealing his grade in Family Medicine "tapped his energy and time [that] he ought to have devoted" to preparing for the exam.  (Doc. No. 29 ¶ 44.)  It was necessary that Plaintiff retake the exam quickly because he was unable to begin another clerkship until he retook this exam.  Dr. Fuchs had noted this restriction in her email to Plaintiff on October 20, 2010.  On February 10, 2011, Plaintiff took the Step 1 exam once again.  (Id.)

On February 11, 2011, the day after Plaintiff retook the Step 1 exam, Plaintiff met with Dr. Schindler.  (Doc. No. 29 ¶ 46.)  Plaintiff recounted to Schindler that he believed Dr. Sahar's failing grade was retaliatory for asking a question.  (Id.)  According to Plaintiff, Schindler did not comment on the alleged retaliation, but only said that she agreed with the other professors

---

[10]  In the letter, Plaintiff does not specifically state which of Sahar's comments were the two harshest.  (Doc. No. 29-4 at 40.)

who had reviewed Plaintiff's case and refused to alter his grade.   (Id.)   Schindler advised

Plaintiff to retake the Family Medicine clerkship.   (Id.)

Later in the day on February 11, 2011, the Clinical Promotions Committee met to review

Plaintiff's grade of Unsatisfactory in the Family Medicine clerkship in order to determine

whether it was grounds for dismissal from DUCOM.   In a letter dated February 14, 2011,  the

Clinical Promotions Committee made the following decision with respect to Plaintiff's

Unsatisfactory grade in Family Medicine:

> The Clinical Promotions Committee met Friday to discuss your Unsatisfactory
> grade in the Family Medicine Clerkship.  As you know, when readmitted to the
> College of Medicine in July of 2009, one of the conditions stipulated by Dean
> Homan was the following: "The receipt of any grade lower than Satisfactory
> during your clinical training will be considered as grounds for dismissal from the
> College of Medicine."  The Committee reviewed the mid-rotation feedback, your
> final evaluation, and the decisions made to uphold the Unsatisfactory grade in
> your appeals to both Drs. Hong and Schindler.   Although previous
> communications from the College provided clear warning that an additional
> failing grade could lead to your dismissal, the Committee decided that issues
> regarding the delivery of your mid-rotation feedback warranted leniency.
>
> The Committee has made the following decisions:
>
> 1.   You are allowed to remain enrolled in the College of Medicine.
> 2.   You will do the remainder of your Clerkships in the Philadelphia area.[11]
> 3.   You are required to repeat the 6-week Family Medicine Clerkship.
> 4.   The receipt of any additional grade of less than Satisfactory (including
>      Unsatisfactory or Marginal Unsatisfactory) will be considered grounds for
>      dismissal from the College of Medicine.[12]

---

[11] With respect to the condition that Plaintiff completes his clerkships in the Philadelphia area, it
is the practice of DUCOM to "bring back" students to Philadelphia who have had clinical
failures in order to provide them with better supervision and support.  (Doc. No. 29, Ex. 14a at
2.)  During discovery, Defendants provided Plaintiff with a list of seven other students who
were required to return to Philadelphia to complete their clerkships due to shelf exam failures
and/or professionalism issues.  (Doc. No. 457.)

[12] Dr. Fuchs called Plaintiff on the afternoon of February 11, 2011 to let Plaintiff know about the
condition that he complete his rotations in Philadelphia.  Plaintiff was scheduled to begin a
clinical rotation on Monday, February 14, 2011, so Dr. Fuchs wanted to ensure Plaintiff
arrived at the correct clinical site.

(Doc. No. 634, Ex. M.)

     **E.**    **Plaintiff Fails again the Step 1 Exam, Fails the OB/GYN Shelf Exam, and is Dismissed from DUCOM**

On February 14, 2011, Plaintiff began an OB/GYN[13] clinical rotation at Hahnemann Hospital in Philadelphia. At some point Plaintiff learned that he had failed his second attempt at the Step 1 exam. He was permitted to take the Step 1 exam a third time. Although Plaintiff was advised not to study at the same time for both the OB/GYN shelf exam and his third and final attempt at the Step 1 exam, he apparently did so and scheduled the Step 1 exam to be retaken on May 6, 2011. (Doc. No. 29-4, Ex. 13 at 1; Doc. No. 29-4, Ex. 14A at 1.)

Ultimately, Plaintiff passed the clinical portion of his OB/GYN clerkship, but failed the NBME shelf exam in OB/GYN. (Doc. No. 634-1 at 5.) The failure of the NBME shelf exam resulted in a final grade of Marginal Unsatisfactory in the OB/GYN clerkship. (Doc. No. 634, Ex. B.) As noted in the letter of February 14, 2011 from the Clinical Promotions Committee, any grade below Satisfactory, including a Marginal Unsatisfactory or Unsatisfactory grade, would be grounds for dismissal. (Doc. No. 634, Ex. M.) Accordingly, on April 11, 2011, the Clinical Promotions Committee voted to dismiss Plaintiff from DUCOM because he had received a grade of less than Satisfactory. (Doc. No. 29 ¶ 61; Doc. No. 634, Ex. O.)

     **F.**    **Plaintiff Unsuccessfully Appeals his Dismissal**

Plaintiff next began the process of appealing his dismissal, which included an opportunity to appear before the Clinical Promotions Committee. (Doc. No. 29-4, Ex. 14.) Dr. Fuchs and Dr. Samuel Parrish, Dean of Student Affairs at DUCOM, assisted Plaintiff with his appeal. (Doc. No. 29 at ¶ 62-66.) The three met on April 26, 2011 and during the meeting, Plaintiff

---

[13] OB/GYN is an acronym for Obstetrics and Gynecology.

explained why he should be readmitted.  (Id. at 1.)  Specifically, Plaintiff blamed the Promotions Committee's decision to transfer his OB/GYN clinical rotation from the Monmouth Medical Center in New Jersey to the Hahnemann Hospital in Philadelphia as a reason for his OB/GYN failure.  Drs. Parrish and Fuchs encouraged Plaintiff instead to take personal responsibility for his failures, rather than blame his shortcomings on external factors.  Plaintiff took their advice and wrote a letter to the Promotions Committee acknowledging his failings.  (Doc. No. 29 ¶ 64.)

On May 12, 2011, the three met again after Drs. Fuchs and Parrish reviewed Plaintiff's letter to the Promotions Committee.  During the meeting, Dr. Parrish discussed with Plaintiff his trouble interacting with others and how it could affect Plaintiff's success in the medical profession.  (Doc. No. 29-4, Ex. 14a at 5.)  Dr. Parrish spoke to Plaintiff about finding Plaintiff "truly odd" at their first meeting and advised him when appearing before the Committee not to appear disinterested.  (Id.)  Both Doctors praised Plaintiff for accepting responsibility for his academic failures in the letter addressed to the Promotions Committee.  (Id.)  In the letter, Plaintiff stated the following:

> This committee is made of successful professionals who are extremely smart and knowledgeable.  You probably wonder why I keep failing.  The truth is that I have worked very hard from the day I entered this medical college four years ago, but obviously I am not as smart as many other students.  When I repeated my second year, I lost confidence in my abilities and felt isolated and separated from my original class that continued to move forward.  I was devastated and humiliated and became an outcast.  I had never felt so bad in all my life.

(Doc. No. 29, Ex. 15.)  On May 13, 2011, Plaintiff met with the Promotions Committee.  The same day, the Committee voted not to reinstate him.  Plaintiff was advised that he could appeal the decision to Dean Homan.  (Doc. No. 29 ¶ 67.)

On May 16, 2011, Plaintiff again met with Drs. Parrish and Fuchs before meeting with Dean Homan and asked them to review the letter he intended to send to Dean Homan.  (Id. ¶¶ 67,

13

68.)  During this meeting, the doctors once again advised Plaintiff that his most persuasive argument for reinstatement was that he had taken on too many things at once.  On May 26, 2011, Plaintiff again met with Dr. Parrish and Dr. Fuchs before meeting with Dean Homan.  In view of what Dr. Parrish characterized as a "persistent pattern of academic failure," the doctors told Plaintiff again that his best chance for reinstatement would be to admit that the failures were his own.  (Doc. No. 29-4, Ex. 14a at 13.)  Plaintiff did not heed the doctors' advice, and in the letter to Dean Homan stated, "I humbly request you to reinstate me because I deserve to be reinstated. The truth was that it was the college that let me handle so many things beyond my capability." (Id., Ex. 17.)

Plaintiff eventually met with Dean Homan.  The Dean wrote to Plaintiff on June 27, 2011 that he had decided to uphold the dismissal of Plaintiff from DUCOM.  (Doc. No. 29-4, Ex. 19.) In the letter, Dean Homan also noted the following:

> In considering your appeal, I also reviewed your concerns that the Academic Policies and Academic Progress Policies in the Student Handbook were not properly followed and applied to you.  My July 21, 2009 letter reinstating you after your first dismissal by the Preclinical Promotions Committee clearly stated that any grade below Satisfactory will be considered grounds for dismissal.  I note that you received a grade of Unsatisfactory in your Family Medicine clerkship and a Marginal Unsatisfactory in your Obstetrics and Gynecology clerkship. Therefore, I find that the College's policies and process were properly followed and applied.

(Id.)  At that point, Plaintiff had exhausted his appeals within DUCOM.  (Id.)  In addition, because he was no longer enrolled at a medical school, the NBME cancelled the Step 1 exam that Plaintiff was scheduled to retake in July 2011.  (Doc. No. 29-5, Ex. 20.)

On June 22 and June 30, 2011, Plaintiff's parents sent letters to John Fry, the President of Drexel University, and to Dean Homan petitioning to have their son readmitted to DUCOM. (Doc. No. 29 at ¶ 73.)  President Fry and Dean Homan did not respond.  (Id.)  On July 4 2011,

14

Plaintiff emailed President Fry and Dean Homan requesting that his Family Medicine clinical grade be amended, and in the event that the grade was not amended, Plaintiff requested a formal hearing pursuant to the Family Educational Rights Privacy Act ("FERPA").  Drexel's FERPA policy grants students the right to a formal hearing when the University refuses to amend a grade that the student considers to be "inaccurate, misleading, or otherwise in violation of his/her privacy or other rights."  (Doc. No. 29-4, Ex. 21.)  The policy does not, however, permit a student to challenge the merits of an otherwise accurately recorded grade.  (Id.)  President Fry, who was out of the country on July 4, 2011, responded to Plaintiff on July 5, 2011, and advised him that another Dean, David Ruth, would be in touch with a response to Plaintiff's email.  (Id.)  Instead, on July 7, 2011, Plaintiff received an email from Dean Homan who informed Plaintiff that he was reviewing his FERPA request.  Moreover, on July 7, 2011, Plaintiff received a response from Dean Ruth confirming that Dean Homan would respond to the request.  (Id.)

On July 19, 2011, Dean Homan emailed Plaintiff and told him that DUCOM would not amend his Family Medicine grade, and that Plaintiff had a right to a formal hearing.  (Id.)  On August 30, 2011, before the hearing took place, the Registrar's office cancelled the hearing, noting that his request to amend his Family Medicine grade was not a matter falling under FERPA's purview because Plaintiff was attempting to challenge the merits of the Unsatisfactory Family Medicine grade.  In an email to Plaintiff, the Registrar wrote:

> I have considered all of the information you have provided to me and have determined that this is not a matter for which a hearing is available under the Drexel University FERPA Policy.  This is because you are attempting to use the FERPA amendment process to challenge a grade and a clinical evaluation.

(Doc. No. 29-5 at 31.)  The receipt of this email effectively ended Plaintiff's attempt at reinstatement under the appeal procedures at DUCOM and Drexel University.

15

### III.   PROCEDURAL HISTORY

On September 13, 2011, Plaintiff filed a complaint with the Pennsylvania Human Relations Commission to be reinstated at DUCOM.  (Doc. No. 29 ¶ 76.)  On September 19, 2011, Plaintiff filed a complaint with the Department of Education, Office of Civil Rights, also seeking reinstatement.

On November 18, 2011, Plaintiff filed his first Complaint (Doc. No. 4) with this Court because "[Plaintiff] realized that the agencies could not timely help him or could never help him." (Id.)  On December 5, 2011, Plaintiff filed his First Amended Complaint.  (Doc. No. 7.) On January 25, 2012, Defendants filed a Motion to Dismiss.  (Doc. No. 12.)  On May 17, 2012, Plaintiff was granted leave to file a Second Amended Complaint.  (Doc. No. 29.)  On June 12, 2012, Defendants filed a Motion to Partially Dismiss Plaintiff's Second Amended Complaint. (Doc. No. 31.)  On March 13, 2012, the Court granted Defendants' Motion to Partially Dismiss the Second Amended Complaint.  (Doc. No. 69.)  In addition, on July 12, 2013, the Court granted in part Plaintiff's Third Motion to Amend his Complaint.  (Doc. No. 127.)

Accordingly, before the Court are the remaining claims asserted in Plaintiff's Second Amended Complaint and an added claim which was included in Plaintiff's Third Motion to Amend his Complaint.   As noted previously, these claims are: (1) Count I—Intentional Discrimination in violation of 42 U.S.C. § 1981 against all Defendants; (2) Count II—Willful Retaliation in violation of 42 U.S.C. § 1981 against all Defendants; (3) Count III—Hostile Educational Environment in violation of 42 U.S.C. § 1981 against Sahar, Parrish, and Drexel University; (4) Count IV—Intentional Discrimination in violation of Title VI of the Civil Rights Act, 42 U.S.C. § 2000d, against Drexel University; (5) Count V—Willful Retaliation in violation of Title VI of the Civil Rights Act, 42 U.S.C. § 2000d against Drexel University; (6) Count VI—

Conspiracy in violation of 42 U.S.C. § 1985 against Sahar, Parrish, and Hamilton; and (7) Count VII—Racially Motivated Breach of Contract in violation of 42 U.S.C. § 1981(b) against all Defendants.

As noted, on February 16, 2015, Plaintiff filed a Motion for Summary Judgment (Doc. No. 632) and on February 17, 2015, Defendants filed a Cross-Motion for Summary Judgment. (Doc. No. 634.)  These Motions are now ripe for disposition.

## IV.   STANDARD OF REVIEW

Granting summary judgment is an extraordinary remedy.  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In reaching this decision, the court must determine whether "the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Favata v. Seidel, 511 F. App'x 155, 158 (3d Cir. 2013) (quoting Azur v. Chase Bank, USA, Nat'l Ass'n, 601 F.3d 212, 216 (3d Cir. 2010) (quotation omitted)).  A disputed issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party.  Kaucher v. Cnty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  For a fact to be considered "material," it "must have the potential to alter the outcome of the case."  Favata, 511 F. App'x at 158.  Once the proponent of summary judgment "points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor."  Id. (quoting Azur, 601 F.3d at 216 (internal quotation marks omitted)).

In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. (quoting Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ., 587 F.3d 176, 181 (3d Cir. 2009) (quotation omitted)).  The Court's task is not to resolve disputed issues of fact, but to determine whether there exists any factual issues to be tried.  Anderson, 477 U.S. at 247-249.  Whenever a factual issue arises which cannot be resolved without a credibility determination, at this stage the Court must credit the non-moving party's evidence over that presented by the moving party.  Id. at 255. If there is no factual issue, and if only one reasonable conclusion could arise from the record regarding the potential outcome under the governing law, summary judgment must be awarded in favor of the moving party.  Id. at 250.

When the parties have filed cross-motions for summary judgment, as in this case, the summary judgment standard remains the same.  Transguard Ins. Co. of Am., Inc. v. Hinchey, 464 F. Supp. 2d 425, 430 (M.D. Pa. 2006).  "When confronted with cross-motions for summary judgment . . . 'the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the summary judgment standard.'"  Id. (quoting Marciniak v. Prudential Fin. Ins. Co. of Am., 184 F. App'x 266, 270 (3d Cir. 2006)).  "If review of [the] cross-motions reveals no genuine issue of material fact, then judgment may be entered in favor of the party deserving of judgment in light of the law and undisputed facts."  Id. (citing Iberia Foods Corp. v. Romeo, 150 F.3d 298, 302 (3d Cir. 1998)).

## V.    ANALYSIS

In the Cross-Motions for Summary Judgment, each party seeks summary judgment in its favor on each claim.  As noted above, the remaining claims are contained in the following counts

of the SAC: (1) Count I—Intentional Discrimination in violation of 42 U.S.C. § 1981 against all Defendants; (2) Count II—Willful Retaliation in violation of 42 U.S.C. § 1981 against all Defendants; (3) Count III—Hostile Educational Environment in violation of 42 U.S.C. § 1981 against Sahar, Parrish, and Drexel University; (4) Count IV—Intentional Discrimination in violation of Title VI of the Civil Rights Act, 42 U.S.C. § 2000d, against Drexel University; (5) Count V—Willful Retaliation in violation of Title VI of the Civil Rights Act, 42 U.S.C. § 2000d against Drexel University; (6) Count VI—Conspiracy in violation of 42 U.S.C. § 1985 against Sahar, Parrish, and Hamilton; and (7) Count VII—Racially Motivated Breach of Contract in violation of 42 U.S.C. § 1981(b) against all Defendants.  Because of the overlapping nature of the claims, the Court will discuss them out of turn to avoid duplicative analysis.

A.    **Plaintiff Has Failed to Raise a Genuine Issue of Material Fact with Respect to His Claims of Intentional Discrimination under 42 U.S.C. § 1981 and Title VI of the Civil Rights Act, 42 U.S.C. § 2000d**

In Counts I and IV respectively, Plaintiff brings a claim of intentional discrimination pursuant to 42 U.S.C. § 1981 against all Defendants and a claim of intentional discrimination pursuant to Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, against Drexel University.  Although the statutes guarantee different rights, the same analysis applies to both statutes.  Accordingly, the Court will discuss these claims concurrently.

42 U.S.C. § 1981 guarantees that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens."  "The term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C. § 1981(b).  Under 42 U.S.C. § 1981, a plaintiff must establish: (1) that he belongs to a racial minority; (2) an intent to discriminate on

19

the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in Section 1981, including the right to make and enforce contracts.  Brown v. Philip Morris Inc., 250 F.3d 789, 797 (3d Cir. 2001).

Title VI of the Civil Rights Act provides, "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.  Under Title VI, a plaintiff must show: (1) that there is racial or national origin discrimination; and (2) the entity engaging in discrimination is receiving federal financial assistance."  Abdullah v. Small Bus. Banking Dept. of Bank of America, Civ. A. No. 13-0305, 2013 WL 1389755, at *2 (E.D. Pa. Apr. 5, 2013) (citing Baker v. Bd. of Regents of Kan., 991 F.2d 628, 631 (10th Cir. 1993).  Plaintiff brings his Section 1981 claim against all Defendants, and his Title VI claim against Drexel University because Title VI applies only to entities.  See Whitfield v. Notre Dame Middle Sch., 412 F. App'x 517, 521 (3d Cir. 2011) (noting that individual liability cannot be asserted under Title VI).

Both Title VI and Section 1981 provide a private cause of action for intentional discrimination.  Pryor v. Nt'l Collegiate Athletic Ass'n, 288 F.3d 548, 562 (3d Cir. 2002).  "The standard for establishing an intent to discriminate, [the second prong under Section 1981 and the first prong under Title VI] is identical in the Title VI and § 1981 contexts."  Id. at 569. Accordingly, if Plaintiff is unable to prove intentional discrimination under Title VI and Section 1981, then Plaintiff's claims fails.  Plaintiff offers direct and circumstantial evidence that he alleges demonstrates Defendants' discriminatory intent.  The Court will review each form of evidence seriatim.

**1.      Plaintiff has not presented direct evidence of discrimination**

Plaintiff contends that he has produced direct evidence[14] of discrimination.   Direct evidence of discrimination is defined as "evidence sufficient to allow the jury to find that the decision makers placed substantial negative reliance on the plaintiff's race in reaching their decision to [dismiss] him."   Fakete v. Aetna, Inc., 308 F.3d 335, 338 (3d Cir. 2002).   Such evidence is overt or explicit evidence which directly reflects discriminatory bias by a decision maker.   Armbruster v. Unisys Corp., 32 F.3d 768, 778-79 (3d Cir. 1994) (describing direct evidence as the proverbial "smoking gun").   This evidence must be "so revealing of discriminatory animus that it is not necessary to rely on any presumption from the prima facie case to shift the burden of production."   Id. at 778.

**a.      Comments contained in Plaintiff's student records**

Initially, Plaintiff argues that direct evidence of Defendants' discriminatory intent exists in "Communist-style hidden files" Defendants maintained on Plaintiff.  (Doc. No. 632 at 35.)  At the outset, the Court finds nothing to suggest that DUCOM created "hidden files."   Rather, Plaintiff cites to his student files and summaries created in advance of the meetings of the Promotions Committee.  Plaintiff first refers to a student profile of Plaintiff and quotes from a comment section.  (Doc. No. 633-16 at 33.)  The "direct evidence" of discrimination Plaintiff relies on in the comment section includes:

---

[14]   The Third Circuit has held that under 42 U.S.C. § 1981, if a plaintiff produces direct evidence of discrimination, the burden shifts to defendant "to convince the trier of fact that it is more likely than not that the decision would have been the same absent consideration of the illegitimate factor" in accordance with the test set forth in Price Waterhouse v. Hopkins, 490 U.S. 228, 276 (1989).  Brown v. J. Kaz, Inc., 518 F.3d 175, 181 (3d Cir. 2009).  Price Waterhouse, however, has not been applied to Title VI.  As will be explained infra, because Plaintiff has failed to adduce direct evidence of discrimination, the Court will not engage in the Price Waterhouse inquiry.

. . . Received Unprofessional Citation on Peer Evaluations[15] for Gross [sic]. . . . Odd Interactions, word choices. . . . Lack of social skills noted by Dr. Parrish (personal space issues, walking around with breast in pocket.) Seems more comfortable with research. . . . Will be required to have counseling. . . . Family Medicine site wants to give him an [Unsatisfactory] in [Family Medicine] at Monmouth. Unable to apply clinical knowledge to patients. Awkward, unprofessional, Immature [sic], lacking in knowledge. Got into altercation with attending in front of patient about not being taught something. Had difficulty interacting with office staff. . . . Dr. Fitzpatrick described his knowledge basis as 'atrocious' in ICM group for Physical Diagnosis. Biggest problem was inappropriate communication (medical jargon), would use nonmedical terms in medical communication. [Following Plaintiff's dismissal from DUCOM] Dr. Fitzpatrick cited 'horrible communication skills.' Per Dr. Fuchs, "can't see forest for [sic] trees." He often goes off on tangents in conversations.

(Doc. No. 634-16 at 33-34.)

Plaintiff also refers to school records which document a student's progress in passing the USMLE Step 1 exam. At the top of the page, Plaintiff's status is recorded as "Yet to Pass Step 1." (Doc. No. 633-16 at 35.) Plaintiff quotes from the notes recorded following his first dismissal in 2009. The school noted that Plaintiff was:

overwhelmed by amount of material in ICM [Intro Clinical Medicine] and not knowing what was important; isolation from peers; depression. Dr. Parrish commented on his anxiety. Very introverted, socially awkward. Insists he wants to be in med school. . . . Dr. Ramchandani cites his high intelligence in his working with him on remediation exam, concerned about psychological issues. Lacks self-awareness about anxiety, perfectionism, depression.

(Doc. No. 633-16 at 36.)

Next, Plaintiff includes the minutes from a meeting of the Clinical Promotions Committee held on December 10, 2010, in which they discuss his failing the clinical portion of the Family Medicine clerkship:

Family Medicine attendings were shocked by his knowledge base; felt he lacked knowledge; couldn't apply knowledge to patient care. Also felt that he was

---

[15] Pursuant to the DUCOM handbook, if a student receives a Citation for Unprofessional Behavior, it is recorded and the Associate Dean of Student Affairs is contacted. There is no inference from this notation that it was created with racial animus. (Doc. No. 633, Ex. 13.)

awkward and immature.  In front of a patient, Kei questioned attending.  Kei did not interact well with staff.  Attendings felt that he had strange interactions; possibly depressed.  Attendings felt that he should repeat Family Med.  Possible reason for behavior=Kei failed Step 1 and found out halfway through rotation.  He is scheduled to take Step 1 again on 12/22/10; and is taking Family Med Shelf Exam on 12/29/10.  Regardless of how he does on the Fam Med Shelf, attendings want to give him a grade of Unsatisfactory.  Giving him a [grade of Unsatisfactory] may be grounds for dismissal for student.  When Dean Homan readmitted him, letter stated that if he ever got a grade lower than Satisfactory, that may be grounds for dismissal.  Motion: If Family Med gives him less than Satisfactory, then he will be dismissed from [DUCOM].

(Doc. No. 633-15 at 3.)

Plaintiff also selects quotes from the discussion of his dismissal by the Promotions

Committee in April 2011:

[Plaintiff] discussed loss of confidence about having to repeat Year 2, series of errors in 'trying to do too many things at same time.'  Says he will see Dr. Moore and faculty to be sure he can handle stress, make sure everything is going okay.  Says he needs to work on interpersonal skills and says part of the problem is that he lives at home and doesn't have the opportunity to interact as much with others.

(Doc. No. 633-16 at 35-36.)

In addition, Plaintiff refers to the following comments from the May 13, 2011 Clinical

Promotions Committee's meeting:

Here to appeal dismissal . . . dismissed again on academic grounds.  Also has communication issues; cannot multi-task.  Lei feels that he needs to be able to multi-task and be able to balance different things, especially as a physician . . . needs to gain his confidence back by being successful with just one thing . . . was advised not to take a shelf exam, but took it anyway because he wanted to be successful with something – he needed confidence . . . Lei feels as though his interpersonal skills need work and improvement – he will meet with faculty and advisors . . . [and] read articles on interpersonal skills.

(Doc. No. 633-17 at 15.)

Plaintiff contends that the comments above contain racial slurs.  To support this

allegation, he points to the following phrases: "odd interactions, word choices," "lack of social

skills, "horrible communication skills," "awkward, immature," "can't see forest for trees," "He

often goes off on tangents in conversations." (Doc. No. 632 at 129.) Plaintiff argues that "[t]hese are typical of racial profiling slurs and racially oriented language by [DUCOM] officials/administrators . . . ." (Id.) This argument, however, is unconvincing. Simply put, no inference of racial animus arises from these phrases.

When a plaintiff presents what he contends is "direct evidence" of racial discrimination, the evidence must be "overt or explicit evidence which directly reflects discriminatory bias by a decision maker." Bullock v. Children's Hosp. of Phila., 71 F. Supp. 2d 482, 484 (E.D. Pa. 1999); see also Armburster, 32 at 778-79, 782 (analogizing direct evidence to the proverbial "smoking gun"). Plaintiff here has presented race-neutral evidence that would not convince a jury that decision makers acted with discriminatory animus. In Walden v. Saint Gobain Corporation, the court analyzed whether facially race-neutral evidence could act as direct evidence of animus in a Section 1981 case involving an African-American plaintiff. 323 F. Supp. 2d 637, 643-44 (E.D. Pa. 2004). In Walden, plaintiff's supervisor told him that he preferred employees who "fit into a corporate culture," and that plaintiff did not do so, because he did not wear Dockers. Id. at 644. The court concluded that neither statement was motivated by racial animus, but rather related to the company's dress code preference, and the "ineffable qualities and conduct associated with the professional and business communities." Id. As such, plaintiff did not have any "direct evidence" of discrimination. Id.; compare Fakete, 308 F.3d at 336, 339 (finding direct evidence of animus based on age existed where supervisor stated to plaintiff that he was "looking for younger single people that will work unlimited hours," and as a consequence "[plaintiff] wouldn't be happy [at Aetna] in the future").

Here, Plaintiff has failed to adduce direct evidence of discrimination because all of the remarks are facially race-neutral and speak to concerns about Plaintiff's professionalism and the

"ineffable qualities and conduct associated with" the professionalism of a medical student. Walden, 323 F. Supp. 2d at 643-44.  For example: "Received Unprofessional Citation on Peer Evaluation . . . unprofessional . . . inappropriate communication;" "awkard and immature . . . In front of patient Kei questioned attending.  Kei did not interact well with staff.  Attendings felt that he had strange interactions."  (Doc. No. 633-16 at 3, 35-36; Doc. No. 634-16 at 33-34.)  In fact, on May 13, 2011, Plaintiff even acknowledged that "his interpersonal skills need work and improvement," and that because he lives at home, he "doesn't have the opportunity to interact as much with others."  (Doc. No. 633-17 at 15; Doc. No. 633-16 at 35-36.)

The comments also address Plaintiff's trouble communicating and his lack of medical knowledge: "Odd Interactions, word choices . . . .  Seems more comfortable with research . . . . lacking in knowledge . . . .  Dr. Fitzpatrick described his knowledge base as 'atrocious' in ICM group for Physical Diagnosis . . . would use nonmedical terms in medical communication.  Dr. Fitzpatrick cited 'horrible communication skills;'" "Family Medicine attendings were shocked by his knowledge base; felt he lacked knowledge; couldn't apply knowledge to patient care."  (Doc. No. 633-15 at 3; Doc. No. 634-16 at 33-34.)  Comments concerning Plaintiff's medical knowledge and ability to apply it do not display racial animus, but rather focus on Plaintiff's likelihood of success as a doctor.

The comments also reflect a concern that Plaintiff may have anxiety and depression issues: "Will be required to have counseling;" "overwhelmed by amount of material in ICM and not knowing what was important; isolation from peers; depression.  Dr. Parrish commented on his anxiety.  Very introverted . . . .  concerned about psychological issues . . . .  anxiety, perfectionism, depression;" "[Plaintiff] discussed loss of confidence about having to repeat Year

25

2 . . . .  Says he will see Dr. Moore and faculty to be sure he can handle stress."  (Doc. No. 634-16 at 33-34; Doc. No. 633-16 at 35-36.)

Finally, these assessments of Plaintiff are in accord with DUCOM's student handbook which emphasizes the importance of professionalism in medical education:

> The process of medical education includes instruction in the knowledge, skills, and attitudes necessary to perform as competent physicians.  While factual information and clinical skills are evaluated by examinations, and observations in the clinical setting, evaluation of behaviors, attitudes and professional development are less systematic and generally based on observed encounters, compliance with assignments, timeliness, and other less structured methods of evaluations.

> The professional development of medical students is an essential component of a complete medical school experience.  Students and faculty have a responsibility to acknowledge incidents of exceptional professionalism as well as lapses in professionalism.  It is important to recognize that in acknowledging such incidents that the actions and not the individual are being observed and noted.

(Doc. No. 633, Exs. 12-13.)

Accordingly, the above written comments made from June 2009 to May 2011 reflect Defendants' continued concern that Plaintiff lacked medical knowledge and had issues with professionalism and communicating with others.  These comments are facially race-neutral and do not amount to direct evidence of a proverbial "smoking gun."  Evold v. Wolf, Block, Schoor and Solis-Cohen, 983 F.2d 509, 523 (3d Cir. 1992).  Plaintiff's subjective belief that these comments display direct racial animus is not sufficient to overcome a Motion for Summary Judgment challenging whether direct evidence of intentional discrimination has been shown. See Tucker v. Thomas Jefferson Univ., 484 F. App'x 710, 712 (3d Cir. 2012) (employee's failure to offer evidence other than his subjective belief that race played a part in his firing was insufficient to withstand summary judgment).  Thus, Plaintiff has failed to raise a genuine issue

of material fact that the comments contained in his student files are direct evidence of racial discrimination.

### b.  Comments made by Dr. Sahar

Plaintiff also contends that several comments made by Dr. Sahar are direct evidence of discrimination.  When Plaintiff first met Dr. Sahar, Dr. Sahar asked him where he was from.  Apparently, Dr. Sahar pressed him to concede that while Plaintiff had immigrated to Canada as a child, he was born in China.  Plaintiff has discussed this interaction in filings since the beginning of this case.  (Doc. No. 29 ¶ 15.)  Plaintiff now in his Memorandum in Support of his Motion for Summary Judgment alleges for the first time that Dr. Sahar also stated "You're Chinese and you were born in Communist China.  I don't like Communist China." Also, at lunch during the first week of the rotation, Dr. Sahar asked Plaintiff if he ate American food or "gook food."  And finally, Dr. Sahar told Plaintiff "You're very big and tall for a Chinaman."  (Doc. No. 632-1 at 135.)  Plaintiff only provides a record citation to support the final statement, "You're very big and tall for a Chinaman."  To support this statement, Plaintiff cites to a portion of his deposition transcript that he has not included in his exhibits.  Plaintiff does not include record citations to support the other comments set forth in his Memorandum in Support of his Motion for Summary Judgment.

First, the Court notes that with respect to the statements introduced in Plaintiff's Memorandum of Law in Support of his Motion for Summary Judgment, "self-serving deposition testimony is insufficient to raise a genuine issue of material fact."  Irving v. Chester Water Auth., 439 F. App'x 125, 127 (3d Cir. 2011).  Moreover, "[l]egal memoranda and oral argument are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion."  Jersey Cent. Power & Light Co. v. Twp. of Lacey, 772 F.2d 1103, 1109-10

(3d Cir. 1985).  Accordingly, the Court may disregard the statements that Plaintiff supports only with his own self-serving deposition testimony and in the Memorandum itself.

However, even if Dr. Sahar did make these remarks, they do not amount to direct evidence of intentional discrimination for two reasons.  The first reason is that the comments do not concern the decision-making process, and they were not made at the time of the adverse decision.  Where a plaintiff relies on comments made by the decision maker as direct evidence of discrimination, it is vital that the statements relate to the decisional process in order to establish that the adverse decision was made because of the plaintiff's race.  Ezold, 983 F.2d at 545 (recognizing that "stray remarks by non-decision makers or by decision makers unrelated to the decision process are rarely given great weight").

For example, in Kim-Foraker v. Allstate Ins. Co., the court evaluated whether the remarks of plaintiff's supervisor amounted to direct evidence of discrimination.  834 F. Supp. 2d 267, 274 (3d Cir. 2011).  There, plaintiff, a Korean-American, alleged that she was terminated from defendant Allstate Ins. Co. based on her race and national origin.  As direct evidence that her termination was motivated by her race and national origin, plaintiff recalled that her supervisor said that he was taking kung fu, that Koreans always use cash, and that Koreans are hard workers, so expectations for plaintiff were greater than for other employees.  Id. at 277.  The court concluded that "the remarks do not amount to direct evidence of discrimination.  Although the remarks were uttered by one of [plaintiff's] supervisors, none of the remarks were uttered when [defendant] made the decision to terminate her employment.  The supervisor's remarks are 'stray remarks' unrelated to the decision to terminate her employment; stray remarks are not direct evidence of discrimination."  Id.

Like the remarks made by plaintiff's supervisor in <u>Kim-Foraker</u>, the comments made by Dr. Sahar here were not made at or near the time that Plaintiff received the unfavorable evaluation by Dr. Sahar or was dismissed from DUCOM. Dr. Sahar made these alleged comments during the first week of Plaintiff's clerkship in September 2010. Then, on November 5, 2010, Dr. Sahar gave Plaintiff a poor evaluation at the end of his clerkship. (Doc. No. 29-4 at 11; Doc. No. 633, Ex. 406.) He was eventually dismissed by DUCOM in April 2011 after failing required tests and receiving the "Marginal Unsatisfactory" grade in the OB/GYN course. <u>See</u> <u>Kim-Foraker</u>, 834 F. Supp. 2d at 276 (supervisor's alleged discriminatory remarks did not demonstrate that employee's race or national origin was motivating factor in adverse employment action because none of the remarks were made when employee was fired); <u>Ade v.</u> <u>KidsPeace Corp.</u>, 401 F. App'x. 697, 704 (3d Cir. 2010) (supervisor's allegedly discriminatory questions and comments made six months before employee's termination not sufficient to demonstrate discriminatory animus behind adverse employment action); <u>Keller v. Orix Credit</u> <u>Alliance, Inc.</u>, 130 F.3d 1101, 1112 (3d Cir. 1997) (decision maker's alleged discriminatory comment made approximately four to five months prior to termination was insufficient to prove that adverse action resulted from discriminatory animus).

Accordingly, the comments listed above amount to "stray remarks unrelated to the decision" to dismiss Plaintiff from DUCOM and are not direct evidence of discrimination.

The second reason that Dr. Sahar's comments do not amount to direct evidence of intentional discrimination is that Dr. Sahar was not a decision maker who had any control over Plaintiff's dismissal from DUCOM. In Plaintiff's own words, Dr. Sahar was "a businessman, [who] was only an unqualified 'volunteer' affiliate faculty member of [DUCOM], which did not pay him a single penny." (Doc. No. 632-1 at 134 n.49.) Dr. Sahar was Plaintiff's clinical

advisor for one course during the fall of his third year of coursework at DUCOM.  Plaintiff was

not dismissed until the following spring, after he received a Marginal Unsatisfactory grade in his

OB/GYN course.  Thus, Dr. Sahar was neither an employee of DUCOM, nor a decision maker

for purposes of dismissing Plaintiff.  His comments do not appear in any document relied on by

the decision makers who dismissed Plaintiff from DUCOM.   Accordingly, the alleged

discriminatory comments by Dr. Sahar did not in any way influence the decision makers at

DUCOM to dismiss Plaintiff.  Thus, for all the above reasons, Plaintiff has failed to show that

direct evidence exists to support his intentional discrimination claim.

### 2.        Plaintiff has not presented circumstantial evidence of discrimination

Even though Plaintiff has failed to produce direct evidence of discrimination, he can still

satisfy his discrimination claims under Section 1981 and Title VI with circumstantial evidence.

The McDonnell Douglas[16] burden-shifting analysis governs Section 1981 and Title VI claims

that rely on circumstantial evidence.  See Guardians Ass'n v. Civil Serv. Comm'n of N.Y., 463

U.S. 582 (1983); Manning v. Temple Univ., 157 F. App'x 509, 513 (3d Cir. 2005).  In addition

to making out a prima facie case of discrimination under McDonnell Douglas, a plaintiff must

also show that the discrimination was intentional.  General Bldg Contractors Ass'n, Inc. v. Pa.,

458 U.S. 375, 389-91 (1982).

Under McDonnell Douglas, in an educational setting, a plaintiff must prove that: (1) he is

a member of a protected class; (2) he suffered an adverse action at the hands of the defendants in

his pursuit of his education; (3) he is qualified to continue his pursuit of his education; and (4) he

was treated differently from similarly situated students who are not members of a protected

---

[16]  The McDonell Douglas burden-shifting analysis refers to the test announced in the Supreme
Court decision McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973).

class.[17]  Bell v. Ohio State Univ., 351 F.3d 240, 252-53 (6th Cir. 2003).  If a plaintiff is able to make a prima facie case under these four elements, the burden then shifts to the defendant, who must "articulate some legitimate non-discriminatory reason" for the adverse action.  McDonnell Douglas, 411 U.S. at 802.  If a defendant satisfies this standard, a plaintiff would then have to show that the legitimate non-discriminatory reason was mere "pretext" for unlawful discrimination.  This requires a showing that each of the defendant's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the adverse action.  Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).

Here, neither party contests that Plaintiff is a member of a protected class or that he suffered an adverse action at the hands of Defendants.  Accordingly, the Court will focus on the third and fourth prongs of the McDonnell Douglas analysis.

### a. Plaintiff has failed to establish that he was qualified to continue in his pursuit of education

The third prong of the McDonnell Douglas test asks whether Plaintiff was qualified to continue in his pursuit of a medical degree at DUCOM.  Bell, 351 F.3d at 252-53.  Here, Plaintiff has failed to raise a genuine issue of material fact that he was qualified to continue in the medical school program.

In reviewing Plaintiff's academic history, Plaintiff failed two courses during his first year and four courses during his second year.  As a result of these failures, his academic record came

---

[17] The Third Circuit in Manning v. Temple University acknowledged that it had not yet adopted the McDonnell Douglas test in the educational context.  157 F. App'x 509, 513 (3d Cir. 2005).  However, in Manning, the court analyzed plaintiff's claims under the test, explaining that "under any rendering of the test, [plaintiff] fails to raise the required inference of discrimination as to her dismissal from Temple."  Id.  The same is true here.  The Court will examine Plaintiff's claims under the McDonnell Douglas test to determine whether he has raised the required inference of discrimination.

under review by the Clinical Promotions Committee who voted to dismiss him.  (Doc. No. 29-4 at 45; Doc. No. 29, Ex. 19.)  After successfully appealing his dismissal, Plaintiff was re-enrolled under the condition that he retake his second year courses, meet with a counselor about test taking strategies and time management, meet with a faculty advisor, and maintain grades of at least Satisfactory in his courses and clinicals.  (Doc. No. 634, Ex. F.)  Specifically, Plaintiff was told that "[a]ny grade below Satisfactory will be considered grounds for dismissal from the College of Medicine."  (Id.)

When Plaintiff repeated his second year courses, he received a grade below Satisfactory in Microbiology.  (Doc. No. 634, Ex. B.)  Despite violating the conditions of his re-enrollment, Plaintiff was permitted to remain enrolled at DUCOM.

Plaintiff then entered the clinical portion of his training at DUCOM and began a Family Medicine clerkship in the fall of 2010.  (Id.)  Plaintiff proceeded to receive a grade of Unsatisfactory in the clinical portion of the clerkship, and a grade of Unsatisfactory on the shelf exam graded by the NBME.  (Id.)  Even though at this point Plaintiff had twice violated the conditions of his re-enrollment, he was still permitted to continue at DUCOM under new conditions.  These conditions included a condition that he complete his clinical training in Philadelphia, repeat the Family Medicine Clerkship, and receive grades of at least Satisfactory, as "[t]he receipt of any additional grade of less than Satisfactory (including Unsatisfactory or Marginal Unsatisfactory) will be considered grounds for dismissal from the College of Medicine."  (Doc. No. 634, Ex. M.)

Thereafter, Plaintiff began an OB/GYN clerkship at Hahnemann Hospital.  Plaintiff ultimately received a grade of Satisfactory in the clinical portion of the OB/GYN clerkship, but received a grade of Unsatisfactory on the shelf exam graded by the NBME.  Because Plaintiff

had now violated the terms of his re-enrollment three times, and because per the DUCOM handbook "[s]tudents earning grades of Marginal Unsatisfactory and/or Unsatisfactory in multiple clerkships will have their entire academic record reviewed by the Clinical Promotions Committee," Plaintiff's academic record was once more scrutinized by the Promotions Committee.  (Doc. No. 634, Ex. Q at 5.)  Most notably, his failures in Family Medicine and OB/GYN resulted in part from the objective grading by the National Board of Medical Examiners.

Ultimately, the Clinical Promotions Committee voted to dismiss Plaintiff from DUCOM citing his pattern of academic failure over the course of his four years at DUCOM.  The Court will not second guess this decision because a federal court "is not the appropriate forum in which to . . . evaluate the substance of the multitude of academic decisions that are made daily by faculty members of public educational institutions—decisions that require 'an expert evaluation of cumulative information and [are] not readily adapted to the procedural tools of judicial or administrative decisionmaking."  Hajjar-Nejad v. George Washington Univ., 37 F. Supp. 3d 90, 135 (D.D.C. 2014) (citing Regents of Univ. of Michigan v. Ewing, 474 U.S. 214, 226 (1985)).  Accordingly, Plaintiff has not established that he was qualified to continue in the program in light of his repeated failures.  Thus, Plaintiff has failed to raise a genuine issue of material fact that he was qualified to continue his medical education at DUCOM.

### b.    Plaintiff has failed to establish that he was treated differently from similarly situated students

Plaintiff also has not established that similarly situated students outside his protected class were treated more favorably than him.  In analyzing the fourth prong of the McDonnell Douglas test, a plaintiff has the burden of establishing that similarly situated students outside of his protected class were treated differently than him.  Texas Dep't of Cmty. Affairs v. Burdine,

450 U.S. 248, 257 (1981). The mere favorable treatment of one member outside of the protected class as compared to a member of the protected class may not be sufficient to infer discrimination. See Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 645 (3d Cir. 1998). "This is not to say that evidence of the more favorable treatment of a single member of a non-protected group is never relevant, but rather that the evidence cannot be viewed in a vacuum." Id. at 646. Rather, the court must review the record as a whole to answer the ultimate inquiry—whether the adverse decision was motivated by race. Id. at 645-46.

Additionally, the students a plaintiff selects to use as comparators must be "similarly situated." Lula v. Network Appliance, Inc., No. 2:03CV1066, 2006 WL 1371132, at *5 (W.D. Pa. May 17, 2006). Specifically, "[i]n order for [a student] to be deemed similarly situated, the individuals with whom a plaintiff seeks to be compared must have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the [school's] treatment of them for it." Bailey v. United Airlines, Civ. A. No. 97-5223, 2002 WL 1397476, at *9 (E.D. Pa. June 26, 2002); see also Morris v. Yale Univ. Sch. of Medicine, 477 F. Supp. 2d 450, 460 (D. Conn. 2007) (finding that plaintiff had failed to establish that identified Caucasian students were similarly situated, "i.e., having similar academic records"). Further, the proposed comparators must be similarly situated in "all relevant respects." Wilcher v. Postmaster General, 441 F. App'x 879, 881 (3d Cir. 2011); see Johnson v. NewCourtland, Inc., Civ. A. No. 13-4328, 2015 WL 894320, at *12 (E.D. Pa. Mar. 3, 2015) (explaining in employment context that "if [employees'] conduct differed in a way that would be material to an employer, they will not be considered comparators"). Accordingly, any comparator for purposes of establishing that Drexel treated similarly situated students differently must have similar

academic records to Plaintiff and have engaged in the same conduct without differentiating or mitigating circumstances.

Plaintiff's academic history is summarized as follows: (1) Plaintiff received a Marginal Unsatisfactory and an Unsatisfactory grade in his first year.  He was permitted to remediate the courses over the summer; (2) Plaintiff received a grade of Unsatisfactory in four courses during his second year; (3) Plaintiff was dismissed as a result of the four failures and subsequently readmitted on the condition that any grade below Satisfactory could be grounds for dismissal; (4) Plaintiff received a Marginal Unsatisfactory grade in Microbiology during the repeat of his second year but was not dismissed.  Instead, he was permitted to raise the grade to Satisfactory after passing the NBME subject exam; (5) Plaintiff was permitted to defer beginning his third year by 12 weeks in order to study for the Step 1 exam; (6) Plaintiff failed the Step 1 exam; (7) Plaintiff received an Unsatisfactory grade in the clinical portion of Family Medicine but was not dismissed; (8) Plaintiff was permitted to postpone taking the Family Medicine shelf exam in order to study for his second attempt at the Step 1 exam; (9) Plaintiff failed the Family Medicine shelf exam, thus receiving an overall grade of Unsatisfactory in Family Medicine; (10) Although Plaintiff had twice breached the terms of his conditional letter of re-enrollment, he was not dismissed, but received a new conditional letter ordering him to retake Family Medicine, complete the rest of his third year clerkships in Philadelphia so DUCOM staff could supervise him, and was again advised that any grade below Satisfactory, including Marginal Unsatisfactory, would be grounds for dismissal;  (11) Plaintiff took the Step 1 exam for a second time and failed; and (12) Plaintiff passed the clinical portion of the OB/GYN clerkship, but failed the NBME shelf exam.  Plaintiff thus received a grade of Marginal Unsatisfactory in OB/GYN and was dismissed.

During discovery, Plaintiff requested information concerning the race and academic background of students who attended DUCOM including the time of his enrollment—from the fall of 2007 to the spring of 2011.[18]   He sought this information in order to show that he was

---

[18] Defendants produced this information on spreadsheets in which students were identified by number in order to preserve their anonymity in accordance with the Family Educational Rights and Privacy Act ("FERPA").  DUCOM was concerned that the unauthorized release of student records could have a major impact on the school of medicine.  In general, FERPA protects the anonymity of student records and provides as follows:

> (1) No funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of permitting the release of education records (or personally identifiable information contained therein other than directory information, as defined in paragraph (5) of subsection (a) of this section) of students without the written consent of their parents to any individual, agency, or organization . . . .

> (2) No funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of releasing, or providing access to, any personally identifiable information in education records other than directory information, or as permitted under paragraph (1) of this subsection, unless –

>> (A) there is written consent from the student's parents specifying records to be released, the reasons for such release, and to whom, and with a copy of the records to be released to the student's parents and the student if desired by the parents, or

>> (B) except as provided in paragraph (1)(j), such information is furnished in compliance with judicial order, or pursuant to any lawfully issued subpoena . . .

20 U.S.C. § 1232g.  Personally identifiable information includes:

> (a) the student's name;

> (b) the name of the student's parent or other family member;

> (c) the address of the student or student's family;

> (d) a personal identifier, such as the student's social security number, student number, or biometric record;

(e) other indirect identifiers, such as the student's date of birth, place of birth, and mother's maiden name;

(f) other information that, along or in combination, is linked or linkable to a specific student that would allow a reasonable person in the school community, who does not have personal knowledge of the relevant circumstances, to identify the student with reasonable certainty; or

(g) information requested by a person who the educational agency or institution reasonably believes knows the identity of the student to whom the education record relates.

34 C.F.R. § 99.3.

Plaintiff was dissatisfied with the spreadsheets and requested that Defendants identify the students by name and produce their student files.  Defendants objected, arguing that production of this information would violate FERPA.  On August 9, 2013 and October 18, 2013, the Court held hearings on the discovery dispute in view of the restrictive provisions of FERPA.

Following the hearings, the Court instructed Defendants to send letters to the students identified in the spreadsheets inquiring whether they objected to Defendants providing Plaintiff with their identity or student records.  On November 26, 2013, the Court instructed Defendants to make changes to the letters in response to Plaintiff's objections, and then to mail the letters to the students.  (Doc. Nos. 291, 308, 332.)

On December 12, 2013, Defendants mailed the form letter to 106 students.  Fifty-five students responded to the letters.  Fifty-one students did not respond.  Of the fifty-five responses, forty-four students objected to having their identities revealed on the spreadsheets created by DUCOM.  Fifty-three of the fifty-five students objected to DUCOM providing Plaintiff with a copy of their student records or other documents which contained their personally identifying information.  Two students of the fifty-five had no objection to revealing their identity or turning over to Plaintiff their student records.

After receiving the responses, the Court issued an Opinion (Doc. No. 451) on whether Plaintiff should be given the information on the students who objected, did not object, or did not respond to the letters sent by DUCOM.

The Court concluded that Plaintiff would be provided with the un-redacted student files, which included identifying information, of the two students who did not object to the release of their personally identifiable information.  The Court also concluded that Plaintiff would be provided with the redacted student files of the remaining 104 students.  Included in the 104 student files were the files of the fifty-one students who did not respond to the letter.  The Court ordered their personally identifiable information redacted from their files because "[i]n the absence of a response, their privacy rights under FERPA have not been knowingly and

37

treated differently from similarly situated students.  Defendants produced this information in spreadsheets and identified students with a number in order to preserve their anonymity. Plaintiff used the information provided by Defendants to create his own spreadsheets to show that similarly situated DUCOM students were treated differently and more favorably than Plaintiff.  The spreadsheets are categorized as follows:

1. Caucasian and African-American students in 2007-2011 who failed clerkships in their third year who were not dismissed;

2. Caucasian and African-American students in 2007-2011 who violated conditional letters who were not dismissed;

3. Caucasian and African-American students in 2007-2011 who failed courses in the first and second year who did not receive conditional letters;

4. Caucasian and African-American students in 2007-2011 who were given more than eighteen months, or more than three attempts, to pass the Step 1 exam;

5. African-American students in 2007-2011 who failed multiple courses in the first or second year who were not dismissed; and

6. Caucasian students in 2007-2011 who failed multiple courses in the first or second year who were not dismissed.

---

voluntarily waived and should be respected by the Court."  (Doc. No. 451 at 11.)  This entire balancing process afforded Plaintiff access to academic records of 106 students, which he used in advancing his claims in this case, while protecting the privacy rights of students under FERPA.

Accordingly, the circumstantial evidence discussed in this section is based upon the spreadsheets created by Defendants, as modified by Plaintiff, and the student records provided to him.  The student number identified on Defendants' spreadsheets corresponds to the number at the top of the student's redacted student file.

Plaintiff himself also compiled a list of dismissed students who attended DUCOM from 2007 to 2011 with their racial background.  This supplemental list is offered by Plaintiff to support his claims.

A review of the academic records of the students referred to on the spreadsheets does not establish, however, that the students relied on by Plaintiff to support his claim of discrimination were similarly situated to him in all material respects.  The Court will discuss the spreadsheets in the order that they have been identified in Plaintiff's Motion for Summary Judgment.

i.    **Spreadsheets with Third Year Caucasian and African-American students who failed clerkships and were not dismissed**

This spreadsheet includes information about African-American and Caucasian students attending DUCOM from 2007 to 2011 who failed clerkships in their third year and were not dismissed.  (Doc. No. 568.)  There are thirty[19] students listed in total, of whom six are Caucasian students, four are African-American students, and three are Chinese students.  The remaining eighteen are minority students with a different race from the thirteen students noted.  As will be discussed below, the Caucasian and African-American students are not similarly situated to Plaintiff because none of the students had a comparable academic record to Plaintiff.

---

[19]  As noted, this spreadsheet was created by Plaintiff from information provided by Defendants during discovery.  This spreadsheet actually contains thirty-two students.  One student declined to share his race.  (Doc. No. 568.)  Nevertheless, Plaintiff included this student on the spreadsheet limited to Caucasian and African-American students.  Thus, the performance of this student is not relevant to the analysis of whether Caucasian and African-American students who failed third year clerkships and were not dismissed were treated differently from Plaintiff.

Additionally, student 418 withdrew from the medical school before DUCOM had an opportunity to decide whether dismissal was proper.  Accordingly, student 418 is also irrelevant to the analysis.

The Caucasian students are identified by numbers 408, 410, 413, 36/92,[20] 33/291, and 424.  Students 408 and 410 passed the clinical portions of their clerkships, but failed the shelf exam, thus receiving Marginal Unsatisfactory grades.  (Doc. No. 568.)  The students were permitted to retake the shelf exam to remediate their grades, at which point their grades were raised to Satisfactory.  (Id.)  Student 413 was also permitted to retake his shelf exam in order to raise his grade to Satisfactory.  Student 36/92 was placed on academic probation after failing two clerkships, but passed the clerkships after repeating them.  Student 33/291 failed two clerkships, was permitted to repeat them, but was required to complete the clerkships in Philadelphia.  (Id.)

The African-American students are identified as 111, 421, 66, and 425.  Student 111 passed the clinical portion of the clerkship but failed the shelf exam.  The student was permitted to retake the shelf exam and passed the exam.  Student 421 was dismissed after an Honor Code violation.  The student was readmitted on conditions similar to those imposed on Plaintiff (i.e., no grades below Satisfactory, and completing all clerkships in Philadelphia).  Student 66 failed the shelf exam and was permitted to repeat the clerkship due to family issues.  Finally, student 425 failed the shelf exam and was permitted to retake the exam twice until he passed.  (Doc. No. 568.)

Plaintiff argues that he was treated differently than these students because he was not permitted to retake the OB/GYN shelf exam even though he had passed the clinical portion of the OB/GYN clerkship like some of the students listed in this spreadsheet.  Although this

---

[20] When Defendants first compiled the redacted student records and created the spreadsheets requested by Plaintiff, Defendants would at times list the same student with a different number on a different spreadsheet.  When Defendants discovered this error, they began identifying students who had mistakenly been given two numbers with both numbers, such as: 36/92, 33/291.

comparison is true to the limited extent noted, Plaintiff omits the fact that the OB/GYN shelf exam failure was the last straw in a series of academic failures that resulted in his dismissal.

Specifically, at the time that Plaintiff failed the OB/GYN shelf exam, he was subject to re-enrollment conditions set forth in Dean Homan's letter which stated that a grade of less than Satisfactory would be grounds for dismissal. (Doc. No. 634, Ex. F.) Moreover, Plaintiff had breached the conditions when he received a Marginal Unsatisfactory grade during his second year, but was nevertheless permitted to remediate his grade. He then breached the conditions again when he received a grade of Unsatisfactory in the Family Medicine clerkship and a grade of Unsatisfactory on the shelf exam. Finally, when he received a grade of Unsatisfactory on the OB/GYN shelf exam, he was dismissed from DUCOM.

Similarly situated students must "have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the [school's] treatment of them for it." Bailey, 2002 WL 1397476, at *9. None of the above students "engaged in the same conduct" as Plaintiff, since none of them were subject to conditional letters or had similar academic records as Plaintiff. Accordingly, the students reflected on this spreadsheet are not similarly situated to Plaintiff and therefore no genuine issue of material fact arises from the information on these students.

> ii.    **Spreadsheets with Caucasian and African-American students who violated conditional letters and were not dismissed**

The next spreadsheet Plaintiff relies on contains information on Caucasian and African-American students who violated conditional letters but were not dismissed. (Doc. No. 632 at 49.) This spreadsheet refers to three African-American students, and five Caucasian students. (Id. at 49-51.) Unlike Plaintiff, the students on this spreadsheet did not violate the terms of the

conditional letter several times.  After Plaintiff was readmitted on July 21, 2009, he proceeded to violate the terms of the conditional letter in the following ways: first, he received a grade of Marginal Unsatisfactory in Microbiology (Doc. No. 634, Ex. B); then, he received a grade of Unsatisfactory in both the clinical portion of Family Medicine and a grade of Unsatisfactory on the shelf exam (Doc. No. 29 ¶ 29; Doc. No. 634, Ex. L.); and finally, he received a grade of Unsatisfactory on OB/GYN shelf exam, resulting in an overall grade of Marginal Unsatisfactory. (Doc. No. 634, Exs. B, N.)  Accordingly, while the students in this spreadsheet may have violated conditional letters, none violated conditional letters more than once.

In fact, of the students listed, only three students actually violated the conditional letters, while the others, Plaintiff asserts, "could have violated the conditional letter without being dismissed." (Doc. No. 632 at 49-50.)  The three students who did violate the conditional letters only failed one course compared to Plaintiff's receipt of grades below Satisfactory in three courses.  Accordingly, these students are not similarly situated to Plaintiff for purposes of showing that Drexel discriminated against him.

iii.   **Spreadsheets with Caucasian and African-American students who failed courses in the first and second year and who did not receive conditional letters**

Plaintiff next refers to a spreadsheet containing Caucasian and African-American students who failed courses in their first and second years at DUCOM, but did not receive conditional letters.  There are twelve students on this list.[21]  None of these students are "similarly situated" in all material respects to Plaintiff.

---

[21] Plaintiff includes students 3 and 11/63 on this spreadsheet, even though both students did receive conditional letters.  (Doc. No. 632 at 52; Doc. No. 647 at 17.)  Accordingly, the Court will not consider these students in its analysis of this spreadsheet.

Looking first at students 1, 10, 16, and 31, Plaintiff contends that these students did not receive a conditional letter after failing courses during their first year.  (Doc. No. 632 at 52.)  Plaintiff apparently ignores the fact that he also did not receive a conditional letter after failing courses his first year.  Therefore, these students are not similarly situated students who received more favorable treatment than Plaintiff.

Student 8 also is distinguishable in two respects.  First, this student failed two courses in his first year and three in his second year.  Student 8 was permitted to repeat his second year, and was ultimately dismissed when he failed two repeated courses.  (Doc. No. 632 at 52.)  Plaintiff by comparison failed two courses in his first year, four courses his second year, was dismissed, and then was readmitted to retake the second year courses.  In comparison to student 8, Plaintiff failed an additional course his second year for a total of four courses.  Moreover, student 8's appeal following his dismissal was unsuccessful, whereas Plaintiff's appeal from his first dismissal was successful and he was readmitted.

Second, student 8 had a history of medical problems that necessitated a leave of absence during the fall semester of his second year, which required him to postpone the appeal of his dismissal.  (Doc. No. 457.)  The medical problems are "differentiating or mitigating circumstances that would distinguish [DUCOM's] . . . treatment" of this student as compared to DUCOM's treatment of Plaintiff.  Bailey, 2002 WL 1397476, at *9.  Thus, because Plaintiff did not have medical problems that would justify the same treatment, and because Plaintiff failed an additional course his second year, student 8 is not similarly situated to Plaintiff.

Student 7 failed courses his first year but only one course in his second year.  (Doc. No. 632 at 52.)  Plaintiff by comparison failed four courses his second year.  Students 20/230, 24, and 26 all passed their first year courses but failed three courses in their second year.  (Id. at 53.)

43

Students 20/230 and 24 were permitted to repeat the three failed courses, and student 26 was permitted to remediate one course, and retake two courses.  (Doc. No. 457.)  Again, Plaintiff is not similarly situated to these students because he failed two courses in his first year and four courses in his second year.

Student 23 is also not comparable to Plaintiff.  This student had several failures in his first year, but then passed all of his second year courses.  This student, however, failed to meet the condition that he pass the Step 1 exam within eighteen months of completing the second year and was subsequently dismissed.  Student 23 had one violation of a condition set by DUCOM and was dismissed.  This student was treated less favorably than Plaintiff who had a worse academic record, and was dismissed only after violating the conditional letter three times.  (Doc. No. 653 at 9; Doc. No. 632 at 53.)

Student 371 is the most similar to Plaintiff, as this student also failed two courses in his first year and four courses in his second year.  (Doc. No. 632 at 54.)  However, evidence of favorable treatment of a single member of a non-protected group "cannot be viewed in a vacuum."  Simpson, 142 F.3d at 646.  Looking at the record as a whole, Plaintiff fails to mention that this student had medical issues which DUCOM considered when it permitted the student to repeat the second year.  This "mitigating circumstance distinguishes [the student's] conduct [and] the [school's] treatment of them for it."  Bailey, 2002 WL 1397476, at *9.  Thus, Plaintiff was not similarly situated to this student for purposes of inferring that DUCOM treated Plaintiff less favorably than this student because of race.

Finally, student 405 was in fact treated less favorably than Plaintiff.  This student failed three courses in his first year and repeated them.  Like Plaintiff, this student did not receive a conditional letter after his first year failures.  Unlike Plaintiff, however, this student was

dismissed after he failed four courses during his second year and was not readmitted.  Thus, this student was treated less favorably than Plaintiff, who was readmitted and allowed to repeat his second year curriculum.  Accordingly, none of the students listed on this spreadsheet are similarly situated to Plaintiff for purposes of inferring racial discrimination by DUCOM.

> ### iv.     Spreadsheets with students who were given more than 18 months or more than three attempts to take the Step 1 exam

The next spreadsheet Plaintiff references includes students who were given more than 18 months, or more than three attempts, to take the Step 1 exam.  This spreadsheet lists seven students.  As noted by Defendants, DUCOM's requirement that students pass the Step 1 exam within 18 months of completing their second year coursework was not instituted until March 2006.  (Doc. No. 647, Ex. C.)  Thus, students who had begun at DUCOM before this date were not subject to this requirement.  In addition, students who began at DUCOM before this date, took a leave of absence, and then resumed their studies were also not subject to this condition.  Of these seven students, student "Heidi Baer," and students 428, 430, 431, and 435 were not subject to this condition.  (Doc. No. 638, Ex. 311.)

Students 7 and 23, however, were subject to this condition.  Student 7 took the Step 1 exam, did not pass, and failed to retake the test within 18 months.  The student was then dismissed and filed an appeal with DUCOM requesting to take the test a second time.  The student delayed retaking the test because of a death in the family and an appeal to the NBME for an accommodation which was ultimately denied.  DUCOM, however, granted the appeal and set a new time limit to pass the Step 1 exam.  When the student once again failed, he was dismissed from DUCOM.  (Doc. No. 633, Ex. 334-41.)  Student 23 did not pass the Step 1 exam within the

required timeframe and was dismissed.  As of the date of the most recent spreadsheet provided by Defendants, this student was no longer enrolled at DUCOM.  (Doc. No. 568.)

Plaintiff is not similarly situated to students 7 and 23 for two reasons.  First, Plaintiff never requested an extension of time to take the Step 1 exam beyond the eighteen month deadline or after three attempts because he was dismissed from DUCOM before he reached the eighteen month point.  Plaintiff finished his second year coursework in May 2010.  He was dismissed approximately one year later after having taken and failed the Step 1 exam twice.  At the time of his dismissal, Plaintiff still had six months remaining to take the Step 1 exam.  He also had one more chance to pass the Step 1 exam.  He was scheduled to retake the exam a third time in July 2011 but was not permitted to take it by the National Board of Medical Examiners when they learned that Plaintiff was no longer attending medical school.  Accordingly, the fact that students 7 and 23 were granted an extension to take the Step 1 exam past the eighteen month deadline, or afforded an additional chance to pass the exam, does not make them similarly situated to Plaintiff in all material respects.

Second, Plaintiff was not dismissed because of his Step 1 failures.  Rather, Plaintiff was dismissed for violating the terms of his conditioned enrollment at DUCOM concerning receipt of a grade below Satisfactory.  The student information on this spreadsheet has no relevance to DUCOM's decision to dismiss Plaintiff because his Step 1 failures did not cause his dismissal.  For these reasons, the student information on this spreadsheet also does not raise an inference that DUCOM dismissed Plaintiff because of his race.

###### v. Spreadsheets with African-American students who failed multiple courses in the first or second year and were not dismissed

The next spreadsheet Plaintiff relies on contains information on African-American students who failed courses in their first or second year at DUCOM and were not dismissed. Like the students listed in the above spreadsheets, the seven[22] students listed here are not similarly situated to Plaintiff.  Student 1/111 had failures during his first year but had no failures during his second year.  (Doc. No. 632 at 59.)  Specifically, student 1/111 failed Physiology and Biochemistry and received a Marginal Unsatisfactory in Gross Anatomy in his first year.  After repeating and passing these first year courses, student 1/111 received grades of Satisfactory in his second year courses.  By comparison, Plaintiff received a grade of Unsatisfactory in Immunology and a grade of Marginal Unsatisfactory in Behavioral Science in his first year. (Doc. No. 634-1 at 3.)  Plaintiff was also permitted to remediate these grades and passed.  Unlike this student, however, Plaintiff proceeded to fail four courses during his second year thus warranting dismissal.  Accordingly, student 1/111 is not similarly situated to Plaintiff.

Student 20 passed all first year courses but failed three courses in his second year.  (Doc. No. 632 at 53.)  This student was permitted to retake the three courses which he then passed. (Doc. No. 457.)  By comparison, Plaintiff failed two courses his first year while student 20 failed none.  Plaintiff then failed four courses his second year.  Student 20 failed courses for the first time during his second year, while Plaintiff had a pattern of failure during both his first and second years.  This dichotomy is a "differentiating or mitigating circumstance[]" that would

---

[22] Plaintiff once again misstates the number of students in this spreadsheet.  Plaintiff listed nine students: 1, 3, 6, 9, 20, 23, 66, 111, and 425.  In fact, there are only seven students listed. Defendants identified student 1 also as student 111: 1/111, and student 6 also as student 66: 6/66.  This reduces the number of students referred to on this spreadsheet as comparators from nine to seven.

justify DUCOM's decision not to dismiss student 20 after the second year failures.  Bailey, 2002 WL 1397476, at *9.  Thus, Plaintiff is not similarly situated to student 20 in all material respects.

Student 23 is discussed above in the section involving students who had been granted an extension of time to take and pass the Step 1 exam.  This student failed five courses in his first year and repeated these courses and passed.  (Doc. No. 632 at 59.)  In his second year, the student received one grade of Unsatisfactory in Bioethics which he remediated.  (Doc. No. 457.)  Although this student had more first year failures than Plaintiff, he had only one second year failure compared to Plaintiff's four second year failures.  This student's academic performance improved while Plaintiff's worsened.  Thus, student 23 is not a similarly situated student who received more favorable treatment than Plaintiff.  In addition, this student was dismissed from DUCOM after failing to take the Step 1 exam within the required timeframe.  Thus, this student, who violated a condition set by DUCOM only once when he did not timely take the Step 1 exam, was treated less favorably than Plaintiff who violated DUCOM's conditions several times before being dismissed.

Student 425 failed one course in his first year and three in his second year.  (Id. at 60.) However, unlike Plaintiff, this student received two Highly Satisfactory grades in his second year along with the three failures.  Plaintiff failed more courses both in his first and second year, and did not receive any Highly Satisfactory grades his second year.  Accordingly, these grades amount to "differentiating or mitigating circumstances" that would explain why DUCOM would not dismiss this student after his second year failures.  Bailey, 2002 WL 1397476, at *9.  Thus, this student also is not similarly situated in all material respects to Plaintiff.

Students 3 and 6/66 are also distinguishable.  Student 3 was dismissed after failing to pass repeated first year courses.  (Doc. No. 653 at 7.)  His appeal for reinstatement was granted

because of family issues that required the student to assist with a family member's health care. He remediated the first year coursework over the summer, passed all his second year courses except one, and remediated that course over the summer. Student 6/66 failed courses during her first year and was dismissed from DUCOM after she again repeated and failed her first year courses. Her appeal for reinstatement was granted because during the year she had repeated the courses, she had a child, a parent died, she had an ill grandparent, and went through a major financial crisis. Thereafter, the student passed all second year coursework. These two students had documented personal issues that DUCOM considered when readmitting them. Accordingly, these "mitigating circumstance[s] distinguish[] [these students'] conduct [and] the [school's] treatment of them for it." Bailey, 2002 WL 1397476, at *9. Thus, students 3 and 6/66 are not similarly situated students to Plaintiff.

Plaintiff also relies on Student 9 who had an academic history almost identical to Plaintiff's academic record. In his first year, student 9, like Plaintiff, failed two courses, and in his second year, student 9 failed the same four courses as Plaintiff. (Doc. No. 632 at 59; Doc. No. 437.) Like Plaintiff, the Promotions Committee voted to dismiss student 9 for these failures. (Doc. No. 437.) Also like Plaintiff, the Promotions Committee granted student 9's appeal and he was readmitted under almost identical conditions to Plaintiff including the condition that "[a]ny grade less than Satisfactory may be considered as grounds for dismissal from the College of Medicine." (Id.) Accordingly, this student was not treated more favorably than Plaintiff, but treated similar to Plaintiff.

### vi. Spreadsheets with Caucasian students who failed multiple courses in the first or second year and were not dismissed

The final spreadsheet that Plaintiff relies on to show that similarly situated students were treated differently than Plaintiff is a spreadsheet containing information about Caucasian students who failed courses in year 1 or year 2 without being dismissed. Like the students above, none of the students here are similarly situated in all material respects to Plaintiff.

Student 8 failed two courses in his first year and three in his second year. Plaintiff by comparison failed two courses in his first year and four courses his second year. Student 8 was ultimately dismissed from DUCOM after repeating his second year and failing two courses. (Doc. No. 632 at 52.)

Student 7 failed courses his first year but only one course his second year. (Id.) This student is distinguishable from Plaintiff who failed four courses his second year. Students 10, 16, and 31 failed courses in their first year but none in their second year, unlike Plaintiff who failed four courses his second year. (Doc. No. 632 at 60-61.)

Students 24 and 26 passed their first year courses but failed three courses in their second year. (Id. at 53.) Plaintiff is not similarly situated to these students because he had failed two courses his first year and four courses his second year for a total of six failed courses in two years. Students 24 and 26 failed three courses over two years. Thus, students 24 and 26 had their first course failures at the end of the second year, while Plaintiff failed courses during his first and second years of study. Accordingly, these students are not similarly situated to Plaintiff.

Student 74 was not treated more favorably than Plaintiff. This student passed all first year courses and then received three grades of Unsatisfactory in his second year and one grade of Marginal Unsatisfactory. (Doc. No. 457.) Like Plaintiff, the Clinical Promotions Committee

voted to dismiss this student after his second year failures. (Id.) Compared to Plaintiff, however, this student had a better academic record, as he had no first year failures, and received three grades of Unsatisfactory his second year, compared to Plaintiff's four. The Promotions Committee readmitted the student and imposed almost identical conditions imposed on Plaintiff, including the repeat of all courses in which he received a grade of less than Satisfactory and also that "any further grade of Marginal Unsatisfactory or Unsatisfactory will be considered grounds for dismissal from [DUCOM]." (Id.) Thus, this student was not treated more favorably than Plaintiff.

Student 371 is most similar to Plaintiff. This student also failed two courses in his first year and four courses in his second year. (Doc. No. 632 at 54.) The Court discussed this student previously when analyzing the spreadsheet containing Caucasian and African-American students who failed courses in the first or second year and did not receive conditional letters. The Court adopts that analysis here. Student 371 had medical issues which DUCOM believed justified permitting the student to repeat the second year. This student's medical issues ultimately necessitated that he withdraw from DUCOM. This "mitigating circumstance distinguishes [the student's] conduct [and] the [school's] treatment of [the student] for it." Bailey, 2002 WL 1397476, at *9. Accordingly, Plaintiff was not similarly situated to this student for purposes of inferring that DUCOM treated Plaintiff less favorably than this student because of race.

Similarly, student 11/63 also suffered from a medical condition that required a leave of absence. Like Plaintiff, this student was dismissed after receiving four grades below satisfactory in the second year. The student's appeal was granted and she was readmitted following a medical leave of absence. The student then failed additional courses after she was readmitted, and was dismissed. (Doc. No. 653 at 8.) Like Plaintiff, this student was dismissed following

51

poor academic performance her second year, and also like Plaintiff was readmitted.  She was ultimately dismissed for a continued pattern of failures of second year courses, similar to Plaintiff.  Accordingly, this student was not treated more or less favorably than Plaintiff.

Student 405 was treated less favorably than Plaintiff.  This student failed three courses in his first year and repeated them.  (Doc. No. 632 at 146.)  Like Plaintiff, this student did not receive a conditional letter after his first year failures.  Unlike Plaintiff, this student was dismissed after he failed four courses during his second year and was not readmitted.  Thus, this student was treated less favorably than Plaintiff.  (Id.)

Finally, student 30 was treated less favorably than Plaintiff.  Student 30 was dismissed after receiving failing grades in his first and second year.  Compared to Plaintiff's four grades of Unsatisfactory, student 30 only had three grades of Unsatisfactory in his second year.  Thus, this student was treated more harshly than Plaintiff.

After a review of the academic performance and personal information on the above students who are referred to on the spreadsheets, it is clear that Plaintiff has failed to present facts that show similarly situated students were treated more favorably than him.

### vii.   Statistical evidence with respect to students dismissed from DUCOM from 2007 to 2011

Finally, Plaintiff includes a spreadsheet he created which contains students who were dismissed from 2007 to 2011 and their race.  This spreadsheet is incomplete[23] and discrimination

---

[23] For example, Plaintiff refers to two students as "Asian" on the spreadsheet, even though in other spreadsheets they are described as Chinese.  (Doc. No. 647 at 18.)  The distinction is important because only Chinese students are within Plaintiff's protected class, while other students who may fall under the "Asian" umbrella would be outside of Plaintiff's protected class.  Therefore, the Court cannot discern of the five "Asian" students identified on the spreadsheet, which are within Plaintiff's protected class of Chinese students and which are outside of Plaintiff's protected class.

cannot be inferred from the race of the student and the year of the student's dismissal without knowing more about the circumstances of dismissal.

The chart is based on nineteen students who were dismissed between 2007 and 2011.[24] These students include five Caucasian students, four Pakistani students, three "Asian" students, three African-American students, two Latino students, one Mexican-American student, and one Asian-Indian student. These statistics do not reflect that "Asian" students were treated less favorably than students outside of their protected class. More Caucasian students were dismissed than "Asian" students, and an equal number of African-American and Asian students were dismissed.

Most importantly, as noted by Defendants, DUCOM sometimes has no input on whether to dismiss a student, such as when a student fails Step 1 more than three times, or fails multiple NBME exams. Without more information concerning the reasons for the dismissals, the Court cannot infer from these statistics that DUCOM intentionally dismisses Chinese students because of their race.

In Koumantaros v. City University of New York, the court examined whether a Caucasian student had established that non-Caucasian students were treated more favorably than her in her claim of discriminatory dismissal. No. 03 Civ. 10170, 2007 WL 840115 (S.D.N.Y. Mar. 19, 2007). There, the student was on academic probation for violating a condition in the student handbook that students must receive a grade of "C" or above in their pre-clinical classes after failing a course. 2007 WL 840115, at *2. While on probation, the student received another

---

[24] There are two additional students listed on Plaintiff's spreadsheet that the Court will not consider. The first student is identified as Asian and was dismissed in 2013. This is outside the timeframe that Plaintiff was enrolled at DUCOM and therefore is not relevant to whether Defendants discriminated against him while he was a student. Additionally, another student recorded as Asian was not dismissed, but withdrew from DUCOM. (Doc. No. 647 at 18; Doc. No. 632 at 63.)

failing grade and was dismissed.  Id. at *2-*3.  After reviewing evidence that plaintiff was treated according to defendant's policies, and concluding that plaintiff had provided only unauthenticated rumors that she was treated worse than non-Caucasian students, the court concluded that plaintiff had not presented evidence of a single similarly situated non-Caucasian student who was treated more favorably than plaintiff.  Id. at *9.  The court went on to pointedly note:

> The [court] is mindful of the difficulty of providing discriminatory dismissal in an educational context.  It can be difficult for a plaintiff to unearth evidence that [he] was treated differently from other students who were similarly situated to [him] "in all material respects."  Education is an individualized experience-like snowflakes, no two students are exactly identical.  [Defendants'] own discretionary policies recognize that what works for one student may not work for another one.  But circumstantial evidence of discrimination is not impossible to uncover, and in this case, plaintiff has failed to unearth any evidence supporting her claim that she has been treated differently from similarly situated, [] students.

Id. at *10.  In sum, Plaintiff has failed to present evidence of a student not in his protected class who was referred to the Promotions Committee and had a comparable academic performance record and background to Plaintiff and who was permitted to continue at DUCOM.  Like the plaintiff in Koumantaros, Plaintiff has failed to present evidence that a single similarly situated non-Chinese student was treated more favorably than him.[25]  Accordingly, Plaintiff has failed to raise a genuine issue of material fact that Defendants discriminated against him based on race.

### c. Plaintiff has not shown that Defendants' legitimate non-discriminatory reason for his dismissal was pretextual

Even if Plaintiff could satisfy the prima facie requirement for racial discrimination, Plaintiff's claim would still fail because he has not rebutted Defendants' "legitimate non-

---

[25] In total, Plaintiff has attempted to show that 35 students were similarly situated to him and received more favorable treatment.  To the contrary, Plaintiff has not raised a genuine issue of material fact that these students were treated more favorably by Defendants and that Defendants engaged in unlawful discrimination.

discriminatory reason" for his dismissal.  McDonnell Douglas, 411 U.S. at 802.  Here, Plaintiff

was dismissed twice from DUCOM—once in 2009 and again in 2011.  (Doc. No. 29-4 at 45,

Doc. No. 29, Ex. 19.)  Plaintiff was dismissed in 2009 after failing two courses in his first year,

and four courses in his second year.  The DUCOM's student handbook states that:

> The year-appropriate Student Promotions Committee reviews the entire record of
> a student with one or more grades of Marginal Unsatisfactory or Unsatisfactory in
> order to determine if that student is demonstrating a level of academic
> performance sufficient to remain in medical school . . . .

(Doc. No. 633, Ex. 18.)  Accordingly, after Plaintiff received four grades of Unsatisfactory in his

second year, the Student Promotions Committee reviewed his "entire record" to determine if he

was "demonstrating a level of academic performance sufficient to remain in medical school."  Id.

After determining that Plaintiff was not adequately performing, he was dismissed.  Plaintiff was

readmitted after appealing the dismissal under the following conditions listed by Dean Homan:

> 1.   You will retake all courses in which your grade was Unsatisfactory and
>      Marginal Unsatisfactory.
> 2.   Any grade below Satisfactory will be considered grounds for dismissal
>      from the College of Medicine.
> 3.   You must meet with Dr. Janet Moore prior to the beginning of classes,
>      August 11, 2009.  You will work with Dr. Moore and focus on test taking
>      skills, time management, and study skills.
> 4.   You will meet with a designated faculty advisor at least monthly
>      throughout the remainder of time in medical school.
> 5.   The receipt of any grade lower than Satisfactory during your clinical
>      training will be considered as grounds for dismissal from the College of
>      Medicine.

(Doc. No. 634, Ex. F.)  Plaintiff proceeded to retake second year courses and received a grade

below Satisfactory in Microbiology.  (Doc. No. 634, Ex. B.)  He was not dismissed at that point

but instead was permitted to raise his grade to Satisfactory.  (Id.)  Plaintiff entered the third year

clerkships and received a grade of Unsatisfactory in his clinical training in Family Medicine, and

a failing grade on the NBME Family Medicine shelf exam.  (Id.)  The shelf exam, notably, was

graded by the NBME.  DUCOM had no control over Plaintiff's failing shelf exam grade.  (Doc. No. 653 at 18.)

At this point, even though Plaintiff had twice breached the conditions set forth in Dean Homan's letter, the Promotions Committee did not dismiss him, sympathizing that there had been miscommunication with respect to Plaintiff's mid-clerkship evaluation.[26]  The Committee therefore sent a new conditional letter on February 14, 2011:

> The Committee has made the following decisions:
>
> 1.   You are allowed to remain enrolled in the College of Medicine.
> 2.   You will do the remainder of your Clerkships in the Philadelphia area.
> 3.   You are required to repeat the 6-week Family Medicine Clerkship.
> 4.   The receipt of any additional grade of less than Satisfactory (including Unsatisfactory or Marginal Unsatisfactory) will be considered grounds for dismissal from the College of Medicine.

(Doc. No. 634, Ex. M.)  Plaintiff subsequently failed the NBME shelf exam in OB/GYN resulting in a grade of Marginal Unsatisfactory in the OB/GYN clerkship.  (Doc. No. 634-1 at 5.) Again, this failure was graded by the NBME, not by DUCOM.  In addition to considering Plaintiff's breach of the conditions in the letters of July 2010 and February 2011, the Promotions Committee was required once more to scrutinize Plaintiff's academic record pursuant to DUCOM's handbook which provides:

> Students earning grades of Marginal Unsatisfactory and/or Unsatisfactory in multiple clerkships will have their entire academic record reviewed by the

---

[26]  In an email from Dr. Hamilton to Dr. Fuchs, Dr. Hamilton noted:

> He did get a midblock review all right, from the same preceptor who gave him his final evaluation – but there are huge discrepancies between the two.  Most notably, his professionalism on the midblock was "5" and on the final was "1"; medical knowledge similarly dropped from "4" to "2".  If Lei was getting inconsistent or meaningless feedback, it's a lot harder to take his final grade at full weight.

(Doc. No. 633, Ex. 556.)

> Clinical Promotions Committee.   The Promotions Committee may consider
> repeated failures as grounds for dismissal from the College of Medicine.

(Doc. No. 634, Ex. Q at 5.)  Finally, after working with Plaintiff for several years to help him

salvage a career in medicine, the Committee voted to dismiss him from the medical school.

Defendants have presented a history of academic failures recorded both by neutral third-

party examiners and DUCOM.  Plaintiff breached the terms of his re-enrollment at DUCOM

when he received grades of Marginal Unsatisfactory in Microbiology, and the final grade of

Unsatisfactory in Family Medicine.  He then breached the condition of his continued enrollment

when he received a grade of Marginal Unsatisfactory on his OB/GYN shelf exam.  These are

legitimate non-discriminatory reasons for Defendants' dismissal of Plaintiff from DUCOM.

They are not pretextual.

Recognizing this fact, Plaintiff does not argue that Defendants' legitimate non-

discriminatory reasons are mere pretext for unlawful discrimination.  Instead, Plaintiff contends

that Defendants could not have dismissed him for violating the terms of Dean Homan's letter of

July 2010 and the February 2011 letter of the Promotions Committee because both letters

violated DUCOM's student handbook and therefore are unenforceable.  (Doc. No. 632 at 25.)

The Court first notes that Plaintiff has provided no authority to support this argument.  Other

courts have approved re-enrollment conditions being placed on a student following dismissal.

See Morris v. Yale Univ. School of Medicine, 477 F. Supp. 2d 450, 459 (D. Conn. 2007)

(finding that plaintiff's breach of the condition upon re-enrollment that he pass the Step 1 exam

before beginning a clerkship justified dismissal); Bell v. Ohio State Univ., 351 F.3d 240, 249

(6th Cir. 2003) (explaining that plaintiff's medical school reinstatement was subject to specific

conditions, which, upon her breach, justified dismissal).

Moreover, DUCOM's student handbook—the legality of which Plaintiff does not contest—mandates that the Promotions Committee review the academic record of any student with more than one grade below Satisfactory in a given year to determine whether the student should be dismissed. Accordingly, even without the conditions imposed on Plaintiff for his continued enrollment at DUCOM, his poor academic performance could have been considered grounds for dismissal.

Upon a showing by Defendants that a legitimate non-discriminatory reason motivated the dismissal, Plaintiff is required to show that Defendants' "reason [for dismissal] was false, and that discrimination was the real reason." Jones v. Sch. Dist. of Phila., 198 F.3d 403, 412-13 (3d Cir. 1999). Plaintiff has failed to make such a showing. Accordingly, Plaintiff has not raised a genuine issue of material fact to permit the Court to disbelieve Defendants' reason for dismissing Plaintiff, or to believe that racial discrimination motivated Plaintiff's dismissal. For these reasons, Defendants' Motion for Summary Judgment on Counts I and IV which contain claims that Defendants intentionally discriminated against him in violation of 42 U.S.C. § 1981 and Title VI of the Civil Rights Act, 42 U.S.C. § 2000d, respectively, will be granted.

## B. Plaintiff Has Failed to Establish a Claim for Racially Motivated Breach of Contract Under 42 U.S.C. § 1981

In addition to bringing a claim of intentional discrimination under 42 U.S.C. § 1981 as alleged in Count I, Plaintiff attempts to bring a claim under the same statute that he titles "racially motivated breach of contract" in Count VII against all Defendants. Plaintiff summarizes this claim as follows:

> [s]o [D]efendants violated § 1981(b) when they breached contracts with [P]laintiff because of their discriminatory intent, which was their racial motivation not to let [P]laintiff, a student born in "Communist China," enjoy fully the "benefits, privileges, terms, and conditions" of the student handbook, student manuals, and

> Drexel University's Code of Conduct [] and 'Academic Policies.' [sic] while
> treating white and [African-American] students more favorably.

(Doc. No. 632 at 32.)   The problem with Plaintiff's claim, however, is that this claim is duplicative of his Count I claim and therefore summary judgment will be entered in Defendants favor on this claim.

According to Plaintiff, "racially motivated breach of contract" under Section 1981 requires a showing that Defendants breached their contract with Plaintiff because of his race. This is simply a repackaging of his intentional discrimination claim under Section 1981.  As described above, in order to succeed on a claim of intentional discrimination under 42 U.S.C. § 1981, a plaintiff must show: (1) that he belongs to a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in Section 1981, including the right to make and enforce contracts.  Brown, 250 F.3d at 797.  Plaintiff here has attempted to create a duplicative cause of action under Section 1981 by rebranding it "racially motivated breach of contract."  For the same reasons advanced in the section above, however, Plaintiff has failed to establish that discrimination influenced Defendants' decision to dismiss Plaintiff—a breach of contract according to Plaintiff.  Accordingly, he has not raised a genuine issue of material fact that his Count VII discrimination claim was "racially motivated."

The cases Plaintiff relies on to support this claim all involve breach of contract claims under state law.  See Nathanson v. Medical College of Pa., 925 F.2d 1368, 1387 (3d Cir. 1991) (analyzing disabled student's state law breach of contract claim under Pennsylvania law); DMP v. Fay School ex rel. Bd. of Trustees, 933 F. Supp. 2d 213, 222 (D. Mass. 2013) (analyzing student's state law breach of contract claim under Massachusetts law); Kimberg v. Univ. of Scranton, No. 3:06cv1209, 2007 WL 40971, at *3 (M.D. Pa. Feb. 2, 2007) (analyzing dismissed

student's state law breach of contract claim against university under Pennsylvania law); Morris v. Yale Univ., 63 A.3d 991 (Conn. App. Ct. 2013) (alleging state law cause of action for breach of contract).[27]

None of these cases refer to a cause of action for "racially motivated breach of contract" under 42 U.S.C. § 1981.  Consequently, Plaintiff's claim for "racially motivated breach of contract" under Section 1981 fails and summary judgment will be granted in favor of Defendants on Count VII.

### C.   Plaintiff Has Failed to Raise a Genuine Issue of Material Fact Regarding His Claim of a Hostile Educational Environment

Plaintiff contends in Count III that he was subject to a hostile education environment in violation of 42 U.S.C. § 1981 by Drexel University, Dr. Sahar, and Dr. Parrish.  The elements of this Section 1981 claim are the same as the elements of a hostile work environment under Title VII of the Civil Rights Act.  McKenna v. Pac. Rail Serv., 32 F.3d 820, 826 n.3 (3d Cir. 1994). To succeed on a hostile educational environment claim, a plaintiff must prove: (1) that he is a member of a protected class; (2) that he was harassed because of race; (3) that defendant had actual knowledge of and was deliberately indifferent to the harassment; and (4) that the harassment was so severe and objectively offensive that it deprived plaintiff of access to the educational benefits or opportunities provided by the school.  Daryl Releford v. Pennsylvania State Univ., No. 10-cv-1621, 2011 WL 900946, at *6 (M.D. Pa. March 14, 2011).

In examining whether an educational environment is "hostile," a court must examine the totality of the circumstances, such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it

---

[27] On March 20, 2014, Plaintiff voluntarily dismissed his claim of breach of contract under Pennsylvania law.  (Doc. No. 450.)

unreasonably interferes with [a student's] performance."  Miller v. Thomas Jefferson Univ., 565 F. App'x 88, 93 (3d Cir. 2014) (citing Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998)).   Teasing, isolated incidents, and offhand remarks do not satisfy this test; rather, the conduct must be sufficiently extreme that it amounts to a change in the terms and conditions of enrollment.  Id. (citing Faragher, 524 U.S. at 788).  These standards serve to ensure that Title VII, and by extension Section 1981, "does not become a general civility code."  Id.  In support of this claim, Plaintiff presents several examples of allegedly discriminatory conduct by Dr. Sahar, Dr. Parrish, Dr. Fuchs, and Dr. Hamilton that he contends amounted to a hostile educational environment.  The Court will address the allegations against each Defendant in turn.

### 1.       Comments made by Dr. Sahar

Plaintiff identifies the following conduct of Dr. Sahar as evidence of a hostile educational environment: (1) when Plaintiff first met Dr. Sahar, he asked Plaintiff where he came from and pressed him to identify that he was born in China (Doc. No. 29 ¶ 15); (2) Dr. Sahar stated that he did not like Communist China; (3) during lunch the first week, Dr. Sahar asked Plaintiff if he ate American food or "gook food;" and (4) during the same lunch, Dr. Sahar told Plaintiff "You're very big and tall for a Chinaman" (Doc. No. 632-1 at 135).

These comments do not show that Plaintiff was subject to a hostile educational environment.  First, as discussed previously, Dr. Sahar's question regarding Plaintiff's national origin does not suggest a discriminatory motive.  Moreover, 42 U.S.C. § 1981 does not provide a ground for relief for national origin discrimination—only for race discrimination.  Doe v. Sizewize Rentals, LLC, 530 F. App'x 171, 173 (3d Cir. 2013); see Beaubrun v. Inter Cultural Family, Civ. A. No. 05-6688, 2006 WL 1997371, at *5 (E.D. Pa. July 13, 2006) (dismissing Section 1981 claim based on national origin discrimination where defendants had allegedly made

negative and "belittling reference to [plaintiff's Haitian] nationality"); Karakozova v. Trustees of Univ. of Pa., Civ. A. No. 09-2564, 2001 WL 1754468, at *6 (E.D. Pa. May 9, 2011) (granting summary judgment against plaintiff who brought Section 1981 claim alleging that defendant had discriminated against her because she was a member of "the Russian Federation"). Thus, any comment Dr. Sahar made concerning where Plaintiff was from in an attempt to ascertain his national origin is not discriminatory conduct under 42 U.S.C. § 1981.

In addition, the comments Dr. Sahar made at lunch are unsupported outside of Plaintiff's own deposition testimony. According to the Third Circuit, as a general rule, "self-serving deposition testimony is insufficient to raise a genuine issue of material fact." Irving v. Chester Water Auth., 439 F. App'x 125, 127 (3d Cir. 2011). Here, during four years of litigation, Plaintiff has not alleged in a court filing that Dr. Sahar asked Plaintiff if he ate American food or "gook food," or stated that Plaintiff was "very big and tall for a Chinaman." (Doc. No. 632-1 at 135). Accordingly, Plaintiff's reliance on his own self-serving deposition testimony is insufficient here to raise a genuine issue of material fact that Dr. Sahar made these statements.

However, even if Dr. Sahar did make these comments, along with the question concerning Plaintiff's national origin, Plaintiff still has failed to show that Dr. Sahar created a hostile educational environment. As Plaintiff has pointed out several times, Dr. Sahar was absent from the Family Medicine clerkship for the majority of Plaintiff's clerkship at AM Sahar. (Doc. No. 29 at Ex. 6.) Dr. Sahar was only present during the first and last week of the clerkship for a total of ten days. (Id.; Doc. No. 633, Ex. 698.) The alleged discriminatory comments described above were made on Plaintiff's first day, and during lunch in the first week, of the clerkship. These two instances of alleged discriminatory statements do not satisfy the severity or frequency of discriminatory conduct necessary to "unreasonably interfere with [Plaintiff's]

performance" because for four weeks out of the six week clerkship, Plaintiff was not subject to any discriminatory conduct.  See Ocasio v. Lehigh Valley Family Health Cent., 92 F. App'x 876, 880 (3d Cir. 2004) ("Isolated incidents over a long period of time do not constitute a hostile work environment."); cf Drinkwater v. Union Carbide Corp., 904 F.2d 853, 863 (3d Cir. 1990) (finding that two sexually stereotyped discriminatory comments did not constitute continuous, pervasive discrimination).  Accordingly, Plaintiff has failed to raise a genuine issue of material fact that Dr. Sahar's comments created a hostile educational environment.

## 2.    Comments made by Dr. Parrish

Plaintiff also alleges that Dr. Parrish made comments that created a hostile educational environment.  When analyzing whether a comment is motivated by racial animus in a hostile educational environment claim, "there are no talismanic expressions which must be invoked as a condition-precedent . . . so long as the words could be seen as conveying the message that members of a particular race are disfavored and . . . are, therefore, not full and equal members of the [school]."  Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1083 (3d Cir. 1996).  Absent evidence that raises an inference of illegal racial animus, disrespectful comments with no overt discriminatory aspect do not amount to harassment because of race.  See Kovoor v. Sch. Dist. of Phila., 211 F. Supp. 2d 614, 627 (E.D. Pa. 2002) (granting defendant's motion to dismiss on plaintiff's hostile work environment claim where plaintiff had failed to demonstrate any connection between the rude and abrupt comments made by his boss and plaintiff's race).

Even if a plaintiff can show that an otherwise benign comment is motivated by race, the comments must still be severe or pervasive enough to alter the conditions of the educational environment.  By analogy, the Third Circuit in Sherrod v. Philadelphia examined whether

plaintiff was subject to a hostile work environment under Title VII.[28]  57 F. App'x 68 (3d Cir.

2003).  In Sherrod, plaintiff, an African-American, was told by her supervisor that "he didn't like

the way [two African-American employees plaintiff supervised] were eating at their desks, it

must be their culture."  Id. at 71.  The supervisor then told Plaintiff that if the two employees

"don't do their work, I'm going to sit at their desks with a whip."  Id.  Plaintiff's supervisor also

told a clerk in the department "don't do nothing [plaintiff] tells you to do."  Id.  Plaintiff was also

told not to attend a meeting even though her presentation was on the agenda and later, another

manager "snub[bed] her."  Id. at 76.  Generally, plaintiff averred that other members of the

management team "would scream at her and treat her badly."  Id.

The court in Sherrod determined that for purposes of raising an issue of material fact, the

comments concerning the African-American employees' "culture" and the threat to "sit at their

desks with a whip" coupled with the facially neutral mistreatment of plaintiff by management

could raise an inference of racial discrimination.  Id. at 76.  The court determined, however, that

plaintiff had failed to establish that the above behavior was severe or pervasive enough to satisfy

the hostile work environment test.  In analyzing whether these statements amounted to severe or

pervasive conduct, the court recognized that "there is no evidence that anyone ever referred to

[plaintiff] using racial slurs.  The statements which [plaintiff] considered offensive were subject

to non-racial interpretation and were not physically threatening or humiliating."  Id. at 77.  The

court therefore affirmed the dismissal of plaintiff's hostile work environment claim.

Here, Plaintiff is unable to show that Dr. Parrish made any harassing comments based on

Plaintiff's race or that the comments were severe or pervasive enough to alter the conditions of

---

[28]  Although Sherrod discusses a hostile work environment under Title VII, the analysis is the
same under Section 1981.  See McKenna, 32 F.3d at 826 n.3.

his educational environment.   Again, viewing the evidence in the light most favorable to Plaintiff, which the Court is required to do at the summary judgment stage, Plaintiff first describes an incident in the fall of 2007 when Plaintiff asked Dr. Parrish about the size of DUCOM's endowment.  (Doc. No. 632 at 112.)  Dr. Parrish allegedly responded to Plaintiff that "knowing the size of endowment [sic] for possible comparison purposes was 'shower room penis measuring.'"   (Id.)   While this comment may have been inappropriate, it does not relate to Plaintiff's race, nor does Plaintiff argue as much.

Next, Plaintiff describes four meetings with Dr. Parrish on April 26, 2011,[29] May 12, 2011, May 16, 2011[30], and May 26, 2011, where alleged discriminatory comments were made. (Doc. No. 632 at 113.)  On May 12, 2011, Dr. Parrish told Plaintiff, "go[ing] back to your first year of medical school . . . you were the weirdest guy I've ever met.  You were weird, strange, truly odd, you scared people."  (Doc. No. 633, Ex. 279.)  Dr. Parrish also asked if he was working with someone, or seeing a counselor.  (Id.)  Plaintiff also notes that Parrish would criticize Plaintiff for being "awkward and immature."  (Doc. No. 632 at 114.)[31]

---

[29] Plaintiff contends that during the meeting on April 26, 2011, Parrish suggested that Plaintiff had a problem which warranted him being brought back to Philadelphia to complete his third-year clerkships.  (Id.)  Plaintiff cites to an email from Dana Farabaugh to Sandra Saldan on February 11, 2011, which states that "[W]e just inherited another problem student so maybe 7 total Lei Ke will be coming from Monmouth."  (Doc. No. 633 at 31.)  The Court will not attempt to ascertain what relevance this email between two non-parties has to Plaintiff's allegation that Dr. Parrish told him he had a problem.  Thus, Plaintiff has not raised a genuine issue of material fact that a racially harassing comment was made on that date.

[30] Despite listing this date as one on which harassing comments were made, Plaintiff does not describe what comments were made on May 6, 2011.  Plaintiff has submitted more than seven hundred pages of exhibits with the Motion for Summary Judgment and has not directed the Court to any comments made by Parrish on May 6, 2011.

[31] Plaintiff also describes an incident in the fall of 2008 when Plaintiff asked Parrish for additional time to take tests due to a problem with his vision.  Apparently, Parrish responded

On May 26, 2011, Dr. Parrish stated that Plaintiff had a "persistent pattern of academic failure." (Doc. No. 633, Ex. 286-87.) Dr. Parrish also advised Plaintiff that in his final appeal, he should not place blame on others. (Id. at Ex. 287.) Specifically, Plaintiff had drafted a letter in which he stated that he had been "put in this situation," and that he "wish[ed] that the committee ordered [him] to have two clerkships off [to] spend more time studying for the second attempt at step 1." (Id.) Dr. Parrish told Plaintiff that if Dean Homan saw the letter, he would be so shocked that he would call Dr. Fuchs, or Dr. Parrish, and they would report that Plaintiff was delusional. Dr. Parrish stated that as the letter was currently drafted, Dean Homan would "throw you out immediately." (Id.)

In examining these comments, Plaintiff has failed to raise a genuine issue of material fact that the comments were racially motivated. While there is no "talismanic expression[]" that need be invoked to qualify as a racially harassing comment, the words must "convey[] the message that members of a particular race are disfavored." Aman, 85 F.3d at 1083. Here, no reading of these comments would suggest that they were motivated by race. Tellingly, Plaintiff does not argue that the comments were motivated by race. Rather, he argues that Dr. Parrish's comment that Plaintiff had a pattern of academic failure was unfair considering Caucasian and African-American students also failed tests. (Doc. No. 632 at 113-14.) A comment made by a school official involved in a student's performance about a student's own poor academic record, however, does not become discriminatory because other students with poor academic records were not mentioned in the conversation. Accordingly, the comments described above are not discriminatory and Plaintiff has failed to adduce any evidence to infer that these comments were racially motivated. Moreover, Plaintiff's subjective belief that race played a role in these

---

that "anybody who asked for accommodation would be punished." (Doc. No. 632.) This comment is unrelated to Plaintiff's claim that Parrish discriminated against him based on race.

comments is not sufficient to establish an inference of discrimination.  Groeber v. Friedman and Schuman, P.C., 555 F. App'x 133, 135 (3d Cir. 2014).

Additionally, Plaintiff has failed to establish that Dr. Parrish's comments were severe or pervasive enough to alter the conditions of his enrollment at DUCOM.  As explained by the court in Sherrod in its analysis of whether the comments were severe or pervasive, "there is no evidence that anyone ever referred to [plaintiff] using racial slurs.  The statements which [plaintiff] considered offensive were subject to non-racial interpretation and were not physically threatening."  Sherrod, 57 F. App'x at 77.  The same is true of the comments Plaintiff has identified here.  Dr. Parrish's comments concerning Plaintiff's academic performance and professionalism are not severe or pervasive enough to affect the terms of his enrollment at DUCOM.

Finally, the Court notes that almost every comment of Dr. Parrish relied on by Plaintiff occurred during Plaintiff's appeal process after Plaintiff had been dismissed from DUCOM on April 11, 2011.  Therefore, many comments by Dr. Parrish could not have affected the terms of Plaintiff's enrollment at DUCOM.  For all these reasons, Plaintiff has failed to establish through the comments of Dr. Parrish that a genuine issue of material fact of a hostile educational environment existed.

### 3.    Other comments

In support of his hostile educational environment claim, Plaintiff also relies on other comments and information in student records as evidence of harassing behavior, including: (1) alleged "hidden files" on Plaintiff; (2) comments made before the Promotions Committee; (3) comments Dr. Sahar made in the course of the litigation; and (4) Dr. Fuchs' summary of Plaintiff's academic record in 2009 and 2011.

First, Plaintiff argues that DUCOM had created "hidden files" on Plaintiff.  The Court has already addressed the notes contained in Plaintiff's student file in the section concerning Plaintiff's "direct evidence" of intentional discrimination.  They will be repeated here because Plaintiff's argument relies upon their content.  These notes include:

> . . . Received Unprofessional Citation on Peer Evaluations for Gross [sic]. . . . Odd Interactions, word choices. . . .  Lack of social skills noted by Dr. Parrish (personal space issues, walking around with breast in pocket.)  Seems more comfortable with research. . . .  Will be required to have counseling. . . .  Family Medicine site wants to give him an [Unsatisfactory] in [Family Medicine] at Monmouth.  Unable to apply clinical knowledge to patients.  Awkward, unprofessional, Immature [sic], lacking in knowledge.  Got into altercation with attending in front of patient about not being taught something.  Had difficulty interacting with office staff. . . .  Dr. Fitzpatrick described his knowledge basis as 'atrocious' in ICM group for Physical Diagnosis.  Biggest problem was inappropriate communication (medical jargon), would use nonmedical terms in medical communication.  [Following Plaintiff's dismissal from DUCOM]  Dr. Fitzpatrick cited 'horrible communication skills.'  Per Dr. Fuchs, "can't see forest for [sic] trees."  He often goes off on tangents in conversations.

(Doc. No. 634-16 at 33-34.)  Plaintiff also quotes from the notes recorded following his first dismissal in 2009:

> overwhelmed by amount of material in ICM [Intro Clinical Medicine] and not knowing what was important; isolation from peers; depression.  Dr. Parrish commented on his anxiety.  Very introverted, socially awkward.  Insists he wants to be in med school. . . .  Dr. Ramchandani cites his high intelligence in his working with him on remediation exam, concerned about psychological issues.  Lacks self-awareness about anxiety, perfectionism, depression.

(Doc. No. 633-16 at 36.)

Next, Plaintiff includes the minutes from the Clinical Promotions Committee held on December 10, 2010 discussing his failing the clinical portion of the Family Medicine clerkship:

> Family Medicine attendings were shocked by his knowledge base; felt he lacked knowledge; couldn't apply knowledge to patient care.  Also felt that he was awkward and immature.  In front of a patient, Kei questioned attending.  Kei did not interact well with staff.  Attendings felt that he had strange interactions; possibly depressed.  Attendings felt that he should repeat Family Med.  Possible reason for behavior=Kei failed Step 1 and found out halfway through rotation.  He

68

is scheduled to take Step 1 again on 12/22/10; and is taking Family Med Shelf
Exam on 12/29/10.  Regardless of how he does on the Fam Med Shelf, attendings
want to give him a grade of Unsatisfactory.   Giving him a [grade of
Unsatisfactory] may be grounds for dismissal for student.  When Dean Homan
readmitted him, letter stated that if he ever got a grade lower than Satisfactory,
that may be grounds for dismissal.  Motion: If Family Med gives him less than
Satisfactory, then he will be dismissed from [DUCOM].

(Doc. No. 633-15 at 3.)

Plaintiff also selects quotes from the discussion of his dismissal by the Promotions

Committee in April 2011:

[Plaintiff] discussed loss of confidence about having to repeat Year 2, series of
errors in 'trying to do too many things at same time.'  Says he will see Dr. Moore
and faculty to be sure he can handle stress, make sure everything is going okay.
Says he needs to work on interpersonal skills and says part of the problem is that
he lives at home and doesn't have the opportunity to interact as much with others.

(Doc. No. 633-16 at 35-36.)

Plaintiff also refers to the following comments from the May 13, 2011 Clinical

Promotions Committee's meeting:

Here to appeal dismissal . . . dismissed again on academic grounds.  Also has
communication issues; cannot multi-task.  Lei feels that he needs to be able to
multi-task and be able to balance different things, especially as a physician . . .
needs to gain his confidence back by being successful with just one thing . . . was
advised not to take a shelf exam, but took it anyway because he wanted to be
successful with something – he needed confidence . . . Lei feels as though his
interpersonal skills need work and improvement – he will meet with faculty and
advisors . . . [and] read articles on interpersonal skills.

(Doc. No. 633-17 at 15.)  As noted previously, none of the comments are racially motivated.

The fact these files were allegedly "hidden" means that Plaintiff was not aware of their

existence.   In the employment context, an "employee who is totally unaware of harassing

behavior cannot subjectively perceive such conduct to be hostile or abusive."  Howard v. Blalock

Elec. Service, Inc., 742 F. Supp. 2d 681, 694 (W.D. Pa. 2010).  "An employee must have some

awareness of harassing behavior in order to perceive it as hostile or abusive."  McGinness v.

69

Nazareth Borough, Civ. A. No. 13-7087, 2015 WL 1511051, at *5 (E.D. Pa. Apr. 2, 2015).  It follows then that because Plaintiff was "totally unaware" of the allegedly harassing comments contained in these files, Plaintiff could not have perceived the comments to be hostile or abusive so as to alter the conditions of his enrollment at DUCOM.

The same is true for the remaining allegations with respect to the comments made during the meetings of the Promotions Committee, Dr. Sahar's comments, and Dr. Fuchs' summary of Plaintiff's academic record.  Plaintiff points to the Promotions Committee's meeting minutes from December 10, 2010 where the following was recorded, "Family Medicine attendings . . . felt that he was awkward and immature . . . felt that he had strange interactions; possibly depressed."  (Doc. No. 632 at 119.)  Plaintiff alleges that this comment represents "racial profiling."  (Id.)  Plaintiff was "totally unaware" that these comments were made at the time he was a student at DUCOM.  Thus, the comments could not have been part of any perception by Plaintiff that he was in a hostile educational environment.

Plaintiff also alleges that a conversation between Dr. Sahar and Dr. Hamilton shows evidence of a hostile educational environment.  (Doc. No. 632 at 120.)  In the conversation, Dr. Sahar stated that he wondered whether Plaintiff "suffer[ed] from Asparagus' [sic] Syndrome." (Id.)  Again, Plaintiff was not made aware until this litigation that Dr. Sahar thought that Plaintiff may be on the autism spectrum.

Finally, Plaintiff argues that the summaries drafted by Dr. Fuchs for Dean Homan contained "malicious misrepresentations."  Plaintiff, however, was unaware of the content of these summaries until this litigation.  Consequently, for all these reasons, Plaintiff has failed to raise a genuine issue of material fact that the conduct he relies on created a hostile educational environment.

70

**D.      Plaintiff Has Failed to Raise a Genuine Issue of Material Fact that He Engaged in Protected Activity in Order to Sustain a Claim of Retaliation Under  42 U.S.C. § 1981 and Title VI, 42 U.S.C. § 2000d**

In Count II and V respectively, Plaintiff alleges a claim of retaliation in violation of 42 U.S.C. § 1981 and Title VI of the Civil Rights Act, 42 U.S.C. § 2000d, against Drs. Sahar, Hamilton, Fuchs, Parrish, Dean Homan, and Drexel University.  To establish retaliation under Title VI, a plaintiff must show: (1) he was engaged in protected activity; (2) the funded entity subjected him to an adverse action after or contemporaneously with the protected activity; and (3) there is a causal link between the adverse action and the protected activity.  Whitfield v. Notre Dame Middle Sch., 412 F. App'x 517, 522 (3d Cir. 2011) (citing Peters v. Jenney, 327 F.3d 307, 320 (4th Cir. 2003)).  The retaliation claim under 42 U.S.C. § 1981 is the same as the Title VI claim except that Title VI applies only to "funded entit[ies]."  Miller, 908 F. Supp. at 648.  Because Title VI applies only to entities, Plaintiff brings his Section 1981 retaliation claim against all Defendants and his Title VI retaliation claim against Drexel University only.  See Whitfield, 412 F. App'x at 521 (noting that individual liability cannot be asserted under Title VI).

To satisfy the first element of a retaliation claim, Plaintiff must establish that he engaged in "protected activity" that relates to discrimination.  See Jimmy v. Elwyn, Inc., Civ. A. No. 11-7858, 2014 WL 630605, at *10 (E.D. Pa. Feb. 18, 2014).  Protected activity includes "formal charges of discrimination as well as informal protests of discriminatory [educational] practices, including making complaints to management."  Barber v. CSX Distrib. Servs., 68 F.3d 694, 701-02 (3d Cir. 1995).  But "if no reasonable person could have believed that the underlying incident complained about constituted unlawful discrimination, then the complaint is not protected."  Wilkerson v. New Media Tech. Charter Sch. Inc., 522 F.3d 315, 322 (3d Cir. 2008).  For

71

example, the filing of a facially invalid or frivolous EEOC complaint does not constitute protected activity for purposes of making out a retaliation claim.  McGhee v. Thomas Jefferson Univ. Hosp., Civ. A. No. 12-2919, 2013 WL 4663541, at *4 (E.D. Pa. Aug. 29, 2013).

Here, Plaintiff alleges that he engaged in protected activity in three ways: (1) with respect to Dr. Sahar, by asking him a question in front a patient; (2) with respect to Drexel University, by requesting a hearing following his dismissal from DUCOM; and (3) with respect to Drs. Fuchs, Parrish, and Homan, by telling them about the Sahar question incident, and about Sahar's retaliation and "racial animus" toward Plaintiff.  (Doc. No. 632 at 159.)

Regarding Plaintiff's retaliation claim against Drexel under Title VI, Plaintiff did not engage in "protected activity" under the statute, and accordingly summary judgment in favor of Defendants will be granted on this claim.  Under Title VI, to satisfy the first element, a plaintiff must show that he had a reasonable good faith belief that the practice he opposed was unlawful under Title VI.  Chandamuri v. Georgetown Univ., 274 F. Supp. 2d 71, 84 (D.D.C. 2003). Plaintiff does not contend here that he engaged in protected activity by voicing concerns over discriminatory policies or discriminatory treatment based on race.  Rather, Plaintiff claims that he engaged in protected activity when he "petitioned [] John Fry, president of Drexel University, on July 4, 2011, for a formal hearing" and when his parents sent a letter to President Fry about his dismissal.[32]  (Doc. No. 632.)  According to Plaintiff, a formal hearing was available under

---

[32] Plaintiff argues that a letter his parents sent to President Fry on June 30, 2011 was also protected activity.  The letter in relevant part reads:

> Lei had earlier appealed his [F]amily [M]edicine "U" grade because the failure of the clinical part of the grade was manifestly unfair, given the fact that the private doctor the college placed Lei under retaliated against him after he inadvertently exercised his First Amendment rights by asking the doctor a question in front of a patient.  The doctor thought Lei had challenged his

DUCOM's "Academic Policies."[33]   Whether or not Plaintiff was entitled to a formal hearing,

Plaintiff's request for a hearing is not a "protected activity" for purposes of a retaliation claim

---

> authority [] and, despite Lei's profound apology, retaliated by failing him
> without warning.

(Doc. No. 633, Ex. 701.)  Nothing in this letter suggests that Plaintiff was retaliated against based on his participation in "protected activity" under Title VI.  Rather, Plaintiff's parents contend that he was retaliated against for asking a question in front of a patient.  As described above, this is not "protected activity" as the term is used in Section 1981 or Title VI.

Plaintiff also contends that his father's letter to the school amounts to participation by Plaintiff in protected activity because "Plaintiff authorized his parent (father) to represent him regarding his student affairs at [DUCOM], and so his father has legal standing in [P]laintiff's matter." (Doc. No. 632 at 102 n.37.)  Plaintiff cites to a FERPA authorization form provided by DUCOM that authorizes DUCOM to discuss a student's academic record with someone other than the student.  Nowhere on the FERPA authorization form does it purport to allow the named individual to act on behalf of the student.  (Doc. No. 633, Ex. 706.)  In addition, Plaintiff does not provide legal support for this argument.  For all these reasons, the letter to President Fry from Plaintiff's father did not amount to protected activity under Section 1981 or Title VI.

[33]  In support of this statement, Plaintiff cites to a series of emails between himself, Dean Homan, and President Fry in July 2011.  In these emails, Plaintiff requests a hearing in order to have his Family Medicine grade amended pursuant to the University's Family Educational Rights and Privacy ("FERPA") Policy.  The Policy states:

> The University provides a student with an opportunity to request amendment to
> the contents of an Education Record which he/she considers to be inaccurate,
> misleading, or otherwise in violation of his/her privacy or other rights.  A
> School Official who receives such a request will coordinate with the University
> Registrar and they will decide within a reasonable period of time whether
> corrective action consistent with the student's request will be taken.  The
> student must be notified of the decision.  If the decision is in agreement with the
> student's request, the appropriate record(s) must be amended.  A student who is
> not provided full relief sought by his/her challenge must be informed by the
> appropriate School Official, in writing, of the decision and his/her right to a
> formal hearing on the matter.

(Doc. No. 633, Ex. 46.)  After Plaintiff's request to amend his Family Medicine grade was denied, a hearing was scheduled.  As noted above, the Office of the Registrar, however, cancelled the meeting after determining that Plaintiff was "attempting to use the FERPA amendment process to challenge a grade and a clinical evaluation," rather than to contend that it was inaccurately recorded.  (Doc. No. 29-5 at 31.)  Thus, Plaintiff was not denied a FERPA

73

under Title VI because it does not relate to discrimination or any activity protected by Title VI. Compare Rubio v. Turner Unified School Dist. No. 202, 523 F. Supp. 2d 1242, 1252-56 (D. Kan. 2007) (denying school's motion for summary judgment on student's Title VI retaliation claim where student alleged that after he filed present lawsuit claiming national origin and race discrimination he subsequently received an increase in discipline referrals).

The balance of Plaintiff's claims against Drs. Sahar, Parrish, Hamilton, and Dean Homan all fall under Section 1981. The Third Circuit has held that in "a retaliation case a plaintiff must demonstrate that there had been an underlying § 1981 violation." Est. of Oliva ex rel. McHugh v. N.J., 604 F.3d 788, 798 (3d Cir. 2010). Previously, the Court found that Plaintiff failed to raise a genuine issue of material fact that Defendants violated Section 1981 when it dismissed Plaintiff. Thus, pursuant to Oliva, because Plaintiff has not demonstrated an underlying § 1981 violation, his retaliation claim fails.

Plaintiff's Section 1981 claim against the individual Defendants also fails because he has not demonstrated that he engaged in protected activity. As explained above in the Title VI context, "protected activity" under Section 1981 must relate to discrimination prohibited by Section 1981. See Jimmy, 2014 WL 630605, at *10. Plaintiff contends that when he asked Dr. Sahar a question in front a patient, it was "protected" by Drexel University's Code of Conduct and DUCOM's student manual. (Doc. No. 632 at 73-74.) While asking this question may have conformed to the policies set forth in the Code of Conduct and DUCOM's student manual, this activity does not amount to "formal charges of discrimination [or] informal protests of

---

hearing as a retaliatory action by Drexel, but rather because he was not entitled to a FERPA hearing in the first place.

discriminatory [] practices."  <u>Barber</u>, 68 F.3d 695 at 701-702.  Thus, Plaintiff did not engage in "protected" activity under Section 1981 when he asked Dr. Sahar a question during his clinical.

Plaintiff also contends that he engaged in protected activity by "protesting" to Jennifer Hamilton, Amy Fuchs, Samuel Parrish, and Dean Homan of "Dr. Sahar's retaliation and racial animus."  (Doc. No. 632 at 79-80, 82-83, 91-92.)  This allegation is only contained in his Memorandum of Law in Support of his Motion for Summary Judgment with only one reference to the record.  In his Motion for Summary Judgment, the following statements are made:

> On January 3, 2011, Hamilton called Ke to tell him that Sahar had failed his rotation . . . .  Plaintiff immediately protested and complained about Sahar's retaliation and racial animus.
>
> ***
>
> In January 2011, after Hamilton failed his [F]amily [M]edicine clerkship, Ke complained to Parrish about Sahar's retaliation and racial animus against him.
>
> ***
>
> On June 21, 2011, plaintiff met with Homan in his office and complained about Sahar's retaliation and racial animus against plaintiff.  (Plaintiff's Exhibits 455, 477.)

(Doc. No. 632 at 79-80, 92, 97.)

The only citation to the record is in support of the third statement.  Reference is made to Plaintiff's Exhibits 455 and 477.  Plaintiff's Exhibit 455 is a copy of Dean Homan's daily calendar which shows that on June 21, 2011 at 11:00 a.m. he had an appointment with Lei Ke.  (Doc. No. 633, Ex. 455.)  Plaintiff's Exhibit 477 appears to be a document Plaintiff created in advance of his meeting with Dean Homan.  The document contains points that Plaintiff wished to raise with Dean Homan.  With respect to Dr. Sahar's alleged retaliation, Plaintiff wrote the following:

> Dr. Sarhar's [sic] retaliation (I was very professional) and my appeal negatively impacted my second try at Step-1.
>
> His retaliation caused the promotions committee to sanction me, although I was repeatedly told that the [F]amily [M]edicine was not held against me.

(Doc. No. 633, Ex. 477.)  Tellingly, in the notes Plaintiff drafted in preparation for his meeting with Dean Homan containing all the reasons he should be readmitted to DUCOM, he never mentions that Dr. Sahar acted out of racial animus.

Plaintiff has produced no evidence that he told any of the above Defendants about "racial animus" in any of the multiple emails and letters exchanged between Plaintiff and Defendants, or in any minutes of meeting.  Plaintiff, who otherwise consistently cites to over seven hundred pages of exhibits to support factual statements alleged in his Motion for Summary Judgment, does not provide a reference to documentary evidence or deposition testimony to support the claim about "racial animus."

"At summary judgment, a plaintiff cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." Jones v. United Parcel Service, 214 F.3d 402, 407 (3d Cir. 2000); see also Jersey Cent. Power & Light Co. v. Twp. of Lacey, 772 F.2d 1103, 1109-10 (3d Cir. 1985) ("Legal memoranda and oral argument are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion.").  Because Plaintiff's allegation that he complained of Dr. Sahar's "racial animus" is unsupported by evidence, Plaintiff has failed to raise a genuine issue of material fact that he engaged in protected activity, and his retaliation claim fails.  See Street v. Steel Valley OIC, Civ. Action No. 06-1705, 2008 WL 682496, at *4 (W.D. Pa. March 7, 2008) (granting summary judgment on retaliation claim where plaintiff had not "provid[ed] any document evidence in support of any suggestion that he actually complained of unequal pay or opportunities [based on race]").

### E.   Plaintiff Has Failed to Raise a Genuine Issue of Material Fact that Defendants Conspired Against Him in Violation of 42 U.S.C. § 1985(3)

Finally, in Count VI, Plaintiff brings a claim against all Defendants for conspiring to interfere with his civil rights in violation of 42 U.S.C. § 1985.  Section 1985(3) imposes civil liability "[i]f two or more persons . . . conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws[.]"  42 U.S.C. § 1985(3).  The Supreme Court in Brown v. Philip Morris Inc. noted the remedies available to a plaintiff under Section 1985(3) in relevant part as follows:

> In general, the conspiracy provision of [S]ection 1985(3) provides a cause of action under rather limited circumstances against both private and state actors.  In order successfully to bring an action under § 1985(3) for private conspiracy, a plaintiff must show, inter alia, '(a) that a racial or other class-based invidious discriminatory animus lay behind the coconspirators' actions, (b) that the coconspirators intended to deprive the victim of a right guaranteed by the Constitution against private impairment, and (c) that the right was consciously targeted and not just incidentally affected.'  Spencer v. Casavilla, 44 F.3d 74, 77 (2d Cir. 1994) (citation omitted). . . .  In order to prevent the use of § 1985(3) as a general federal tort law, courts have been careful to limit causes of action thereunder to conspiracies that deprive persons of constitutionally protected rights, privileges and immunities 'that are protected against private as well as official encroachment.'  Libertad v. Welch, 53 F.3d 428, 446-50 (1st Cir. 1995).

> It is well established that § 1985(3) does not itself create any substantive rights; rather, it serves only as a vehicle for vindicating federal rights and privileges which have been defined elsewhere.  See Great Am. Fed. Sav. & Loan Ass'n v. Novotny, 442 U.S. 366, 376 (1979).  Moreover, in the context of actions brought against private conspirators, the Supreme Court has thus far recognized only two rights protected under § 1985(3): the right to be free from involuntary servitude and the right to interstate travel.  See Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 278 (1993); Caswell v. The Morning Call, Inc., No. Civ. A. 95-7081, 1996 WL 560355, at *6 (E.D. Pa. Sept. 30, 1996); Welch v. Board of Dirs. of Wildwood Golf Club, 877 F. Supp. 955, 959 (W.D. Pa. 1995).

Brown, 250 F.3d at 805.

In <u>McArdle v. Hunagel</u>, the Third Circuit affirmed the dismissal of a plaintiff's § 1985(3) claim where the plaintiff had alleged that private conspirators had "conspired to injure his ability to earn a living practicing law, to prevent him from having a normal life, and to cause him other damages." 588 F. App'x 118, 120 (3d Cir. 2014). In dismissing plaintiff's claim, the court cited the Supreme Court's decision in <u>Brown</u> and concluded that "[w]e know of no authority to extend § 1985(3) to protect earning a living through the practice of law or to having a 'normal life.' Thus, the District Court correctly dismissed [plaintiff's] § 1985 claim." <u>Id.</u>

Here, Plaintiff alleges that private Defendants conspired to deprive him of his civil rights. Specifically, Plaintiff states the following with respect to the object of the alleged conspiracy:

> Because of [D]efendants' retaliatory conspiracy against Ke for carrying out a statutory protected activity allowed by Drexel University's Code of Conduct and the student manuals under § 1981(b) and because of their further conspiracy to harm his civil rights, Ke was finally expelled from [DUCOM] on June 27, 2011 when Homan issued his official dismissal letter [], with his career that he had started building since high school in Toronto's Mount Sinai Hospital torpedoed abruptly. The reality in America is that if one is dismissed from a medical school, one can never transfer to another to continue one's studies. So Ke's career was destroyed, and that was an irreparable injury. A dismissed medical student cannot even apply for medical school again. Additionally, he has suffered a huge financial loss in the proximity of $200,000 [D]efendants took in tuition and fees to unjustly enrich themselves.

Doc. No. 632-1 at 221. Although it is not entirely clear which "civil rights" Plaintiff alleges Defendants conspired to deprive him of, the above statement suggests that Defendants conspired to deprive him of his right to attend medical school at DUCOM, his tuition money, and his ability to attend a different medical school. Similar to the plaintiff in <u>McArdle</u>, Plaintiff here has not alleged that Defendants conspired to deprive him of his right to be free from involuntary servitude or his right to interstate travel. Rather, Plaintiff alleges that Defendants conspired to deprive him of a medical school education, and also caused him financial harm. Like the plaintiff in <u>McArdle</u>, Plaintiff has failed to cite to any authority that would expand Section

78

1985(3) to cover these alleged deprivations.   Moreover, Plaintiff has not established any violation of his civil rights by one or more of these Defendants, and therefore no violation has been shown about which Defendants conspired against Plaintiff.   Accordingly, Plaintiff's conspiracy claim is also without merit because no genuine issue of material fact has been raised by Plaintiff.[34]

## VI.    CONCLUSION

For all the foregoing reasons, the Cross-Motions for Summary Judgment reveal no genuine issue of material fact regarding the sustainability of Plaintiff's claims against Defendants.   Accordingly, Defendant's Motion for Summary Judgment will be granted and Plaintiff's Motion will be denied.   An appropriate Order follows.

---

[34] Plaintiff's claim also fails to the extent that it alleges that members of DUCOM's staff conspired with one another to deprive Plaintiff of his civil rights.  As discussed by the Third Circuit in Carter v. Delaware State University, 65 F. App'x 397, 400 (3d Cir. 2003), where each defendant co-conspirator is a member of the same institution a conspiracy claim fails. "This is in accord with the familiar rule that a person cannot conspire with himself and therefore for the agents of a single corporation to conspire among themselves and not with outsiders does not state a cause of action under 1985(3)."  Johnson v. Univ. of Pittsburgh, 435 F. Supp. 1328, 1370 (W.D. Pa. 1977).